Quarles & Brady Streich Lang LLP
Firm State Bar No. 00443101
One South Church Avenue
Suite 1700
Tucson, AZ 85701-1621
TELEPHONE 520.770.8700

Attorneys for Debtor, The Roman Catholic Church of the Diocese of Tucson

Susan G. Boswell (#004791)
Kasey C. Nye (#020610)

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>THE ROMAN CATHOLIC CHURCH OF THE DIOCESE OF TUCSON *aka* THE DIOCESE OF TUCSON, an Arizona corporation sole,<br><br>Debtor. | In Proceedings Under Chapter 11<br><br>Case No. 4-04-bk-04721-JMM<br><br>Hearing Date: October 25, 2004<br>Hearing Time: 10:00 a.m.<br>Location: 110 S. Church Ave., Courtroom 3150, First Floor, Tuluca Building, Tucson, Arizona |

### MOTION FOR ORDER APPOINTING A LEGAL REPRESENTATIVE FOR FUTURE TORT CLAIMANTS

The Roman Catholic Church of the Diocese of Tucson *aka* the Diocese of Tucson, an Arizona corporation sole and the debtor and debtor in possession (the "Diocese" or the "Debtor") in the above captioned Chapter 11 reorganization case (the "Reorganization Case"), by and through its attorneys undersigned, respectfully requests that the Court enter an Order appointing a legal representative (the "Future Claims Representative") for Future Tort Claimants (defined below).

This Motion presents a "core proceeding" over which the Court has jurisdiction to enter a final order under 28 U.S.C. §§ 157 (A) & (O) and 1334. This Motion is based upon 11 U.S.C. §§ 1109, 105 and 524 and applicable case law as discussed more fully below.

This Motion is supported by the attached Memorandum of Points and Authorities, and the entire record before the Court in the Reorganization Case.

RESPECTFULLY SUBMITTED this 11th day of October, 2004.

QUARLES & BRADY STREICH LANG LLP
One South Church Avenue
Suite 1700
Tucson, AZ 85701-1621

By /s/ Susan G. Boswell
Susan G. Boswell
Kasey C. Nye

Attorneys for Debtor
The Roman Catholic Church of the Diocese of Tucson

# MEMORANDUM OF POINTS AND AUTHORITIES

On September 20, 2004 (the "Petition Date"), the Diocese commenced the Reorganization Case by filing a voluntary Chapter 11 petition. The Diocese has remained a debtor-in-possession under to 11 U.S.C. §§1107 and 1108 since the Petition Date. The Diocese filed the Reorganization Case in order to reorganize its financial affairs pursuant to a plan of reorganization that will, among other things, fairly, justly and equitably compensate the victims of sexual abuse by clergy or others associated with the Diocese while allowing the Diocese to continue its ministry and mission and attempt to finally bring healing to victims, parishioners and others affected by the past acts of sexual abuse committed by clergy and others.

## I. BACKGROUND

### A. The Diocese of Tucson

The Diocese traces itself to the activities of Padre Eusebio Francisco Kino, the Jesuit missionary who, in 1692, founded the Mission San Xavier del Bac, which today is a functioning parish in the Diocese. Over the generations since Father Kino, the Diocese has grown to serve 300,000 plus Roman Catholics located within nine southern Arizona Counties (La Paz, Yuma, Pima, Santa Cruz, Pinal, Graham, Gila, Greenlee and Cochise) encompassing a territory of more than 40,000 square miles.

Within the structure of the Roman Catholic Church in the United States, the Diocese of Tucson meets the requirements for designation as a "mission" diocese. The "mission" designation of the Diocese is based upon, among other things:

- the predominantly rural nature of the communities within the Diocese;
- the isolation of the parishes that serve the communities (62% of the parishes are located in rural areas or border towns);
- economies that are agriculture and service based;
- economic devastation of communities that were dependent on copper mining;
- Arizona's low ranking as a state in several leading social and economic indices.

The designation as a "mission" diocese means that the Diocese is eligible for financial assistance from the annual Catholic Home Missions Appeal national collection taken up in Catholic parishes across the United States. This financial assistance is restricted for use in certain supported programs.

The Diocese provides ecclesiastical services and pastoral care to the seventy-five (75) parishes and parish-related schools and dozens of missions located within the province of the Diocese. The offices of the Diocese have forty-three (43) employees. These offices include (but are not limited to): Office of the Bishop (includes Vicars General, Moderator of the Curia, Vicar for the Religious, Vicar for Deacons, and Office of Child, Adolescent and Adult Protection); Chancellor's Office (includes Archives); Vocations; Human Resources; Fiscal Services; Property and Insurance Services; Community Relations (includes publishing the Catholic Vision newspaper); Tribunal; Formation; Catechesis; and Evangelization.

### B. The Sex Abuse Crisis

Over the last fifty years a tragedy that runs contrary to the every teaching and tradition of the Roman Catholic Church has unfolded in the Roman Catholic Church as a whole and in the Diocese in particular: a small number priests, other clergy and others took advantage of their positions of trust and respect in the community and sexually abused children.

Prior to early 2002, the Diocese was a defendant in 11 suits involving 16 plaintiffs (the "2002 Cases").[1] In addition, the Diocese was providing counseling and other services to people who alleged they had been abused but who had not sought damages through civil actions. In early 2002, the Diocese settled the 2002 Cases (the "2002 Settlement"). As part of the 2002 Settlement, the Diocese agreed to pay the plaintiffs in the 2002 Cases, a $3,000,000 payment due

---

[1] The plaintiffs consisted of eleven (11) plaintiffs who alleged that they were the victims of sexual abuse and five (5) parents who alleged damages as result of their children having been allegedly abused. The plaintiffs contended that the Diocese was liable for their damages on a theory of respondeat superior. The Diocese denied and continues to deny any liability for these acts by clergy and others.

in January, 2007 (the "Remaining 2002 Settlement Payment"). The Remaining 2002 Settlement Payment is secured by a parcel of real estate previously owned by the Diocese. The claimants in the 2002 Cases are, therefore, secured creditors in the Reorganization Case.

The Diocese believed at the time of the 2002 Settlement that the 2002 Cases, together with the claims of those who had informally sought help from the Diocese, constituted the universe of claims arising out of these problems. That belief was mistaken. Since the 2002 Settlement, another twenty-three (23) cases have been filed here and in California[2] involving thirty-five (35) plaintiffs alleging, again, the failure of the Diocese to properly supervise or otherwise deal with alleged knowledge by the Diocese of the actions of certain clergy and others.[3] Given the experience since the 2002 Settlement as well as the experience of other Dioceses around the country who have settled these types of cases, the Diocese believes that there may well be other claimants who have not yet asserted formal (*i.e.* through litigation) or informal claims arising out of alleged abuse by clergy or others associated with the Diocese.

C. **The Response of the Diocese**

The Most Reverend Gerald Kicanas, D.D. ("Bishop Kicanas") became the coadjutor Bishop of Tucson on October 30, 2001 and sole Bishop after the retirement of Bishop Manuel Moreno in 2003. Bishop Kicanas has led the Diocese's response to the sexual abuse issues by: (1) providing and offering support to the victims of childhood sexual abuse; (2) reforming Diocesan operations to provide improved transparency regarding finances, historic and present abuse allegations; and (3) reforming Diocesan operations to prevent future abuse from occurring and to appropriately respond to abuse allegations.

---

[2] The California cases name the Diocese as a defendant along with other Dioceses in California.

[3] None of the current cases have been tried; accordingly, neither the liability of the Diocese (which the Diocese disputes) nor the validity of the claims has been established.

Examples of steps taken by the Diocese under the leadership of Bishop Kicanas include having:

- Formed the Victim Assistance Program ("VAP"), in June of 2002 in conjunction with Catholic Social Service ("CSS") and Pima County Attorney's Office (the "County Attorney"). The VAP is designed so that an abuse victim that seeking assistance will receive appropriate care through a process that respects that person's privacy. When a person calls the VAP, a report is made both to law enforcement and to the Diocese so that the allegation can be investigated. Each allegation is either investigated by law enforcement or, when law enforcement declines to investigate because the alleged behavior occurred too long ago, by the Diocese. Without waiting for any determination of the credibility or the validity of the allegation, the VAP may initiate counseling services through CSS or, if the individual prefers, through an independent licensed or certified professional.

- Published the names of all priests and other workers for the Church against whom there are credible allegations of sexual misconduct involving children and updating this list when new allegations arise.

- Entered into a relationship with the County Attorney, under which the Diocese reports all allegations of sexual abuse of children it receives or which it becomes aware of to the County Attorney so that the County Attorney can initiate an appropriate law enforcement investigation and response. This relationship, entered into voluntarily by the Diocese, is considered a model for other Diocese and law enforcement agencies across the country.

- In conjunction with the release of the national John Jay College of Criminal Justice Study on the Nature and Scope of the Problem of Sexual Abuse of Children and Young People by Catholic Priests 1950 – 2003, the Diocese released detailed statistics regarding allegations of sexual abuse by priests and other workers in the Diocese.

- Participated in annual Compliance Audits by The Gavin Group of Boston, an independent compliance auditing firm, regarding the Diocese's implementation of policies and

procedures for the response to allegations of sexual abuse of minors, for the creation of safe environment programs, and for pastoral response and outreach to victims. The 2003 audit determined that the Diocese is considered a "Best Practices" Diocese and a model for other dioceses around the country.

- Established a Sexual Misconduct Policy Review Committee in February of 2002 to review all policies and procedures related to child abuse (reporting, prevention, response to victims) and to make pointed recommendations on how to strengthen policies and procedures. The Committee issued recommendations and Guidelines for the Prevention of and Response to Sexual Misconduct in July of 2002.

- Appointed a Sexual Misconduct Review Board in October of 2002 that is responsible for the review of all allegations of child abuse and sexual misconduct made against Church personnel and for the oversight of all efforts at parishes and school to implement the Guidelines.

- Created the Office of Child, Adolescent, and Adult Protection under the supervision of Sexual Misconduct Review Board. The Office is headed by Dr. Paul Duckro, Ph.D., a former senior clinician in the Program for Psychology and Religion at St. Louis Behavioral Medicine Institute, an academic affiliate of St. Louis University Health Sciences Center in St. Louis, Mo., and former professor at the St. Louis University School of Medicine in the Department of Community and Family Medicine. Because of its work the positive and productive relationships the Office has developed with law enforcement, social service, and child advocacy groups, United States Conference of Catholic Bishops has recognized the Diocese of Tucson for its work.

- Created and implemented the Safe Environment Program that includes training sessions of all parish and school employees, mandatory fingerprinting of all current and prospective employees of the Diocese, parishes and schools (including priests, religious women, religious brothers, deacons, and seminarians) and volunteers as well as criminal history background checks of all current and prospective employees and volunteers. Through June of 2004 more than 2,000 people had been fingerprinted and had received background check. In addition, a structure for

Case 4:04-bk-04721-BMW  Doc 69   Filed 10/11/04   Entered 10/11/04 17:36:49   Desc
Main Document    Page 7 of 17

oversight of compliance with policies and procedures for the creation of safe environments for children at parishes and schools was established.

### D. The Need for Reorganization

The Diocese does not and did not in 2002 carry on any unrelated business activity nor did it own commercial real estate that would provide additional income to the Diocese. Accordingly, the 2002 Settlement required the Diocese to borrow monies and use its reserves in order to fund the 2002 Settlement. The Diocese was left without any ability to respond to the current claims in a manner consistent with the apparent expectations and demands of this current group of claimants. Moreover, in light of the law in Arizona regarding repressed memory and the date upon which a cause of action accrues, incidents that occurred twenty or thirty years ago may still be brought against the Diocese, making it difficult for the Diocese to know when all of the potential claims and claimants have finally been identified.[4] *See, e.g.,* Doe v. Roe, 191 Ariz. 318-319, 955 P.2d 956-957 (Ariz. 1998). Therefore, in order to deal with this latest round of cases and claimants, deal with any other claims which have not yet been asserted against the Diocese (either because of incapacity, repressed memory or conscious choice) and deal with all of these victims in a fair, just and equitable manner in light of the limited resources of the Diocese, the Diocese filed the Reorganization Case. For the benefit of the claimants, the Diocese, its estate and the members of the Catholic community within the Diocese, it is necessary for the Diocese to be able to confirm a plan of reorganization that deals with current claims (disclosed or not) and any claims that might arise in the future related to a claim of repressed memory or incapacity. Therefore, it is necessary that all constituencies who assert or might assert claims against the Diocese arising out of sexual abuse by clergy or other workers associated with the Diocese have an opportunity to be heard in the Reorganization Case.

---

[4] One of the purposes of this Reorganization Case is to provide a framework for identifying and compensating those claimants who claim repressed memory has precluded them from coming forward earlier.

Those who assert or might assert claims against the Diocese arising out of allegations of sexual abuse by clergy or other workers associated with the Diocese break down into five categories (collectively, the "Tort Claims"):[5] (i) claims currently in litigation; (ii) claims of claimants who have chosen not to initiate litigation against the Diocese but who have asserted that they have been abused and are receiving counseling or other services from the Diocese; (iii) claims of persons who have contacted the Diocese regarding potential abuse claims but who have not sought counseling or other services offered by the Diocese; (iv) claims that have not yet been asserted but are known to the claimants;[6] and (v) potential claims of persons who are suffering from repressed memory or incapacity (the "Future Tort Claims").

The Court has recently set April 15, 2005 as the date by which all claimants in categories (i) through (iv) must file claims in the Reorganization Case. In addition, the Diocese has filed its plan of reorganization (the "Plan") and disclosure statement and the Reorganization Case is proceeding. The Plan contemplates that a certain portion of the "pool" to be established for compensation of the allowed Tort Claims will be set aside for Future Tort Claims and that the holders of all Future Tort Claims will be compensated from the reserved portion of the pool. However, it is now appropriate that a representative be appointed to represent the interest of the holders of Future Tort Claims ("Future Tort Claimants") while the Reorganization Case proceeds.

II. **Legal Argument**

The appointment of a Future Claims Representative is appropriate under the circumstances of the Reorganization Case for individuals holding the Future Tort Claims because they are parties in interest who may hold "claims" within the meaning of that term under the

---

[5] Each of these categories might also include claims of minors. The Diocese is filing a separate motion to appoint a guardian ad litem to represent the interests of minors in the Reorganization Case.

[6] Claimants in this category do not suffer from incapacity or repressed memory.

1 | Bankruptcy Code and applicable 9th Circuit precedent and are entitled to representation in the
2 | Reorganization Case.

### A. The Future Tort Claimants Hold Claims Under Bankruptcy Code

#### 1. The Nature of Future Tort Claims

Arizona law began recognizing the so called Repressed Memory Doctrine in 1998 in the Doe v. Roe, opinion. 191 Ariz. 313, 955 P.2d 951, 266 Ariz. Adv. Rep. 19 (Ariz.1998). In the Doe v. Roe case, the Arizona Supreme Court held that an alleged victim of childhood sexual abuse could overcome the statute of limitations and bring a tort action as an adult by proving that he or she suffered from a psychological condition commonly referred to as "Repressed Memory" which prevented the alleged victim from discovering their injury within the statute of limitations.

In other words, the Arizona courts have accepted the notion that childhood sexual abuse can create a latent psychological injury that is only discovered many years later.[7] Moreover, a person suffering from a lack of capacity could argue that the statute of limitations on his or her claim does not begin to run until the person is no longer incapacitated. Most of the Tort Claimants base their claims (*i.e.*, the ability to get around the statute of limitations) on the Repressed Memory Doctrine.[8] The triggers that cause an individual victim to "recover" their memory of abuse or regain their capacity are <u>particular to the individual victim,</u> and not easy to predict.

---

[7] The issue of whether repression is an generally accepted scientific hypothesis is still open to debate. *See, e.g.,* Logerquist v. McVey, 196 Ariz. 470, 490-491, 1. P.3d 113, 133-134 (2000).

[8] The Diocese, under Bishop Kicanas' leadership, has sought reconciliation and healing with all abuse victims, irrespective of their eligibility for compensation due to a repressed memory, by among other things paying for counseling, fully investigating allegations, and by Bishop Kicanas' personally offering to meet with victims and their families.

## 2. Future Tort Claimants Possess Claims Under the Bankruptcy Code

The Bankruptcy Code has the "broadest possible definition" of a claim which is designed to ensure that "all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case." California Dept. Health Services v. Jensen (In re Jensen), 995 F.2d 925, 929 (9th Cir. 1993) quoting from H.R. Rep Non. 595, 95th Cong. 2nd Sess. 1, 309 (1978). In some cases, courts limit whether a claim can be addressed in a reorganization case in order to prevent the "discharge [of] a creditor's right before a creditor knew or should have known that its rights existed." Jensen, 995 F.2d at 930.

In Jensen, the 9th Circuit has adopted "what might be called the 'fair contemplation' test for determining when the relationship between a debtor and a putative creditor gives rise to a claim. That test has been interpreted as the equivalent of the 'conduct plus' 'pre-petition relationship' or Piper Test." Ritter Ranch Development L.L.C. v. City of Palmdale (In re Ritter Ranch Development, L.L.C.), 255 B.R. 760, 765 (9th Cir. BAP 2000 (J. Montali)) quoting Hassanally v. Republic Bank (In re Hassanally), 208 B.R. 26, 52 (9th Cir. BAP 1997 (J. Ollason)). Under that test, the Court must focus on the debtor's pre-confirmation conduct to determine if a relationship existed pre-confirmation between an identifiable claimant or group of claimants and the debtor's pre-confirmation conduct. Epstein v. Committee of Unsecured Creditors (In re Piper Aircraft), 58 F.3d 1573 (11th Cir. 1995); Hassanally 208 B.R. 52; Ritter Ranch 255 B.R. 765 See also, Jensen, 995 F.2d at 930.

In this case, there is a clear relationship between the Future Tort Claimants and the Diocese's pre-confirmation conduct. Specifically, Tort Claimants' theory of liability against the Diocese alleges the Diocese inadequately supervised or inadequately responded to knowledge of clergy or other workers associated with the Diocese having sexually abused children, which, according to the Tort Claimants, resulted in pre confirmation sexual abuse committed against the Tort Claimants. Tort Claimants must, under applicable law, bring suit within the two years of the abuse or within two years of achieving majority unless the Tort Claimants can establish that the

abuse was too traumatic to cope with, and therefore involuntarily blocked from memory as a defense mechanism or the Tort Claimant was suffering from some other recognized incapacity such that he or she was excused, by applicable law, from being bound by the applicable statute of limitations. The Diocese submits that if the alleged abuse occurred pre-confirmation, then there necessarily existed a pre-confirmation relationship between the Diocese's alleged conduct and the Future Tort Claimants which can and should be treated in a plan of reorganization. *See, e.g.,* Jensen, 995 F.2d at 930, 931; Hassanally 208 B.R. at 51, 52 ; Ritter Ranch 255 B.R. 765; In re Russell, 193 B.R. 568 (Bankr. S.D. Cal 1996); Hexcell Corp v. Stepan Co (In re Hexcell), 253 B.R. 564 (Bankr. N.D. Cal. 1999).

The Plan seeks to address both the Tort Claimants and Future Tort Claimants, by creating a Settlement Trust and a Litigation Trust[9] which will be funded with assets from the Diocese and other sources and will provide mechanisms for adjudicating the validity of Tort Claims and liquidating and adequately compensating those Tort Claims. Future Tort Claimants have a stake in the Reorganization Case, in the plan confirmation process and in the Plan. Appointment of a Future Claims Representative is, therefore, necessary to enable the Court to render valid and binding judgments against persons determined to be the Future Tort Claimants by enabling them, through their duly appointed representative, to participate in the reorganization process.

B. **Appointment of a Legal Representative for Future Tort Claimants is Necessary and Proper Under the Circumstances**

The appointment of a representative to protect the interest of future claimants in Title 11 cases related to mass tort litigation is well established. This course of action was pioneered in the asbestos cases and ultimately codified as to asbestos claims under 11 U.S. C. § 524(g). Prior to the enactment of 11 U.S.C. § 524(g) bankruptcy courts routinely appointed future claims

---

[9] Capitalized terms used herein that are not otherwise defined herein will have the same meaning as contained in the Plan.

representatives as parties in interest pursuant to 11 U.S.C. § 1109(b)[10] and 105(a). <u>In re Johns-Manville Corp.</u>, 36 B.R. 743, 757 (Bankr. S.D.N.Y. 1984)(holding "[f]uture claimants are undeniably parties in interest to these reorganization proceedings pursuant to the broad, flexible definition of that term enunciated by the foregoing authorities. The drafting of 'party in interest' as an elastic concept was designed for just this kind of situation"); <u>In re UNR Industries, Inc.</u>, 46 B.R. 671 (Bankr. N.D.Ill. 1985) (finding that' [i]n this unique case with its unique circumstances, it is necessary for the Court to exercise its equitable authority to fashion some kind of procedural relief for these putative asbestos disease victims"); <u>In re Amatex Corp.</u>, 755 F.2d 1034 (3rd Cir. 1985); <u>In re Forty-eight Insulations, Inc.</u>, 58 B.R. 476, 477 (Bankr. N.D. Ill. 1986); <u>Locks v. United States Trustee</u>, 157 B.R. 89, 92 (W.D. Pa. 1993).

<u>Manville</u> was one of the first cases to address the appointment of a legal representative for future claimants. Upon the request of the debtor, the <u>Manville</u> court determined that appointment of a future claims representative was necessary to effectuate a meaningful chapter 11 plan and to ensure the viability of the reorganized debtor:

> ...future claimants are indeed the central focus of the entire reorganization. Any plan not dealing with their interests precludes a meaningful and effective reorganization and thus inures to the detriment of the reorganization body politic. Any meaningful plan will either provide funding for future claimants directly or provide for the continuation of some form of responsive, ongoing entity post-confirmation, from which to glean assets with which to pay them. If they are denied standing as parties in interest, they will be denied all opportunity either to help design the ship that sails away from these reorganization proceedings with their cargo on board or to assert their interests during a pre-launching distribution. In either event, the direct impact on these claimants will be enormous ...

Likewise, although the Tort Claimants and Future Tort Claimants have many interests that coincide in the Reorganization Case, there may be other instances where their interests are not

---

[10] 11 U.S.C. § 1109(b) provides that "A party in interest, including a trustee, a creditors committee, an equity security holders committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard in any issue in a case under this chapter."

entirely identical or may otherwise diverge. The Plan seeks to balance the rights and needs of all prepetition creditors (including Future Tort Claimants) with the continued ministry and mission of the Diocese, taking into account its limited assets. Although the Diocese does not believe that the universe of Future Tort Claimants is significant, it still submits that they should be represented.

The majority of cases appointing an independent representative for future claimants have done so based upon recognition of the potential conflict of interests between present and future claimants. As the Third Circuit put it in the Amatex Case:

> [N]one of the parties currently involved in the reorganization proceedings have interests similar to those of future claimants, and therefore future claimants require their own spokesperson.

755 F.2d at 1043. *See also*, UNR, 46 BR. At 675 (finding the interests of UNR's future claimants were not adequately represented by the Debtor or the official committee of unsecured creditors); Johns-Manville, 36 B.R. 749 (finding none of the existing committees of unsecured creditors and present asbestos claimants could represent future claimants).

As will become apparent as this Reorganization Case unfolds, the Diocese has a very limited set of resources upon which it can draw to satisfy the present and future claims resulting from the sexual abuse by clergy and others in the Diocese. The very essence of the Reorganization Case is to attempt to fairly compensate all creditors holding Tort Claims, regardless of whether those claims were scheduled for trial in September 2004 or whether a putative abuse victim's memory of the abuse is repressed today. For that process to work, a Future Claims Representative must be appointed to represent the interests of the Future Tort Claimants.

### III. Conclusion

Wherefore the Diocese respectfully requests that the Court enter an Order:

A.  Approving the Motion;

B. Finding that Future Tort Claimants are parties in interest in the Reorganization Case;

C. Appointing a Future Claims Representative on behalf of Future Tort Claimants to: (i) make appearances, (ii) file pleadings, and (iii) take such other actions or perform such other duties as the Court may authorize upon request of the Future Claims Representative, the Diocese or other party in interest; and

D. Granting such other relief as the Court deems just and proper under the circumstances.

RESPECTFULLY SUBMITTED this 11th day of October, 2004.

QUARLES & BRADY STREICH LANG LLP
One South Church Avenue
Suite 1700
Tucson, AZ 85701-1621

By /s/ Susan G. Boswell
Susan G. Boswell
Kasey C. Nye

Attorneys for Debtor
The Roman Catholic Church of the Diocese of Tucson

Copies of the foregoing
served via e-mail this
11th day of October, 2004
upon:

| Gerard R. O'Meara<br>GUST ROSENFELD<br>One S. Church Ave., #1900<br>Tucson, AZ 85701<br>gromeara@gustlaw.com<br>*Attorneys for the Diocese of Tucson* | Tom Zlaket<br>Thomas A. Zlaket, P.L.L.C.<br>310 S. Williams Blvd., #170<br>Tucson, AZ 85711-4446<br>tazlaket@qwest.net<br>*Attorneys for the Diocese of Tucson* | C. Taylor Ashworth<br>Stinson Morrison Hecker LLP<br>1850 N. Central Ave. # 2100<br>Phoenix, Arizona 85004-4584<br>rmcgee@stinsonmoheck.com<br>*Attorneys for Plaintiffs* |
|---|---|---|
| Lynne Cadigan<br>Kim E. Williamson<br>504 S. Stone Ave.<br>Tucson, AZ 85701<br>lmcadigan@qwest.net<br>kewilliamson@qwest.net<br>*Attorneys for Plaintiffs* | Lowell E. Rothschild<br>Michael McGrath<br>Mesch Clark & Rothschild, P.C<br>259 N, Meyer Avenue<br>Tucson, AZ 85701-1090<br>lrothschild@mcrazlaw.com<br>mmcgrath@mcrazlaw.com<br>*Attorneys for Roman Catholic Parishes* | Rob Charles<br>Lewis and Roca LLP<br>One S. Church Ave., Suite 700<br>Tucson, AZ 85701-1611<br>rcharles@lrlaw.com<br>*Attorneys for Catholic Foundation for the Diocese of Tucson* |
| Christopher J. Pattock<br>Office of the United States Trustee<br>230 N. First Avenue<br>Room 204<br>Phoenix, AZ 85003-1725<br>christopher.j.pattoc@usdoj.gov | Ivan S. Abrams<br>Law Offices of Ivan Safyan Abrams<br>177 N. Church Ave., # 200<br>Tucson, AZ 85701<br>Tucson3985@aol.com<br>*Attorneys for Plaintiffs* | Daniel J. Quigley<br>Quigley & Whitehill, P.L.C.<br>2730 E. Broadway Blvd. #160<br>Tucson, AZ 85716-5384<br>Quigley@qw-law.com<br>*Attorneys for St. Augustine Catholic High School* |
| Neil J. Konigsberg<br>Konigsberg Law Office PLLC<br>2302 E. Speedway Blvd., #104<br>Tucson, AZ 85719-4732<br>Neil.konigsberg@azbar.org<br>*Attorneys for Tucson Electric Power* | Donald L. Gaffney<br>Jonathan M. Saffer<br>Snell & Wilmer L.L.P.<br>One S. Church Ave., #1500<br>Tucson, AZ 85701-1630<br>dgaffney@swlaw.com<br>jmsaffer@swlaw.com<br>*Attorneys for Pacific Employers Insurance Company* | Robert B. Millner<br>Kevin P. Kamraczewski<br>Patrick C. Maxcy<br>Sonnenschein Nath & Rosenthal LLP<br>8000 Sears Tower<br>Chicago, IL 60606<br>rmillner@sonnenschein.com<br>kevink@sonnenschein.com<br>pmaxcy@sonnenschein.com<br>*Attorneys for Pacific Employers Insurance Company* |
| G. David Delozier, P.C.<br>4016 E. Forest Pleasant Place<br>Cave Creek, AZ 85331<br>gddelozier@aol.com | | |

Copies of the foregoing
served via U.S. Mail this
11th day of October, 2004, upon:

| First Catholic Slovak Ladies<br>24950 Chagrin Blvd.<br>Beachwood, OH 44122 | Terri Thiessen<br>3781 W. Golfcourse Rd.<br>Thatcher, AZ 85446 | Belen Alderete<br>215 N. West Moreland<br>Tucson, AZ 85745 |
|---|---|---|
| Catholic Order of Foresters<br>P.O. Box 3012<br>Naperville, Ill 60566 | | |

/s/ Suzanne K. Utter
Suzanne K. Utter