Quarles & Brady Streich Lang LLP
Firm State Bar No. 00443101
One South Church Avenue
Suite 1700
Tucson, AZ 85701-1621
TELEPHONE 520.770.8700

Attorneys for Debtor, The Roman Catholic Church of the Diocese of Tucson

Susan G. Boswell (#004791)
Kasey C. Nye (#020610)

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>THE ROMAN CATHOLIC CHURCH OF THE DIOCESE OF TUCSON *aka* THE DIOCESE OF TUCSON, an Arizona corporation sole,<br><br>Debtor. | In Proceedings Under Chapter 11<br><br>Case No. 4-04-bk-04721-JMM<br><br>Hearing Date: October 25, 2004<br>Hearing Time: 10:00 a.m.<br>Location: 110 S. Church Ave., Courtroom 3150, First Floor, Tuluca Building, Tucson, Arizona |

## MOTION FOR ORDER APPOINTING GUARDIAN AD LITEM TO REPRESENT THE INTEREST OF MINORS IN THE REORGANIZATION CASE

The Roman Catholic Church of the Diocese of Tucson *aka* the Diocese of Tucson, an Arizona corporation sole and the debtor and debtor in possession (the "Diocese" or the "Debtor") in the above captioned Chapter 11 reorganization case (the "Reorganization Case"), by and through its attorneys undersigned, respectfully requests that the Court enter an Order appointing a guardian ad litem for Tort Claimants (defined below) who are minors and unrepresented in the Reorganization Case.

This Motion presents a "core proceeding" over which the Court has jurisdiction to enter a final order under 28 U.S.C. §§ 157 (A) & (O) and 1334. This Motion is authorized by Fed. R. Civ. P. 17(c) as made applicable to this proceeding by Fed. R. Bankr. P. 7017.

| | |
|---|---|
| 1 | This Motion is supported by the attached Memorandum of Points and Authorities, and the entire record before the Court in the Reorganization Case. |
| 2 | |
| 3 | RESPECTFULLY SUBMITTED this 11th day of October, 2004. |
| 4 | QUARLES & BRADY STREICH LANG LLP<br>One South Church Avenue<br>Suite 1700<br>Tucson, AZ 85701-1621 |
| 5 | |
| 6 | |
| 7 | By /s/<br>Susan G. Boswell<br>Kasey C. Nye |
| 8 | |
| 9 | |
| 10 | Attorneys for Debtor |
| 11 | The Roman Catholic Church of the Diocese of Tucson |

## MEMORANDUM OF POINTS AND AUTHORITIES

On September 20, 2004 (the "Petition Date"), the Diocese commenced this Reorganization Case by filing a voluntary Chapter 11 petition. The Diocese has remained a debtor-in-possession under to 11 U.S.C. §§1107 and 1108 since the Petition Date. The Diocese filed the Reorganization Case in order to reorganize its financial affairs pursuant to a plan of reorganization that will, among other things, fairly, justly and equitably compensate the victims of sexual abuse by clergy or others associated with the Diocese while allowing the Diocese to continue its ministry and mission and attempt to finally bring healing to victims, parishioners and others affected by the past acts of sexual abuse committed by clergy and others.

## I. BACKGROUND

### A. The Diocese of Tucson

The Diocese traces itself to the activities of Padre Eusebio Francisco Kino, the Jesuit missionary who, in 1692, founded the Mission San Xavier del Bac, which today is a functioning parish in the Diocese. Over the generations since Father Kino, the Diocese has grown to serve 300,000 plus Roman Catholics. The Diocese also serves those located within nine southern Arizona Counties (La Paz, Yuma, Pima, Santa Cruz, Pinal, Graham, Gila, Greenlee and Cochise) in a territory of more than 40,000 square miles.

The Diocese provides ecclesiastical services and pastoral care to the seventy-five (75) parishes and parish-related schools and dozens of missions located within the province of the Diocese. The offices of the Diocese have forty-three (43) employees. These offices include (but are not limited to): Office of the Bishop (includes Vicars General, Moderator of the Curia, Vicar for the Religious, Vicar for Deacons, and Office of Child, Adolescent and Adult Protection); Chancellor's Office (includes Archives); Vocations; Human Resources; Fiscal Services; Property and Insurance Services; Community Relations (includes publishing the Catholic Vision newspaper); Tribunal; Formation; Catechesis; and Evangelization.

Within the structure of the Roman Catholic Church in the United States, the Diocese of Tucson meets the requirements for designation as a "mission" diocese. The "mission" designation of the Diocese is based upon, among other things:

- the predominantly rural nature of the communities within the Diocese;
- the isolation of the parishes that serve the communities (62% of the parishes are located in rural areas or border towns);
- economies that are agriculture and service based;
- economic devastation of communities that were dependent on copper mining;
- Arizona's low ranking as a state in several leading social and economic indices.

The designation as a "mission" diocese means that the Diocese is eligible for financial assistance from the annual Catholic Home Missions Appeal national collection taken up in Catholic parishes across the United States. This financial assistance is restricted to certain supported programs of the Diocese.

**B.  The Sex Abuse Crisis**

Over the last fifty years a tragedy that runs contrary to every teaching and tradition of the Roman Catholic Church has unfolded in the Roman Catholic Church as a whole and in the Diocese in particular: a small number priests, other clergy and others took advantage of their positions of trust and respect in the community and sexually abused children.

Prior to early 2002, the Diocese was a defendant in eleven (11) suits involving sixteen (16) plaintiffs (the "2002 Cases").[1] In addition, the Diocese was providing counseling and other services to people who alleged they had been abused but who had not sought damages through civil actions. In early 2002, the Diocese settled the 2002 Cases (the "2002 Settlement"). As part

---

[1] The plaintiffs consisted of eleven (11) plaintiffs who alleged that they were the victims of sexual abuse and five (5) parents who alleged damages as result of their children having been allegedly abused. The plaintiffs contended that the Diocese was liable for their damages on a theory of respondeat superior. The Diocese denied and continues to deny any liability for these acts by clergy and others.

-4-

of the 2002 Settlement, the Diocese agreed to pay the plaintiffs in the 2002 Cases, a $3,000,000 payment due in January, 2007 (the "Remaining 2002 Settlement Payment"). The Remaining 2002 Settlement Payment is secured by a parcel of real estate previously owned by the Diocese. The claimants in the 2002 Cases are, therefore, secured creditors in the Reorganization Case.

The Diocese believed at the time of the 2002 Settlement that the claimants in the 2002 Cases, together with those who had informally sought help from the Diocese, constituted the universe of claims arising out of these problems. However, that was not the case. Since the 2002 Settlement, another twenty-three (23) cases have been filed here and in California[2] involving thirty-five (35) plaintiffs alleging, again, the failure of the Diocese to properly supervise or otherwise deal with alleged knowledge by the Diocese of the actions of certain clergy and others.[3] Given the experience since the 2002 Settlement as well as the experience of other Dioceses around the country who have settled these types of cases, the Diocese believes that there may well be other claimants who have not yet asserted formal (*i.e.* through litigation) or informal claims arising out of alleged abuse by clergy or others associated with the Diocese.

C. **The Response of the Diocese**

The Most Reverend Gerald Kicanas, D.D. ("Bishop Kicanas") became the coadjutor Bishop of Tucson on October 30, 2001 and sole Bishop after the retirement of Bishop Manuel Moreno in 2003. Bishop Kicanas has led the Diocese's response to the sexual abuse issues by: (1) providing and offering support to the victims of sexual abuse; (2) reforming Diocesan operations to provide improved transparency regarding finances and historic and present abuse allegations; and (3) reforming Diocesan operations to prevent future abuse from occurring and to appropriately respond to abuse allegations.

---

[2] The California cases name the Diocese as a defendant along with other Dioceses in California.

[3] None of the current cases have been tried; accordingly, neither the liability of the Diocese (which the Diocese disputes) nor the validity of the claims has been established.

Examples of steps taken by the Diocese under the leadership of Bishop Kicanas include having:

- Formed the Victim Assistance Program ("VAP"), in June of 2002 in conjunction with Catholic Social Service ("CSS") and the Office of the Pima County Attorney (the "County Attorney"). The VAP is designed so that an abuse victim who is seeking assistance will receive appropriate care through a process that respects that person's privacy. When a person calls the VAP, a report is made both to law enforcement and to the Diocese so that the allegation can be investigated. Each allegation is either investigated by law enforcement or, when law enforcement declines to investigate because the alleged behavior occurred too long ago, by the Diocese. Without waiting for any determination of the credibility or the validity of the allegation, the VAP may initiate counseling services through CSS or, if the individual prefers, through an independent licensed or certified professional.

- Published the names of all priests and other workers for the Church against whom there are credible allegations of sexual misconduct involving children and updates this list when new allegations arise.

- Entered into a relationship with the County Attorney under which the Diocese reports all allegations of sexual abuse of children it receives or of which it becomes aware, to the County Attorney so that the County Attorney can initiate an appropriate law enforcement investigation and response. This relationship, entered into voluntarily by the Diocese, is considered a model for other dioceses.

- In conjunction with the release of the national John Jay College of Criminal Justice Study on the Nature and Scope of the Problem of Sexual Abuse of Children and Young People by Catholic Priests 1950 – 2003, the Diocese released detailed statistics regarding allegations of sexual abuse by priests and other workers in the Diocese.

- Participated in annual Compliance Audits by The Gavin Group of Boston, an independent compliance auditing firm, regarding the Diocese's implementation of policies and

procedures for the response to allegations of sexual abuse of minors, for the creation of safe environment programs, and for pastoral response and outreach to victims.

- Established a Sexual Misconduct Policy Review Committee in February of 2002 to review all policies and procedures related to child abuse (reporting, prevention, response to victims) and to make pointed recommendations on how to strengthen policies and procedures. The Committee issued recommendations and Guidelines for the Prevention of and Response to Sexual Misconduct in July of 2002.

- Appointed a Sexual Misconduct Review Board in October of 2002 that is responsible for the review of all allegations of child abuse and sexual misconduct made against Church personnel and for the oversight of all efforts at parishes and school to implement the Guidelines.

- Created the Office of Child, Adolescent, and Adult Protection under the supervision of the Sexual Misconduct Review Board. The Office is headed by Dr. Paul Duckro, Ph.D., a former senior clinician in the Program for Psychology and Religion at St. Louis Behavioral Medicine Institute, an academic affiliate of St. Louis University Health Sciences Center in St. Louis, Mo., and former professor at the St. Louis University School of Medicine in the Department of Community and Family Medicine. Because of its work and the positive and productive relationships the Office has developed with law enforcement, social service, and child advocacy groups, the Diocese has been recognized for its efforts.

- Created and implemented the Safe Environment Program that includes training sessions of all parish and school employees, mandatory fingerprinting of all current and prospective employees of the Diocese, parishes and schools (including priests, religious women, religious brothers, deacons, and seminarians) and volunteers as well as criminal history background checks of all current and prospective employees and volunteers. Through June of 2004, more than 2,000 people had been fingerprinted and had received background checks. In addition, a structure for oversight of compliance with policies and procedures for the creation of safe environments for children at parishes and schools was established.

D. **The Reorganization Case**

The Diocese does not and did not in 2002 carry on any unrelated business activity nor did it own commercial real estate that would provide additional income to the Diocese. Accordingly, the in order to fund the 2002 Settlement, it was necessary for the Diocese to borrow monies and use its reserves. The Diocese was left without any ability to respond to the current claims in a manner consistent with the apparent expectations and demands of this current group of claimants. Moreover, in light of the law in Arizona regarding repressed memory and the date upon which a cause of action accrues, incidents that occurred twenty or thirty years ago may still be brought against the Diocese, making it difficult for the Diocese to know when all of the potential claims and claimants have finally been identified.[4] See, e.g., Doe v. Roe, 955 P.2d 951, 956-57 (Ariz. 1998) (statute of limitation on cause of action for childhood sexual abuse does not start to run until plaintiff retrieves repressed memory of abuse). Therefore, in order to deal with this latest round of cases and claimants, deal with any other claims which have not yet been asserted against the Diocese and deal with all of these victims in a fair, just and equitable manner in light of the limited resources of the Diocese, the Diocese filed the Reorganization Case.

The universe of potential claimants includes (i) secured claims related to the 2002 Settlement; (ii) unsecured claims of trade creditors, vendors and other persons or entities who provide goods or services to the Diocese; (iii) lenders (including parishes who lent money to the Diocese for the 2002 Settlement); (iv) the unsecured claims of persons who contend they were abused by clergy or other persons employed by or related to the Diocese for which such claimants contend the Diocese is liable under several theories (the "Tort Claims").

The universe of Tort Claims consist of five categories of claims: (i) claims currently in litigation; (ii) claims of individuals who have chosen not to initiate litigation against the Diocese

---

[4] One of the purposes of this Reorganization Case is to provide a framework for identifying and compensating those claimants who claim repressed memory has precluded them from coming forward earlier.

-8-

but who have asserted that they have been abused and are receiving counseling or other services from the Diocese; (iii) claims of persons who have contacted the Diocese regarding potential abuse claims but who have not sought counseling or other services offered by the Diocese; (iv) claims that have not yet been asserted but are known to the claimants; and (v) potential claims of persons who are suffering from repressed memory or other incapacity. The Diocese has information, and therefore believes, that there are claimants who are minors who fall within the first four categories. Furthermore, because they are minors, the statute of limitations as to their claims has not yet begun to run.[5]

## II. **Legal Argument**

The Court has recently set April 15, 2005 as the date by which all claimants in categories (i) through (iv) must file claims in the Reorganization Case. In addition, the Diocese has filed its plan of reorganization (the "Plan") and disclosure statement and the Reorganization Case is proceeding. The Plan provides for a "pool" to be established for compensation of the allowed Tort Claims. Accordingly, the interests of minors who are not otherwise represented in the Reorganization Case, need to be represented. Accordingly, the Diocese requests an Order pursuant to Fed. R. Civ. P. 17(c), as made applicable to adversary proceedings and contested matters in the Reorganization Case by Fed. R. Bankr. P. 7017 and 9014, to appoint a guardian ad litem to represent any Tort Claimants who are minors. Fed. R. Civ. P. 17 provides in relevant part:

> ...The court shall appoint a guardian ad litem for an infant or incompetent person not otherwise represented in an action or shall make such other order as it deems proper for the protection of the infant or incompetent person.

Fed. R. Civ. P. 17

---

[5] It may be possible that a minor could be suffering from a repressed memory; however, the guardian ad litem would represent the interests of all minors, regardless of the category of such minor's claim.

-9-

As is discussed above, the Diocese has information and therefore believes that there are minors who have Tort Claims against the Diocese which, as of the petition date, were not in litigation. These claimants require representation because there will be numerous circumstances throughout this Reorganization Case where the minors' interests require representation. Accordingly, the Diocese submits that, in order to protect the due process rights of these otherwise unrepresented minors, a guardian ad litem should be appointed.[6]

### III. Conclusion

Wherefore the Diocese respectfully requests that the Court enter an Order:

A. Approving the Motion;

B. Appointing a guardian ad litem to represent Tort Claimants who are minors to: (i) make appearances, (ii) file pleadings, and (iii) take such other actions or perform such other duties as the Court may authorize upon request of the guardian ad litem, the Diocese or other party in interest; and

---

[6] The Diocese has also filed a motion to appoint a Future Claims Representative to represent the interests of potential claimants who claim to be suffering from repressed memory or other incapacity. Absent some clear conflict, it would seem that the Future Claims Representative and the guardian ad litem could be the same person. This would also conserve estate resources.

C. Granting such other relief as the Court deems just and proper under the circumstances.

RESPECTFULLY SUBMITTED this 11th day of October, 2004.

QUARLES & BRADY STREICH LANG LLP
One South Church Avenue
Suite 1700
Tucson, AZ 85701-1621

By /s/ Susan G. Boswell
Susan G. Boswell
Kasey C. Nye

Attorneys for Debtor
The Roman Catholic Church of the Diocese of Tucson

Copies of the foregoing
served via e-mail this
11th day of October, 2004
upon:

| Gerard R. O'Meara<br>GUST ROSENFELD<br>One S. Church Ave., #1900<br>Tucson, AZ 85701<br>gromeara@gustlaw.com<br>*Attorneys for the Diocese of Tucson* | Tom Zlaket<br>Thomas A. Zlaket, P.L.L.C.<br>310 S. Williams Blvd., #170<br>Tucson, AZ 85711-4446<br>tazlaket@qwest.net<br>*Attorneys for the Diocese of Tucson* | C. Taylor Ashworth<br>Stinson Morrison Hecker LLP<br>1850 N. Central Ave. # 2100<br>Phoenix, Arizona 85004-4584<br>rmcgee@stinsonmoheck.com<br>*Attorneys for Plaintiffs* |
|---|---|---|
| Lynne Cadigan<br>Kim E. Williamson<br>504 S. Stone Ave.<br>Tucson, AZ 85701<br>lmcadigan@qwest.net<br>kewilliamson@qwest.net<br>*Attorneys for Plaintiffs* | Lowell E. Rothschild<br>Michael McGrath<br>Mesch Clark & Rothschild, P.C<br>259 N, Meyer Avenue<br>Tucson, AZ 85701-1090<br>lrothschild@mcrazlaw.com<br>mmcgrath@mcrazlaw.com<br>*Attorneys for Roman Catholic Parishes* | Rob Charles<br>Lewis and Roca LLP<br>One S. Church Ave., Suite 700<br>Tucson, AZ 85701-1611<br>rcharles@lrlaw.com<br>*Attorneys for Catholic Foundation for the Diocese of Tucson* |
| Christopher J. Pattock<br>Office of the United States Trustee | Ivan S. Abrams<br>Law Offices of Ivan Safyan Abrams | Daniel J. Quigley<br>Quigley & Whitehill, P.L.C.<br>2730 E. Broadway Blvd. #160 |

| 230 N. First Avenue<br>Room 204<br>Phoenix, AZ 85003-1725<br>christopher.j.pattoc@usdoj.gov | 177 N. Church Ave., # 200<br>Tucson, AZ 85701<br>Tucson3985@aol.com<br>*Attorneys for Plaintiffs* | Tucson, AZ 85716-5384<br>Quigley@qw-law.com<br>*Attorneys for St. Augustine Catholic High School* |
|---|---|---|
| Neil J. Konigsberg<br>Konigsberg Law Office PLLC<br>2302 E. Speedway Blvd., #104<br>Tucson, AZ 85719-4732<br>Neil.konigsberg@azbar.org<br>*Attorneys for Tucson Electric Power* | Donald L. Gaffney<br>Jonathan M. Saffer<br>Snell & Wilmer L.L.P.<br>One S. Church Ave., #1500<br>Tucson, AZ 85701-1630<br>dgaffney@swlaw.com<br>jmsaffer@swlaw.com<br>*Attorneys for Pacific Employers Insurance Company* | Robert B. Millner<br>Kevin P. Kamraczewski<br>Patrick C. Maxcy<br>Sonnenschein Nath & Rosenthal LLP<br>8000 Sears Tower<br>Chicago, IL 60606<br>rmillner@sonnenschein.com<br>kevink@sonnenschein.com<br>pmaxcy@sonnenschein.com<br>*Attorneys for Pacific Employers Insurance Company* |
| G. David Delozier, P.C.<br>4016 E. Forest Pleasant Place<br>Cave Creek, AZ 85331<br>gddelozier@aol.com | | |

Copies of the foregoing
served via U.S. Mail this
11th day of October, 2004, upon:

| First Catholic Slovak Ladies<br>24950 Chagrin Blvd.<br>Beachwood, OH 44122 | Terri Thiessen<br>3781 W. Golfcourse Rd.<br>Thatcher, AZ 85446 | Belen Alderete<br>215 N. West Moreland<br>Tucson, AZ 85745 |
|---|---|---|
| Catholic Order of Foresters<br>P.O. Box 3012<br>Naperville, Ill 60566 | | |

*/s/ Suzanne K. Utter*
Suzanne K. Utter