1    **IN THE UNITED STATES BANKRUPTCY COURT**

2    **FOR THE DISTRICT OF ARIZONA**

3

4    In re:                                    In Proceedings Under Chapter 11

5    THE ROMAN CATHOLIC CHURCH OF              Case No. 4-bk-04-04721-JMM
     THE DIOCESE OF TUCSON *aka* THE
6    DIOCESE OF TUCSON, an Arizona             **Hearing Date:  June 1, 2005**
     corporation sole,                         **Hearing Time:  1:30 p.m.**
7                                              **Location:  United States Bankruptcy Court, James**
                                               **A. Walsh Courthouse, 38 South Scott Avenue,**
8                  Debtor.                     **4th Floor, Courtroom 4, Tucson, Arizona  85701**

9

10

11

12   **THIRD AMENDED AND RESTATED DISCLOSURE STATEMENT REGARDING**
     **PLAN OF REORGANIZATION DATED, MAY 25, 2005**

13

14   DATED: May 25, 2005                       Susan G. Boswell, Esq.
                                               Kasey C. Nye, Esq.
15                                             Quarles & Brady Streich Lang, LLP
                                               One South Church Avenue Suite 1700
16                                             Tucson Arizona 85701
                                               Attorneys for Debtor
17                                             The Roman Catholic Church of the Diocese of
                                               Tucson
18

19

20   **THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE**
     **BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN**
21   **THE MEANING OF BANKRUPTCY CODE § 1125.  IF YOU HAVE REQUESTED AND**
     **RECEIVED A COPY OF THE DISCLOSURE STATEMENT IN CONNECTION WITH**
22   **THE COURT'S HEARING TO CONSIDER APPROVAL OF THE DISCLOSURE**
     **STATEMENT, NOTHING CONTAINED HEREIN IS OR WILL BE DEEMED A**
23   **SOLICITATION OF ACCEPTANCE OF THE DEBTOR'S PLAN OF**
     **REORGANIZATION FILED BY THE DEBTOR.**

24

25

26

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ...................................................................................... 1

    A.    The Filing of the Reorganization Case ............................................ 1

    B.    Institution of Programs ...................................................................... 3

II. STATEMENTS REGARDING REPRESENTATIONS ............................... 5

    A.    Definitions And Plan Supremacy ..................................................... 5

    B.    Limited Representations ..................................................................... 6

    C.    Voting Procedures .............................................................................. 7

III. OVERVIEW OF THE PLAN .................................................................... 9

    A.    General Structure Of The Plan ......................................................... 9

    B.    Estimated Distributions To Creditors ............................................ 14

IV. THE DEBTOR ....................................................................................... 17

    A.    The History and Mission of the Diocese ....................................... 17

    B.    Organizational Structure Of The Diocese ..................................... 21

    C.    Legal Structure of the Diocese. ...................................................... 24

    D.    Potential Disputes Over Property Ownership and Associated Risks .................. 29

    E.    The Financial Structure and Operations of the Diocese ............... 31

    F.    The Diocese's Assets And Liabilities ............................................. 32

        1.    Assets ............................................................................... 33

            (a)    Real Property ................................................... 33

            (b)    Personal Property ........................................... 33

        2.    Liabilities ........................................................................ 39

            (a)    Parish Claims ................................................... 39

            (b)    Catholic Order of Foresters ............................ 40

            (c)    2002 Settlement Obligations .......................... 40

            (d)    Parish Guaranty Claims ................................... 40

            (e)    Trade Debt ....................................................... 40

            (f)    Tort Claims ...................................................... 40

    G.    The Sex Abuse Crisis ...................................................................... 43

        1.    The 2002 Settlement ...................................................... 43

        2.    The Current Cases .......................................................... 44

V. SIGNIFICANT EVENTS PRIOR TO THE REORGANIZATION CASE ...................... 45

A.    The Response to Childhood Sexual Abuse Crisis .................................................. 45

B.    The Reorganization Case ........................................................................................ 48

VI.    SIGNIFICANT EVENTS IN CHAPTER 11 ................................................................. 48

VII.    DESCRIPTION OF THE PLAN ..................................................................................... 51

A.    Classification And Treatment Of Claims Under The Plan ................................ 51

1.    Claim Amounts ............................................................................................ 51

2.    Effective Date of the Plan ......................................................................... 51

3.    Classification generally .............................................................................. 51

B.    Unclassified Claims ................................................................................................. 52

1.    Administrative Claims ................................................................................ 52

2.    Priority Unsecured Claims ........................................................................ 52

3.    Priority Tax Claims .................................................................................... 52

C.    Unimpaired Claims .................................................................................................. 53

1.    Priority Employee Unsecured Claims – Class 1 ..................................... 53

2.    Other Secured Claims – Class 3 ............................................................... 53

3.    Parish Guaranty Claims – Class 5. Unimpaired. ................................... 53

4.    Insurance and Benefit Claims – Class 11 ............................................... 54

D.    Impaired Claims ...................................................................................................... 54

1.    Class 2: Prepetition Date Secured Tax Claims ....................................... 54

2.    Class 3: Escrow Agent Secured Claim ..................................................... 54

3.    Class 4: General Unsecured Convenience Claim. ................................... 55

4.    Class 6: Parish Loan Claims ..................................................................... 55

5.    Class 8: General Unsecured Claims ......................................................... 55

6.    Class 9: Other Tort and Employee Claims .............................................. 56

7.    Class 10: Tort Claims ................................................................................. 56

(a)    Definition of Class 10 Tort Claims .............................................. 56

(b)    Treatment ......................................................................................... 57

8.    Class 12 - Penalty Claims .......................................................................... 62

VIII.    Means For Execution of the Plan ................................................................................ 63

A.    Creation and Funding of the Settlement Trust and the Litigation Trust ............... 63

B.    Limitation of Funding ............................................................................................. 64

**TABLE OF CONTENTS**
**(continued)**

Page

C.  Treatment of Executory Contracts ................................................................. 65

    1.  Assumption and Rejection of Executory Contracts ................................. 65

    2.  Claims Based on Rejection of Executory Contracts ............................... 65

    3.  Effect of Assumption of Executory Contracts ........................................ 66

D.  Funding on the Effective Date ......................................................................... 66

E.  Funding After the Effective Date ..................................................................... 66

F.  Procedure for Determination of Claims Other Than Tort Claims ...................... 66

    (a)  Objections to Claims ............................................................................ 66

    (b)  Disputed Claims .................................................................................. 66

    (c)  Treatment of Contingent Claims ......................................................... 67

G.  Payments Effective Upon Tender ..................................................................... 67

H.  Preservation of Debtor's Claims, Demands, And Causes of Action .................. 67

I.  Special Provisions Governing Unimpaired Claims ........................................... 68

J.  Operative Documents ...................................................................................... 68

K.  Return of Deposits .......................................................................................... 68

L.  Administrative Claims Bar Date ...................................................................... 69

M.  Delivery Of Distributions ............................................................................... 69

N.  Limitation on De Minimis Payments ............................................................... 70

IX.  CONDITIONS TO EFFECTIVE DATE ................................................................. 71

A.  Conditions To Occurrence Of Effective Date ................................................... 71

B.  Debtor's Obligations to Cause Effective Date to Occur. .................................. 71

C.  Waiver Of Conditions ..................................................................................... 71

D.  Effect of Non-occurrence of Conditions. ......................................................... 72

E.  Merger; Choice of Law ................................................................................... 72

F.  Other Obligations of the Reorganized Debtor .................................................. 72

G.  Modifications To Plan ..................................................................................... 72

X.  EFFECT OF CONFIRMATION ............................................................................ 72

A.  Discharge ........................................................................................................ 72

B.  Vesting ............................................................................................................ 73

C.  Exculpation And Limitation Of Liability ......................................................... 74

D. Permanent Injunction Against Prosecution of Released Claims and Channeled Claims Against Participating Third Parties and Settling Insurers. .................................................................................................... 74

XI. RETENTION OF JURISDICTION ........................................................................ 75

XII. GENERAL PROVISIONS ................................................................................... 77

A. Extension Of Payment Dates ................................................................. 77

B. Notices .................................................................................................... 77

C. Closing of the Case ................................................................................ 77

D. Interest .................................................................................................... 77

E. Additional Assurances ............................................................................ 77

F. Confirmation By Nonacceptance Method ............................................. 78

G. Withdrawal Of Plan ............................................................................... 78

H. Severability And Reformation ............................................................... 78

I. Prohibition Against Prepayment Penalties ............................................ 78

J. Fractional Dollars .................................................................................. 78

K. Payment Of Statutory Fees And Filing of Quarterly Reports .............. 79

L. Reservation of Rights ............................................................................. 79

M. No Professional Fees or Expenses ......................................................... 79

N. Continuation of Committee and Release of Unknown Claim Representative and Guardian ad Litem ............................................................................. 79

O. Section 1146 Exemption. ....................................................................... 80

P. Successors and Assigns .......................................................................... 80

XIII. Post-confirmation Management AND REORGANIZED DEBTOR. ................ 80

XIV. FEDERAL TAX CONSEQUENCES ................................................................. 81

XV. ACCEPTANCE AND CONFIRMATION ......................................................... 83

A. Voting Procedures .................................................................................. 83

1. Generally ....................................................................................... 83

2. Incomplete Ballots ......................................................................... 83

3. Withdrawal Of Ballots; Revocation ............................................. 84

4. Submission Of Ballots ................................................................... 84

B. Feasibility ............................................................................................... 85

C. Best Interests Of Creditors And Liquidation Analysis .......................... 85

# TABLE OF CONTENTS
## (continued)

Page

D.    Confirmation Over Dissenting Class ................................................................ 87

    1.    No unfair discrimination ................................................... 87

    2.    Fair and Equitable Test .................................................... 87

        (a)    Secured Creditors ................................................... 87

        (b)    Unsecured Creditors .............................................. 88

        (c)    Equity Interests ...................................................... 88

XVI.   ALTERNATIVES TO THE PLAN ............................................................. 88

XVII.  RECOMMENDATIONS OF THE DEBTOR AND CONCLUSION ............................ 89

The Roman Catholic Church of the Diocese of Tucson *aka* the Diocese of Tucson, an Arizona corporation sole and the debtor and debtor in possession in the above captioned Chapter 11 reorganization case (the "Diocese" or the "Debtor"), has prepared this Third Amended and Restated Disclosure Statement ("Disclosure Statement") in connection with the solicitation of acceptances of the "Debtor's Third Amended and Restated Plan of Reorganization" dated May 25, 2005 (the "Plan"). A copy of the Plan is attached as Exhibit "1" to this Disclosure Statement.[1]

## I.    **INTRODUCTION.**

### A.    The Filing of the Reorganization Case.

On September 20, 2004 (the "Petition Date"), the Diocese commenced the above-captioned Chapter 11 reorganization case ("Reorganization Case") by filing a voluntary Chapter 11 petition. The Diocese filed this Reorganization Case in order to bring healing to victims, Parishioners and other affected by the past acts of sexual abuse committed by clergy and others associated with the Diocese. The Diocese seeks to achieve this healing by reorganizing its financial affairs pursuant to a plan of reorganization that will, among other things, fairly, justly, and equitably compensate the victims of sexual abuse by clergy, while allowing the Diocese to continue its ministry and mission. It is through the Reorganization Case that the Diocese seeks to finally and comprehensively address the issues resulting from the abuse crisis that has caused great harm to the victims, plunged the Diocese into a dire financial condition, and has interfered with the Catholic Church's traditional ministries in the communities within the Diocese.

In proposing the Plan, the Diocese seeks first to provide care, compassion and compensation to those who have endured harm. The Plan necessarily recognizes its financial limitations, while establishing a fund for those victims who have presently identified themselves or identify themselves in the future. The Diocese believes that the Plan is the only vehicle

---

[1]    Unless this Disclosure Statement expressly states that a term defined in the Plan will have a different meaning herein, all terms defined in the Plan will have the same meanings when used in this Disclosure Statement.

- 1 -

available to it to ensure an equitable and fair distribution of compensation to victims, some identified and some still unknown.

The Plan maintains funding of programs within the Diocese which are essential to the financial reorganization of this religious organization as well as providing for the continuation of the programs that the Diocese has put in place to educate and screen people working with the Diocese and to ensure that the Diocese can continue to provide care and counseling to those injured. The ability of the Diocese to reorganize its financial affairs and provide an orderly way to deal with victims of abuse, also allows the Diocese to continue programs recently started to respond to the crisis and prevent future abuse. These programs, which are described in more detail below, include screening Diocesan and other personnel so that individuals of faith and integrity who have the highest standards of behavior will fill the trusted roles of clergy, teachers and administrators.

The Plan to which this Disclosure Statement applies is the result of the collective effort and cooperation of the Committee, the Committee's Professionals, the attorneys for a large number of Tort Claimants, the Representatives, the attorney for the Representatives and the Diocese. These parties have worked very hard to try and reconcile the various needs and expectations of the various constituencies with the limited resources of the Diocese as well as to provide a reasonable and equitable framework for dealing with Unknown Tort Claims. The issues that challenged all of these parties as well as the emotional nature of these matters make this effort and the results even more noteworthy. However, as a result of those efforts and the willingness of everyone to compromise, the Tort Claimants have an opportunity to receive at least the Initial Distribution Amount within approximately a year of the filing of the Reorganization Case, and the Diocese will have accomplished the purpose for which it filed the Reorganization Case.

### B.     Institution of Programs.

The Diocese responded to the sex abuse crisis by, among other things, establishing a Sexual Misconduct Policy Review Committee in February 2002 to review all policies and procedures related to child abuse (reporting, prevention, response to victims) and to make pointed recommendations on how to strengthen policies and procedures. The Committee issued recommendations and proposed a "Code of Conduct for All Who Minister in the Diocese" (the "Code of Conduct") and comprehensive "Guidelines for the Prevention of and Response to Sexual Misconduct" ("Guidelines"). Pursuant to the recommendations of the Sexual Misconduct Policy Review Committee, the Diocese promulgated the Code of Conduct and Guidelines and established the Sexual Misconduct Review Board in July of 2002. The Sexual Misconduct Review Board is responsible for the review of all allegations of child abuse and sexual misconduct made against Church personnel and for the oversight of all efforts at Parishes and parochial schools within the territory of the Diocese (the "Schools") to implement the Guidelines.

Also pursuant to the recommendations of the Sexual Misconduct Policy Review Committee, the Diocese created the Office of Child, Adolescent, and Adult Protection (the "Office") under the supervision of the Sexual Misconduct Review Board. The Office is headed by Paul Duckro, Ph.D., a former senior clinician in the Program for Psychology and Religion at St. Louis Behavioral Medicine Institute, an academic affiliate of St. Louis University Health Sciences Center in St. Louis, Missouri, and professor emeritus at the St. Louis University School of Medicine in the Department of Community and Family Medicine. Attached hereto as Exhibit "2" is a copy of Dr. Duckro's Curriculum Vitae.

Through the work of the Office, the Diocese has committed itself to work openly and collaboratively with law enforcement. The Diocese has held training for its employees and others associated with the Diocese, such as Priests, Parish employees, teachers, and administrators.

Screening of current and new personnel is part of the preventative program. The Diocese hired a human resources director, Richard Serrano, to lead this effort. His work has included the

development of systematic processes to recruit, screen and orient new personnel.  He is also revising human resources policies to ensure that management practices are consistent with the emphasis of the Code of Conduct and Guidelines on prudent behavior, early detection of problems, and effective response to problems.

Education is ongoing and focused on both awareness and motivation.  Educational sessions that focus on diocesan policy and mandated reporting have been held around the Diocese for all personnel.  That education process is continuing at the Diocese, the Parishes and the Schools.  The Diocese is committed to continuing that effort, which is why it is so important that the Diocese be able to continue these programs while at the same time finding a just and equitable way to respond to victims and provide for payment to its other creditors.

The Diocese has also established programs for screening candidates for the priesthood, deaconate and lay ministry.  The screening programs are required before entry into the formation process so as to help ensure that mature persons of integrity with the highest standards of behavior are admitted.  A program is underway to improve ongoing formation of priests. Outreach to victims is done by publicizing widely the Bishop's commitment to receive respectfully any report of sexual abuse by anyone ministering or working under the auspices of the Diocese.  High priority is given to the freedom of the victim to come forward when he or she is ready.  Counseling is offered, and the individual is given the opportunity to meet with the Bishop if that is requested.  Outreach is also conducted by collaborating with local agencies devoted to child advocacy and to child abuse prevention and awareness.  The Director of the Office sits on the Board of the Southern Arizona Child Advocacy Center ("SACAC").  The Diocese is a Corporate Member of the Pima County Child Abuse Prevention Council.  The positive and productive relationships the Office has developed with law enforcement and social service, and child advocacy groups have been a hallmark of the Diocese's efforts to prevent child abuse within the Church.

1    In the most recent audit that was performed by the Gavin Group, Inc.,[2] the Diocese was
2    found to be in compliance with all articles of the Charter for the Protection of Children and
3    Young People.  The survey specifically noted that during the audit period (2004), the Diocese had
4    participated actively in the work of the SACAC.  It further noted Dr. Duckro's involvement with
5    the SACAC Board.  None of these activities are required as part of the Charter but were
6    undertaken by the Diocese because of its commitment to the protection of children.

7    While most Chapter 11 reorganization plans focus only on the financial, the Plan
8    proposed by the Diocese addresses not only compensation for victims and other Creditors, but
9    also proposes the continuation of the economic and institutional reforms it started so that the
10   Diocese can further its role as a trusted, leader for both Catholic faithful and the communities it
11   serves.  To that end, the Diocese, the Representatives and the Committee have agreed to the
12   Sharing Arrangement that will, under certain circumstances, provide for a return of funds back to
13   the Diocese to be used for Special Projects which will allow the Diocese to continue the
14   institutional reforms it started and respond to the needs of victims for counseling and comfort.

15   **II.    STATEMENTS REGARDING REPRESENTATIONS.**

16        **A.    Definitions And Plan Supremacy.**

17        Unless this Disclosure Statement expressly states that a term defined in the Plan will have
18   a different meaning herein, all terms defined in the Plan will have the same meanings when used
19   in this Disclosure Statement.  In addition, unless otherwise stated, terms used in this Disclosure
20   Statement will have the same meanings as in the Bankruptcy Code, the Federal Rules of
21   Bankruptcy Procedure, or the Local Rules of the Bankruptcy Court.  Terms defined in this
22   Disclosure Statement which are also defined in the Plan or the other sources described above are
23   solely for convenience; and the Debtor does not intend to change the definitions of those terms

24   _____

25       [2]   Once again in 2004, the Gavin Group, Inc. was retained by the United States
     Conference of Catholic Bishops to conduct the national audit of the implementation of the
26   Charter for the Protection of Children and Young People.

- 5 -

from the Plan or from the otherwise applicable sources.  Furthermore, in the event of any inconsistency between the Plan and this Disclosure Statement, the Plan will control.  The Exhibits attached to this Disclosure Statement are incorporated into and are a part of this Disclosure Statement.

### B.    Limited Representations.

This Disclosure Statement is submitted in accordance with Bankruptcy Code § 1125 for the purpose of soliciting acceptances of the Plan from holders of certain Claims.  It is subject to approval by the Bankruptcy Court as containing information of a kind, and in sufficient detail, which is adequate to enable you to make an informed judgment whether to vote to accept or to reject the Plan.  This Disclosure Statement will be used to solicit acceptances of the Plan only after the Bankruptcy Court enters an order approving this Disclosure Statement as containing adequate information.

In determining whether the Plan should be confirmed, the Bankruptcy Court will consider whether the Plan satisfies the requirements of the Bankruptcy Code, including whether it is feasible, and whether it is in the best interests of the holders of Claims.  The Bankruptcy Court also will receive and consider a ballot report prepared by the Debtor concerning the votes for acceptance or rejection of the Plan by parties entitled to vote. Only holders of Allowed Claims that are impaired under the Plan will be allowed to vote to approve or reject the Plan.

THIS DISCLOSURE STATEMENT IS NOT THE PLAN.  THIS DISCLOSURE STATEMENT, TOGETHER WITH THE PLAN, WHICH IS ATTACHED HERETO AS EXHIBIT "1", SHOULD BE READ COMPLETELY.  FOR THE CONVENIENCE OF CREDITORS, THE PLAN IS SUMMARIZED IN THIS DISCLOSURE STATEMENT, BUT ALL SUMMARIES AND OTHER STATEMENTS REGARDING THE PLAN ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN ITSELF, WHICH IS CONTROLLING IN THE EVENT OF ANY INCONSISTENCY.

The Bankruptcy Court will hold a hearing on confirmation of the Plan.  The date and time of the hearing will be fixed by order of the Court and will be noticed to Creditors after the

- 6 -

Disclosure Statement is approved.  The Confirmation Hearing may be adjourned from time to time without further written notice.

Information contained in this Disclosure Statement was obtained from knowledgeable personnel at the Diocese or from the books and records of the Diocese.  Financial information developed for purposes of this Disclosure Statement were developed by personnel at the Diocese working with the Debtor's Professionals.  Certain materials contained in this Disclosure Statement are taken directly from other, readily accessible documents or are digests of other documents. While every effort has been made to retain the meaning of such documents, you are urged to rely upon the contents of such documents only after a thorough review of the documents themselves.

NO REPRESENTATIONS OR ASSURANCES CONCERNING THE DEBTOR, INCLUDING, WITHOUT LIMITATION, ITS OPERATIONS, THE VALUE OF ITS ASSETS, OR THE FUTURE OPERATIONS OF THE REORGANIZED DEBTOR ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

THIS IS A SOLICITATION BY THE DEBTOR ONLY AND IT IS NOT A SOLICITATION BY THE DEBTOR'S ATTORNEYS OR ANY OTHER PROFESSIONALS EMPLOYED BY THE DEBTOR. THE REPRESENTATIONS MADE HEREIN ARE THOSE OF THE DEBTOR AND NOT OF THE DEBTOR'S ATTORNEYS OR ANY OTHER PROFESSIONAL.

REASONABLE EFFORTS HAVE BEEN MADE TO ACCURATELY PREPARE ALL UNAUDITED FINANCIAL STATEMENTS WHICH MAY BE CONTAINED IN THIS DISCLOSURE STATEMENT FROM THE INFORMATION AVAILABLE TO THE DEBTOR. HOWEVER, AS TO ALL SUCH FINANCIAL STATEMENTS, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED THEREIN IS WITHOUT ERROR.

APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE CERTIFICATION BY THE COURT THAT THIS DISCLOSURE STATEMENT IS WITHOUT INACCURACY.

**C.** **Voting Procedures.**

If you are the holder of a Claim that is "impaired" under the Plan, it is important that you vote.  In that regard, acceptances of the Plan are sought only from those holders of Claims whose Claims are "impaired" by the Plan and who are not deemed to have accepted or rejected the Plan. Specifically, acceptances are solicited only from those Creditors and parties in interest whose

legal, equitable, or contractual rights are altered by the Plan or who will not receive under the Plan the full amounts of their Allowed Claims in Cash. Holders of Claims which are not impaired under the Plan are deemed to have accepted the Plan. See Bankruptcy Code § 1126(f). Conversely, acceptances need not be solicited from the holders of Claims who will receive nothing under the Plan because they are deemed to have rejected the Plan. See Bankruptcy Code § 1126(g).

In order for a Class of Claims to vote to accept the Plan, votes representing at least two-thirds in amount and more than one-half in number in that Class must be cast in favor of acceptance of the Plan. As more fully described below, the Debtor is seeking acceptances from holders of Allowed Claims in the following Classes (reserving the right to supplement as to any other impaired Class(es) of Claims, if any):

| Class | Description | Status |
|---|---|---|
| Class 2 | Prepetition Date Secured Tax Claims | Impaired – Entitled To Vote |
| Class 3 | Escrow Agent Secured "Claim" | Impaired – Entitled To Vote |
| Class 5 | General Unsecured Convenience Claims | Impaired – Entitled To Vote |
| Class 7 | Parish Loan Claims | Impaired – Entitled To Vote |
| Class 8 | General Unsecured Claims | Impaired – Entitled To Vote |
| Class 9 | Other Tort and Employee Claims | Impaired – Entitled To Vote |
| Class 10 | Tort Claims | Impaired – Entitled To Vote |

The following Classes of Claims are not impaired under the Plan or are otherwise prohibited by the Bankruptcy Code from voting on the Plan for the reason indicated:

| Class | Description | Status |
|---|---|---|
| Unclassified | Administrative Claims | Unimpaired – Deemed to Accept |
| Unclassified | Priority Unsecured Claims | Unimpaired – Deemed to Accept |
| Unclassified | Priority Tax Claims | Unimpaired – Deemed to Accept |

- 8 -

| Class 1 | Priority Employee Unsecured Claims | Unimpaired – Deemed to Accept |
|---------|-----------|-----------|
| Class 4 | Other Secured Claims | Unimpaired – Deemed to Accept |
| Class 6 | Parish Guaranty Claims | Unimpaired – Deemed to Accept |
| Class 11 | Insurance and Benefit Claims | Unimpaired – Deemed to Accept |
| Class 12 | Penalty Claims | Take Nothing- Deemed to Reject |

The specific treatment of each Class under the Plan is set forth in the Plan and is summarized in Article VII of this Disclosure Statement. Bankruptcy Code § 1129(b) provides that, if the Plan is rejected by one or more impaired classes of Claims, the Plan nevertheless may be confirmed by the Bankruptcy Court, if: (i) the Bankruptcy Court determines that the Plan does not discriminate unfairly and is fair and equitable with respect to the rejecting Class(es) of Claims that are impaired under the Plan; and (ii) at least one Class of Impaired Claims has voted to accept the Plan.

A VOTE FOR ACCEPTANCE OF THE PLAN BY THOSE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE IS MOST IMPORTANT. THE DEBTOR RECOMMENDS THAT THE HOLDERS OF ALLOWED CLAIMS VOTE IN FAVOR OF THE PLAN.

Unless otherwise expressly stated, portions of this Disclosure Statement describing the Diocese have not been subject to a certified audit, but have been prepared from information compiled by the Diocese from records maintained in the ordinary course of its business. Every effort has been made to be as accurate as possible in the preparation of this Disclosure Statement.

III. **OVERVIEW OF THE PLAN.**

A. **General Structure Of The Plan.**

The Diocese filed the Reorganization Case in order to reorganize its financial affairs pursuant to a plan of reorganization that will, among other things, fairly, justly, and equitably compensate the victims of abuse by clergy or others associated with the Diocese while allowing the Diocese to continue its ministry and mission and its efforts to prevent abuse of children in the

- 9 -

future and attempt to finally bring healing to victims, Parishioners and others affected by the past acts of abuse committed by clergy and others. The Plan seeks to achieve this healing by restructuring the Diocese's debt obligations so that it can equitably and justly compensate the victims of sexual abuse while the Diocese continues its ministry and mission. The Plan also represents the efforts of the Committee, the Diocese, a large group of Tort Claimants, the Representatives and the professionals of each of these constituencies to negotiate a consensual plan of reorganization. The Plan contemplates that, on the Effective Date, the Diocese will transfer certain assets consisting of Cash and a pledge of the proceeds from the sale of Diocese Real Property (to the extent not sold prior to the Effective Date), proceeds contributed by Settling Insurers, proceeds of settlements with Participating Third Parties and assignment of proceeds received by the Diocese from Insurance Action Recoveries to be utilized in whole or in part to make payments to Tort Claimants with Allowed Tort Claims. Pursuant to the Plan, a Settlement Trust and a Litigation Trust will be established. The other Allowed Claims in the Estate will be paid in full in accordance with the terms of the Plan. Such other Allowed Claims will be paid from the reserves established by the Diocese for such payment and from the business operations of the Diocese.

Tort Claimants who have not otherwise had their Claims Allowed prior to the Effective Date pursuant to an agreement between such Tort Claimant and the Diocese which is approved by the Bankruptcy Court will have their Claims treated and resolved under either the Settlement Trust or the Litigation Trust. Tort Claimants who have had their Claims Allowed prior to the Effective Date will receive the applicable Initial Distribution Amount from the Trustee of the Settlement Trust and be entitled to possible future distributions depending upon certain contingent events. It is contemplated that all of the Fund will go into the Settlement Trust (or the Litigation Trust, if applicable), and distributed to Settling Tort Claimants with Allowed Claims (including those with Allowed Tort Compromise Claims), to fund the Unknown Claims Reserve and to fund the Trust Administrative Expense Reserve.

- 10 -

All Tort Claimants will automatically be included in the Settlement Trust unless such Tort Claimant affirmatively elects to have his or her Tort Claim treated under the terms of the Litigation Trust. The Settlement Trust and the Litigation Trust will be funded from the transfers by the Diocese on the Effective Date, any earnings obtained by the Trustee from investments of such assets after the Effective Date, any Insurance Action Recoveries after the Effective Date, proceeds of settlements with Settling Insurers and payments from Participating Third Parties.

If any Tort Claimants opt into the Litigation Trust, the Litigation Trust will be funded with ten percent (10%) of the Initial Contribution which is $15,700,000, to be paid to the Trustee from the Settlement Trust after the Effective Date to establish the Litigation Trust unless the Bankruptcy Court determines that a lesser amount is sufficient to fund the Litigation Trust. The final allocation of the transferred Cash and Assets between the Settlement Trust and the Litigation Trust will be determined by the Bankruptcy Court as part of the confirmation process if such a determination is necessary. If there are only a few Tort Claimants who opt into the Litigation Trust, then the Diocese and the Committee will likely request that a lesser amount be used to fund the Litigation Trust. In all events, there is a limitation on the amount of recovery a Non-settling Tort Claimant can receive regardless of the amount of the judgment entered in any litigation regarding the Tort Claim as discussed in Section VII D 7 (iv) below. If no Tort Claimant affirmatively elects to have his or her Tort Claim determined pursuant to the terms of the Litigation Trust, there will be no allocation to the Litigation Trust.

The Allowance of the Tort Claims in the Settlement Trust will be evaluated and determined by the Special Arbitrator proposed by the Diocese, the Committee and the Representatives and confirmed by the Bankruptcy Court as part of the confirmation process. The parties have agreed that Lina Rodriguez be confirmed by the Bankruptcy Court as the Special Arbitrator. Ms. Rodriguez began her career in private practice at a noted Tucson law firm. She was appointed as a Pima County Superior Court Judge in 1984 and served twenty years in that position, recently retiring. While on the bench, she presided over a variety of cases. She has also

served as an arbitrator and mediator both while she was a sitting judge and after. Given her breadth of experience, the parties believe that she is particularly well suited for the position as Special Arbitrator. She has also agreed to serve in that capacity.

If a Tort Claim is Allowed (whether by the Special Arbitrator or pursuant to an agreement or order of the Bankruptcy Court prior to the Effective Date), such Tort Claim will be classified into a Tier based upon criteria contained in the Plan. There are five (5) Tiers for direct victims of abuse which are generally described in the Plan. There is also a provision for treatment of the Relationship Tort Claims which are the Claims of parents or spouses of Tort Claimants who filed Tort Claims and who were allegedly abused by clerics or other workers related to the Diocese. The Plan also provides for a Tort Claimant who might otherwise have a credible Tort Claim but which may be barred by the statute of limitations to participate as a Tort Compromise Claim so long as the Tort Claimant elects to do so on the Ballot. Under certain circumstances, the Diocese and the Committee can offer a Tort Claimant the opportunity to participate as a Tort Compromise Claim after the Effective Date so long as such Tort Claimant's Claim has not yet been Disallowed by the Special Arbitrator or an adverse ruling on the Tort Claim been rendered against a Non-Settling Tort Claimant.

The criteria for each Tier is described in detail in Article 15 of the Plan. Briefly the criteria will consist of such considerations as: (i) the evidence that the abuse occurred; (ii) the evidence of injury to plaintiff (both the injury of the event itself and the emotional injury suffered thereafter); (iii) the evidence that the claim is not barred by limitations; and (iv) the evidence of Diocese's responsibility for the action. There will be consideration of issues such as: (i) the age of the victim at the time of the abuse; (ii) the frequency and duration of the abuse; (iii) the notoriety of the alleged abuser; and (iv) the strength of the victim's repression case, if necessary to preserve the claim. The Special Arbitrator will be required to adhere strictly to established Arizona case and statutory law in Allowing or Disallowing Unknown Tort Claims based upon a claim of repressed memory or other incompetence that under currently applicable Arizona law

- 12 -

would toll the statute of limitations. The Special Arbitrator, in her discretion, will have given the weight she deems appropriate to each of the factors. This is just a brief description of the factors and Article 15 of the Plan should be consulted for a full description of the factors.

It is contemplated that the Reorganized Debtor and the Committee will have a continuing role in evaluating Tort Claims. The Tort Claimant, the Diocese or the Committee can request an evidentiary hearing and present witnesses and other evidence relevant to the evaluation of a Tort Claim or Unknown Tort Claim by the Special Arbitrator. The Tort Claimant or Unknown Tort Claimant, the Diocese or the Committee can request the Special Arbitrator to issue subpoenas compelling the attendance of witnesses at the evidentiary hearing. If the Special Arbitrator approves such request, the witness will be compelled to attend to the extent the witness could be compelled to attend a hearing in the Bankruptcy Court in which the Reorganization Case is pending. The Special Arbitrator may also request from the Tort Claimant (including any Unknown Tort Claimant), the Committee or the Debtor any materials that will aid the Special Arbitrator in evaluating a Tort Claim (including an Unknown Tort Claim). The Special Arbitrator will give notice to the Reorganized Debtor, the Tort Claimant (or Unknown Tort Claimant if applicable) and the Committee Professionals of the Allowance of any Tort Claim and the Tier in which the Special Arbitrator is Allowing the Tort Claim. The Reorganized Debtor, the Tort Claimant (or Unknown Tort Claimant if applicable) or the Committee may object to such Allowance, including the Tier placement by written objection to the Special Arbitrator with twenty (20) days of receiving such notice. The Special Arbitrator will serve notice on the Reorganized Debtor, the Tort Claimant (or Unknown Tort Claimant if applicable) and the Committee Professional if the Special Arbitrator is changing the Tier Placement or decision to Allow the Tort Claim. The decision of the Special Arbitrator will be final and there will be no appeal from her decision.

If a Tort Claimant wishes to assert his/her right to a jury trial or trial to the Court to liquidate such Tort Claim (a "Non-Settling Tort Claimant"), to the extent he or she has not

- 13 -

already submitted to the equitable jurisdiction of the Bankruptcy Court and waived his or her right to a jury trial, he or she will have to affirmatively elect such treatment on the Ballot sent with the Plan. Any jury trial or trial to the Court of a Non-Settling Tort Claimant will be held in the United States District Court for the District of Arizona, Tucson Division or in the Bankruptcy Court. If an objection has been filed to the Non-Settling Tort Claimant's Claim that has not been resolved by the Effective Date, the proceeding which commenced the Claim objection process will be deemed to be the commencement of the action to determine the Tort Claim of a Non-Settling Tort Claimant.

## B. Estimated Distributions To Creditors.

The following is a summary of the estimated recoveries for each the holders of Allowed Claims (or provisionally Allowed Claims) under the Plan:[3]

| Class/Nature of Claim | Treatment | Approximate Total Estimated Allowed (Or Provisionally Allowed) Claims | Estimated Dates of Distributions | Estimated Distributions |
|---|---|---|---|---|
| Class 1 Prepetition Employee Claims | Impaired | $364,000.00[4] | Various depending upon Employee's status and use of vacation time and sick leave time | To be satisfied by Diocese assuming and honoring policy after Effective Date |
| Class 2 Prepetition Date Secured Tax Claims | Impaired | $8,754 | One-half - 30 Days after Effective Date and One-half – 6 months after the Effective Date | $8,754 |

---

[3] The following is an estimate only of the recoveries to be obtained in each Class. Until certain events occur, particularly with respect to the number of Allowed Tort Claims and Unknown Tort Claims, a Tort Claimant should assume that he or she will only receive the amount of the Initial Distribution.

[4] This amount has either been paid pursuant to Order of the Bankruptcy Court allowing the Diocese to honor it policies or will be paid in the ordinary course in accordance with the policies and procedures of the Diocese.

- 14 -

| Class/Nature of Claim | Treatment | Approximate Total Estimated Allowed (Or Provisionally Allowed) Claims | Estimated Dates of Distributions | Estimated Distributions |
|---|---|---|---|---|
| Class 3 Escrow Agent Secured Claims | Impaired | $3,000,000 | To be paid in accordance with the terms of the Promissory Note dated March 25, 2002, due January 24, 2007. As additional collateral, the Reorganized Debtor will execute a pledge of the Restricted St. Augustine Account | $3,000,000 |
| Class 4 Other Secured Claims. | Unimpaired | $300,000 | No payment anticipated but letter of credit will remain in place and Bank One, N.A. will retain its collateral securing the letter of credit. | $ 0 [5] |
| Class 5 General Unsecured Convenience Claims | Impaired | $7,353.30 [6] | 30 Days after the Effective Date or applicable Claim Payment Date | $500 per Claim |
| Class 6 Parish Guaranty Claims | Unimpaired | $7,268,202.55 | No distribution. Parishes will continue to pay in accordance with terms | $ -0- |
| Class 7 Parish Loan Claims | Impaired | $4,700,000.00 | Interest only at the rate of 2.5% per annum , monthly payments of $44,738 until paid in full. | Unknown [7] |

[5] The $300,000 obligation is a Secured Claim of Bank One, N.A. which secures a letter of credit issued by Bank One, N.A. The letter of credit has not been drawn upon and the Diocese is not in default of the obligation which the letter of credit secures.

[6] These consist of certain vendor payables in the amount of $500 or less that the Diocese believes may comprise the Class 4 Claims.

[7] This is the amount of the loans made by the Parishes to the Diocese in conjunction with the 2002 Settlement. The Parishes have also filed claims against the Diocese for return of their custodial funds for Unrestricted Deposits and, in some cases, for indemnification and contribution.

| Class/Nature of Claim | Treatment | Approximate Total Estimated Allowed (Or Provisionally Allowed) Claims | Estimated Dates of Distributions | Estimated Distributions |
|---|---|---|---|---|
| Class 8 General Unsecured Claims | Impaired | $2,499,517.83 | Paid in full in installments beginning 30 days after the Effective Date and monthly thereafter until paid in full amortized so that all payments will be made by the 15th anniversary of the Effective Date. Obligations bear Interest at 4.5% per annum. | $2,499,517.83 |
| Class 9 Other Tort and Employee Claims | Impaired | $Unknown because Claims are unliquidated | To be paid from proceeds of applicable insurance to the extent available. Otherwise, no distribution. | $Unknown |
| Class 10 Tort Claims | Impaired | $Unknown | Initial Distribution Amount of: Tier One -- $100,000 Tier Two -- $200,000 California Tier -- $300,000 Tier Three -- $425,000 Tier Four -- $600,000 Amounts of distribution are subject to increase depending upon the number of Tort Claims Allowed and the number of Unknown Claims that are asserted and Allowed. Prior to any additional distributions to Tier 1 and Tier 2, distributions will be made to the holders of Allowed Tort Claims in the California Tier so that each such Tort Claimant has received $350,000, to Tier 3 so that each such Tier 3 Tort Claimant has received $500,000 and to Tier 4 so that each such Tier 4 Tort Claimant has received $700,000. An Unknown Claims Reserve of $5 million from which Unknown Tort Claims that are Allowed by the Special Arbitrator will be paid. Tort Claims of Non-Settling | $Unknown because final amount will depend upon the number of Allowed Tort Claims and Unknown Tort Claims; however, Settling Tort Claimants with Allowed Tort Claims will receive at least the Initial Distribution Amounts for their respective Tiers. |

| Class/Nature of Claim | Treatment | Approximate Total Estimated Allowed (Or Provisionally Allowed) Claims | Estimated Dates of Distributions | Estimated Distributions |
|---|---|---|---|---|
| | | | Tort Claimants will be determined by the Bankruptcy Court, a jury or the District Court, depending upon the rights asserted or waived by a Non-Settling Tort Claimant recovery limited to the lesser of: (i) the judgment; (ii) $425,000; or (iii) a Pro Rata share of the amount allocated to the Litigation Trust. | |
| Class 11 Insurance and Benefit Claims | Unimpaired | $694,711.18 | To be paid from proceeds of applicable insurance or from operations of the Diocese or the Reorganized Debtor as such claims are due | $694,711.18 |
| Class 12 Penalty Claims | Impaired | $Unknown | N/A | $0 |

## IV.   THE DEBTOR.

### A.   The History and Mission of the Diocese.

The Roman Catholic Church is a hierarchical religious organization governed by its own laws and customs. These laws are written in the Code of Canon Law. The Code of Canon Law defines the organization of the Church, the roles and powers of the various entities which comprise the Church, and the duties of the various entities participating in the Church. The Code of Canon Law applicable to the Roman Catholic Church is, for the most part: (i) a set of norms created to bring order to the life of the ecclesial community; (ii) articulated and promulgated by those who are entrusted with the community's care; and (iii) to serve the common good, thus imposing obligations and establishing legal bonds from which certain rights, duties and interests flow. Hereinafter, the Code of Canon Law will be cited as the "Canon Law."

1    A diocese is a territory subject to the jurisdiction of the Bishop.  The Diocese traces its

2    origin to the activities of Padre Eusebio Francisco Kino, the Jesuit missionary who, in 1692,

3    founded the Mission San Xavier del Bac, which today is a functioning Parish in the Diocese.  In

4    1897, the Church in Arizona was elevated to the status of a regular diocese, with Tucson as the

5    see, under the jurisdiction of the first Bishop of Tucson, Bishop Peter Bourgade, who had been

6    recruited in France by Bishop John Baptist Salpointe for missionary work in Arizona.  The first

7    U.S. born Bishop of Tucson was Bishop Daniel J. Gercke, who served as Bishop from 1922 until

8    1960.  Following Bishop Gercke were: Bishop Francis J. Green (1960-1981); Bishop Manuel D.

9    Moreno (1982-2003); and Bishop Gerald F. Kicanas (2003 until the present).

10    The Diocese was incorporated by Bishop Granjon in 1914 in Arizona as a corporation sole

11    under the name of "Roman Catholic Church of the Diocese of Tucson" with the stated purpose of

12    the corporation being "the care and administration of the temporal affairs of the Roman Catholic

13    Church of the Diocese of Tucson, which embraces the State of Arizona, and a portion of the State

14    of New Mexico, and religious, educational, and charitable ministrations, and maintenance and

15    care of all the property now held, or that may be received, by the said Roman Catholic Church of

16    the Diocese of Tucson."[8]  The Articles of Incorporation have been amended over the years to

17    reflect the succession of bishops and changes in the territory of the Diocese.  The Diocese

18    operates as a 501(c)(3) non-profit corporation.

19    Over the generations since Padre Kino, the Diocese has grown to serve 300,000 plus

20    Roman Catholics and seventy-six (76) Parishes in the Diocese (the "Parishes") located within

21    nine southern Arizona Counties (La Paz, Yuma, Pima, Santa Cruz, Pinal, Graham, Gila, Greenlee

22    and Cochise) encompassing a territory of more than 40,000 square miles.  A map showing the

23    locations of the Parishes and missions located within the Diocese is attached as Exhibit "3".

24    Geographically, the Diocese is the fifth largest diocese in the continental United States.  The

---

25    [8]  In 1969, the Diocese of Phoenix was formed from the Diocese of Tucson, leaving the
26    Diocese with its present territory.

Diocese's southern border of 350 miles is also the border of the United States with Mexico, and is the largest such border with Mexico of any diocese in the United States.

In a total population of 1.45-million in the counties that comprise the territory of the Diocese, there are an estimated 300,000-plus Roman Catholics who are served by the Parishes, dozens of missions and twenty (20) Schools. The Church personnel who minister in the territory of the Diocese[9] include 189 priests, 238 religious women (sisters), 143 deacons, nearly 1,000 lay employees of Parishes and Schools, and forty-three (43) lay employees of the Diocese. In addition, there are thousands of volunteers who participate in the spiritual and service ministries of the Parishes and Schools. Roman Catholics comprise approximately twenty-five percent (25%) of the total population within the territory of the Diocese.

There are also dozens of charitable, fraternal, and spiritual organizations and movements through which thousands of Catholics serve their Parishes and their communities. For the most part, these organizations are affiliated with national and international Catholic institutes and organizations. Many operate in conjunction and collaboration with Parishes. The Knights of Columbus, Catholic Daughters of the Americas, Catholic Foresters, Cursillo Movement, St. Vincent de Paul, Serra Club International and Catholic Worker are among these organizations. These organizations are not part of the Diocese, nor do they receive support from the Diocese other than through the spiritual guidance of the Bishop and others associated with the Diocese.

The Diocese of Tucson is located in the Bishop Manuel D. Moreno Pastoral Center, 111 South Church Avenue, in downtown Tucson. The Diocese has maintained offices in downtown Tucson since the formation of the Vicariate Apostolic in 1868.

The United States Conference of Catholic Bishops Secretariat on the Home Missions identifies the Diocese of Tucson as a "mission diocese" eligible for financial assistance from the annual Catholic Home Missions Appeal national collection taken up in Catholic Parishes across

---

[9] These personnel are not employees of the Diocese but are associated with or employed by Parishes and other orders.

the United States. This identification is due to a number of geographic and socio-economic factors, including:

- the sheer size of the Diocese;

- the predominantly rural nature of the communities within the Diocese;

- the isolation of the Parishes that serve the communities (62% of the Parishes are located in rural areas or border towns);

- economies that are agriculture and service based;

- economic devastation of communities that were dependent on copper mining;

- nearly 50% of Parishes and missions within the Diocese have total annual incomes of less than $150,000;

- four Native American reservations, one of which is geographically equivalent to the size of the state of Connecticut (On the Tohono O'odham Reservation, there are only two priests for 24,000 persons scattered over three million acres.);

- Arizona's low ranking as a state in several leading social and economic indices.

The Diocese of Tucson receives financial assistance annually from the Home Missions Appeal. The financial assistance is restricted and must be used to help fund diocesan evangelization efforts, Parish religious education programs, lay ministry training, and the pastoral care of migrant communities.

The Diocese is also the recipient of financial assistance from the Catholic Church Extension Society. The Society "extends" financial resources provided by Catholics in the United States to dioceses in rural and remote areas of the country. The resources are restricted and required to be used in support of salary subsidies for Church personnel in ministry, for construction of church buildings, and for Parish religious education programs.

The Diocese provides spiritual guidance for the Parishes and the Catholics within the Diocese through its Bishop and various offices discussed below. The Diocese also provides administrative services to the Parishes and missions located within the Diocese, such as financial

services, property management, pension plan and insurance programs. The nature of these programs and the manner in which the Diocese is compensated for these services is discussed below.

**B.     Organizational Structure Of The Diocese.**

The Diocese is structured and operates in accordance with Canon Law. Among other things, Canon Law establishes that the Roman Catholic Church is comprised of "juridic persons." According to Canon Law, a "juridic person" is the equivalent of a corporation in civil law. Each Parish, service organization, School, or other charity affiliated with the Church is considered a separate juridic person. An ordinary (bishop) is given the responsibility to supervise the juridic persons in a diocese.

The Bishop of the Diocese is the Most Reverend Gerald F. Kicanas, D.D. According to Canon Law, the Bishop is a teacher of doctrine, priest of sacred worship, and minister of governance. The Bishop governs those within the Diocese with legislative, executive, and judicial power. The Bishop also: explains the truths of faith; fosters vocations; strives to promote holiness of the Christian faithful; presides over and administers the sacraments of the church; and protects the integrity of ecclesiastical discipline and sacraments. Part of the duties of the Bishop and the Diocese are carried out by the offices of the Diocese which consist of: Office of the Bishop (includes Vicars General, Moderator of the Curia, Vicar for the Religious, Vicar for Deacons, and Office of Child, Adolescent and Adult Protection); Chancellor's Office (includes Archives); Vocations; Human Resources; Fiscal Services; Property and Insurance Services; Community Relations (includes Catholic Vision newspaper); Tribunal; Formation; Catechesis; Evangelization; Catholic Schools; and Catholic Social Mission.

These offices are under the direct supervision of the Bishop. They conduct work of several types: work required by Canon Law; work required by civil law of a non-profit corporation; work that supports the Bishop in his responsibilities to the Catholic people and to their Parishes and Schools in the territory of the Diocese; work that supports the Bishop in his

responsibilities to respond to social issues and concerns; and work that is involved in any business effort. Each of the offices performs specific functions in support of the Bishop's pastoral ministries and in support of the Parishes and Schools in the territory of the Diocese which include:

• Office of the Bishop: This Office deals with official correspondence of the Bishop; scheduling of appointments with pastors, Parish clergy, Parish staff, and parishioners; pastoral visits to Parishes and Schools, and Confirmations at Parishes; oversight of child protection efforts and initiation and coordination of training of Parish and School staff and volunteers in creation of safe environments for children (Office of Child, Adolescent, and Adult Protection).

• Vicar General: The Vicar General has the executive power over the Diocese which belongs to the Bishop by law, namely the power to place all administrative acts except those, however, that the Bishop has reserved to himself or which require a special mandate of the Bishop by law. There are two Vicar Generals in the Diocese: Rev. Van Wagner and Rev. Raul Trevizo.

• Moderator of the Curia: The Moderator of the Curia, under the authority of the Bishop, is to coordinate those things which pertain to the treatment of administrative affairs and to take care that the other members of the curia properly fulfill the office entrusted to them. The Moderator of the Curia in the Diocese is Rev. Al Schifano.

• Chancellor's Office: This office is responsible for facilitation of archival record keeping; arrangement of priest substitute needs for Parishes. The Chancellor is required by the Canon Law to ensure that all documents which regard the Diocese or Parishes must be protected with greatest care. The Chancellor ensures that there is in a safe place a diocesan archive, or record storage area in which instruments and written documents which pertain to the spiritual and temporal affairs of the Diocese are to be safeguarded after being properly filed and diligently secured. The Chancellor of the Diocese is June Kellen.

• Financial Officer: The Financial Officer administers the finances and property of the Diocese under the authority of the Bishop in accord with the budget determined by the finance council and, from the income of the Diocese, is to meet expenses which the Bishop or others designated by him have been legitimately authorized. The Financial Officer of the Diocese on the Petition Date, and for a time thereafter, was Mary Huerstel. Ms. Huerstel's appointment expired and she determined not to continue as the Financial Officer. The Diocese does not contemplate replacing the Financial Officer at this time. Rather, it has hired a Controller and the Moderator of the Curia has assumed supervisory duties over the fiscal office of the Diocese.

• Vocations: This office provides for the recruitment of seminarians; initiation and coordination of Parish vocation awareness programs; assistance with and facilitation of responses at Parish level to interest in pursuing a ministry.

• Human Resources: This office participates in negotiations on behalf of all Parishes and Schools with employee benefit providers; facilitation of response of Parishes and Schools to employee needs; assistance with compliance by Parishes and Schools with child protection policies (fingerprinting of employees and volunteers and background checks of employees and volunteers). Richard Serrano is the head of Human Resources.

In addition, the Diocese provides, among other things:

• Fiscal Services: Training of Parish financial staff; assistance with bookkeeping, and other Parish and School financial administration needs.

• Property and Insurance Services: Facilitation of insurance claims reports; property recording assistance; construction project oversight assistance.

• Development Services: Assistance with capital and other fundraising needs; assistance with Parish stewardship programs.

• Community Relations: Publication of the diocesan newspaper, Catholic Vision.

• Tribunal: Assistance with and facilitation of needs of parishioners related to the Sacrament of Marriage.

- 23 -

• Formation: Initiation and coordination of workshops and certification training for the development of Parish lay leadership and for the permanent deacons.

• Catechesis: Initiation and coordination of workshops and other training for Parish religious education teachers and youth ministers.

• Evangelization: Initiation and coordination of resources and workshops and certification training for Parish-based evangelization programs.

• Catholic Schools: Initiation and coordination of workshops for principals, faculty, and staff and facilitation of and assistance with certification of Catholic Schools.

• Catholic Social Mission: Initiation and coordination of workshops for Parish staff and parishioners in response to social issues and concerns.

**C.** **Legal Structure of the Diocese.**[10]

As previously noted, the Diocese is a juridic person under Canon Law. Similarly, each Parish is a juridic person separate from the Diocese. A juridic person is an artificial person, distinct from all natural persons or material goods, constituted by competent ecclesiastical authority for an apostolic purpose, with a capacity for continuous existence and with canonical rights and duties like those of a natural person (*e.g.*, to own property, enter into contracts, sue or be sued).

As decreed by Canon Law, every diocese (which is itself a juridic person) is to be divided into distinct parts or Parishes. The establishment of Parishes is obligatory, not optional. A Parish is a certain community of the church members whose pastoral care is entrusted to a pastor under the authority of the diocesan bishop. Canon 515, § 1. Once a Parish has been established, it becomes a juridic person separate and distinct from the Diocese. Canon 515, § 3. The Pastor (not

---

[10] This discussion sets forth, in part, the position of the Diocese only on the issue of property ownership. This discussion is not meant to be an exhaustive analysis of the issues of property ownership which may arise or could be asserted. One or more creditors or parties in interest dispute the position of the Diocese. The effect of litigation over this issue on the Estate and the Creditors (including the Tort Claimants) is contained on Section IV. D. below.

the Bishop) represents the Parish in all juridic affairs in accord with the norm of Canon Law; he is to see to it that the goods of the Parish are administered in accordance with the norms of Canon Law. Canon 532.

While the Church (including each Diocese and each Parish) is governed by and adheres to Canon Law, the Church (and the Diocese and each Parish) also operates pursuant to civil laws that establish their own norms for, among other things, property ownership. Each Parish has its own governance structure. It has its own employees, it has its own tax identification number, it keeps its own books and records, it has its own bank accounts, and it is governed in accordance with Canon Law. Each Parish also has its own finance council which is responsible (along with the Pastor) for managing the financial affairs of the Parish. If one were to try and find an analogy to a Parish in civil law, the closest would be an unincorporated association.[11] However, there are certain limitations on unincorporated associations. For example, Arizona law does not allow unincorporated associations to, among other things, hold title to real property. Accordingly, mere legal title to the Parish Real Property which is owned by the Parishes is in the name of the Diocese (or the Bishop). However, the Diocese does not have any equitable, beneficial or proprietary interest in the Parish Real Property.

As previously stated, the Diocese is a corporation sole. The utilization of the corporate structure of a corporation sole is a way of preserving the authority of the Bishop to make certain decisions under Canon Law which are tantamount to reserved powers under civil law. A corporation sole is a unique form of entity under state law. Because of the technical distinction between the statutorily authorized purposes or objects of the corporation and the powers of the corporation under the Arizona statutory language, Canon Law necessarily must be applied to questions regarding the nature and extent of a corporation sole's interests in property. A.R.S. § 10-11904 provides that upon executing and filing the articles of incorporation the person

_____

[11] There may be differences between a Parish and an unincorporated association which do not need to be addressed or resolved at this time.

who executed the articles and the successors to his office by the name and title specified in the articles is "deemed a corporation sole with perpetual succession, and may acquire and possess, by gift, bequest, devise or purchase and hold, sell, rent or otherwise dispose of such property, borrow money and give written security therefore and secure payment thereof by mortgage or lien." In addition, an individual or an office in the religious polity is constituted the corporation. A.R.S. § 10-11904. Accordingly, in this case, the Bishop acting from time to time in the Diocese is, in essence, the corporation.

Furthermore, Arizona law requires that the person that embodies the corporation sole must be, "A person vested with the legal title to property of a church or religious society <u>in conformity with its constitution, canons, rites or regulations</u>,…may make and subscribe to written articles of incorporation…" A.R.S. §10-11902 [emphasis added]. The provisions of A.R.S. § 10-11902 are significant because of the identity of the office (*i.e.* the Bishop) and the vesting of legal title to property of a church in the corporation sole is "in conformity with its constitution, canons," etc. pursuant to applicable state law. Statutory law requires that the Court would have to adhere to Canon Law in considering property ownership issues.

As stated, the Parishes operate separately and conduct their own business subject only to the oversight and reserved powers of the Bishop. The Diocese, under the direction and leadership of the Bishop and the Offices of the Diocese discussed above, provides services to the Parishes. The Diocese is compensated for these services both through the chancery tax and other agreed fees and compensation. The best analogy to this structure under civil law is a trust or restricted asset.

Under applicable trust law, as under Canon Law, the Diocese, acting through the Bishop, does not have unfettered authority to deal with the assets of the Parishes. Trust law (and the applicable trust documents) prescribe the actions of trustee and give (or fail to give) authority for trustee of a trust to act (or refrain from acting) in a certain way. If, for example, the Diocese were to attempt to alienate Parish property, sell Parish property, or otherwise affect the Parishes

1 without complying with the applicable requirements of Canon Law, the Bishop would violate

2 Canon Law just as the Diocese (acting through the Bishop), as the trustee or holder of property

3 subject to a restriction would be violating the trust or restriction encumbering the property if he

4 took action in violation of the terms of the trust or applicable law.

5     The real property upon which a Parish is located is owned by the Parish. The Parish paid

6 for the property (either by direct acquisition from a third party or acquisition from the Diocese).

7 Improvements to those properties were made by the Parishes and paid for by the Parishes. To

8 fund construction, Parishes either obtain loans or do not commence construction until all of the

9 money required has been raised. The monies to build the churches, Schools and other

10 improvements to Parishes come from the work and generosity of the parishioners of that Parish

11 (and others who might donate). These funds are subject to donor imposed restriction, *i.e.*, for the

12 specific purpose of building the improvements. The monies to construct the churches, the

13 Schools, and associated improvements do not come from the Diocese, unless it is through a loan

14 which constitutes a legal obligation of a Parish and which is repaid.

15     However, as stated above, because the Parish has no "civil" legal[12] authority to hold title

16 to real estate, mere legal title is in the name of the Diocese.[13] The Diocese has no equitable or

17 beneficial interest in the Parish Real Property, and therefore, the Parish property, including the

18 Parish Real Property, is not property of the Estate pursuant to Bankruptcy Code § 541.

19     The Parish Real Property consists primarily of lots improved with churches, schools,

20 rectories, housing, convents, and other improvements related to the ministries of each of the

21 seventy-six (76) Parishes and the schools and missions. The Parish Real Property also includes a

---

22
23     [12]  As opposed to whatever equitable, beneficial or proprietary rights the Parish may have in Parish Real Property.

24
25
26     [13]  However, as the beneficiary of the trust between each Parish and the Diocese, the Parish has a beneficial, equitable and proprietary interest in the Parish Real Property. Consistent with this concept, under Canon Law, the Parish is the owner of its "temporal goods" which includes all real and personal property owned by a Parish. Therefore, civil and Canon Law are consistent with respect to the ownership of the Parish Real Property.

small number of properties that are not currently being actively used in ministry, usually adjacent to the Parish or school and intended for future use. Although the Parish Real Property is not property of the estate, a description of Parish Real Property is attached hereto as Exhibit "4". The Diocese does not know, and has no way to reasonably estimate the market value of the Parish Real Property. The Parish Real Property is not included as property of the Estate of the Diocese nor is it considered for purposes of the Plan. The Diocese does not include and has not included the Parish Real Property as assets of the Diocese on its books and records.

The Diocese also administers certain pooled investments for the benefit of the Parishes and other associated entities. These funds consist of the regular collections and other monies of the Parishes and other entities in excess of the three months of expenses retained by the Parishes and which are not specifically restricted (the "Unrestricted Deposits"). In addition, the Parishes and other entities remit restricted funds to the Diocese for management (the "Third Party Restricted Deposits"). The Diocese is also the direct recipient of restricted donations, restricted grants and similar restricted gifts (the "Diocese Restricted Funds"). Collectively, the Third Party Restricted Deposits and the Diocese Restricted Funds will hereinafter be referred to as the "Restricted Funds". Prior to the Petition Date, the Diocese pooled the Unrestricted Deposits and the Restricted Funds and invested them for the benefit of the Parishes, the Diocese and other entities. Since the Petition Date, the Diocese and the Parishes have taken steps to separate any Diocese deposits and investments from those of the Parishes. Furthermore, an oversight board was established to oversee the investment and management of the Parish Restricted Funds and postpetition Parish Unrestricted Deposits. However, the Diocese continues to provide management and other services to the Parishes and other entities with respect to the those funds.

The Diocese acts as a trustee, manager and custodian of the Third Party Restricted Deposits and the Unrestricted Deposits. Just as a trustee under a trust can invest, re-invest and manage assets of the Trust, so does the Diocese perform that function. In addition, just as a trustee of a trust acquires bare legal title to the assets under the trustee's management and control,

- 28 -

1    so does the Diocese have bare legal title.  However, just as a trustee of a trust does not acquire

2    any beneficial or equitable interest in the property subject to the trust except as explicitly

3    provided in the Trust or applicable law, the Diocese has no beneficial or equitable interest in the

4    Restricted Funds and the Unrestricted Deposits except to the extent that the Diocese has also

5    placed unrestricted and restricted assets in the fund.  Moreover, the relationship between the

6    Diocese and the Parishes and other entities that are themselves juridic persons is governed by

7    Canon Law just as the obligations, rights and powers of a trustee are governed by state law.  The

8    pooled fund that has been managed by the Diocese is commonly referred to as the Deposit and

9    Loan Fund.

10            **D.        Potential Disputes Over Property Ownership and Associated Risks.**

11            As described above, the Diocese believes that certain parties in interest in this

12    Reorganization Case may dispute the Parishes' rights to the Parish Real Property and other Parish

13    property.  The Diocese has sought to resolve this dispute by proposing a Plan that provides Tort

14    Claimants an opportunity to accept prompt fair and equitable compensation from a dedicated fund

15    in lieu of years of litigation regarding the extent of the Parishes' property rights.  The discussion

16    contained in this Disclosure Statement only briefly describes the issues regarding the property

17    ownership and broad legal concepts that would apply.  In addition to other issues which would be

18    raised, including fact intensive inquiries of the source of funds for acquisition of every Parish

19    asset, resolving the extent of the Diocese's property rights versus the Parishes' property rights

20    through litigation necessarily implicates the First Amendment of the United States Constitution.

21    This will require a complicated analysis of neutral principals of civil law and interpretation of

22    religious doctrine requiring deference to ecclesiastical authorities, and state law.  See *e.g.*:

23    Watson v. Jones, 80 U.S. 679, 723 (1871); Jones v. Wolf, 443 U.S. 595, 602-605, 99 S.Ct. 3020,

24    3025-3026 61 L.Ed.2d 775 (1979); Rashedi v. General Bd. of Church of Nazarene, 203 Ariz. 320,

25    323, 54 P.3d 349, 352 (Ariz.App. 2002); Gonzalez v. Roman Catholic Archbishop of Manila, 280

26    U.S. 1, 16, 50 S.Ct. 5, 74 L.Ed. 131 (1929); Serbian E. Orthodox Diocese v. Milivojevich,

- 29 -

426 U.S. 696, 709, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976); <u>Dobrota v. Free Serbian Orthodox Church St. Nicholas</u>, 191 Ariz. 120, 124, 14, 952 P.2d 1190, 1194 (App.1998).

The Diocese believes that any litigation over whether the Parish Real Property and other Parish property are part of the Estate, and the applicability of the First Amendment, neutral civil laws and religious doctrine under Canon law to the property issues will be both extraordinarily time consuming and expensive. Whatever the outcome, the Diocese believes that the result would be subject to multiple appeals.

Below is a table offering the Diocese's estimate of the amount of time it would take to litigate the parish property issue. The table was created using statistics published on the Federal Judiciary Center's Table C-10 which describes U.S. District Court-Median Time Interval from Filing to Trial of Civil Cases in Which Trials Were Completed and Table B-4 which describes U.S. Courts of Appeals - Median Time Intervals in Cases Terminated After Hearing or Submission during fiscal year 2004.

| Litigation/Appeal Stage | Median Interval between filing and disposition | Cumulative Total |
|---|---|---|
| Trial Court (Arizona) | 30.7 | 30.7 |
| Appeal to District Court or Bankruptcy Appellate Panel | 26.2 | 56.9 |
| Appeal to 9th Circuit | 33.0 | 89.9 |
| Request for Rehearing en banc 9th Circuit Court of Appeals (Estimated using average interval between filing last brief to hearing or submission in the 9th Circuit) | 6.7 | 96.6 |
| U.S. Supreme Court (Estimated using most efficient court of appeals- the 4th Circuit) | 21.4 | 118.0 |

This is a conservative estimate by the Diocese. It is possible that the time for disposition in the trial court could be substantially less and, if the ruling is appealed to the Bankruptcy Appellate Panel rather than the District Court, the time for the initial appeal could be less. Based upon the Diocese's estimate, litigating the parish property issue on the merits and appealing the issue would take approximately nine (9) years ten (10) months. Assuming a complaint were filed

1   simultaneously with this Disclosure Statement, the date the issue would be disposed of by the

2   United States Supreme Court would be approximately Monday, February 23, 2015. It is possible

3   that that time could be cut to approximately five (5) years but even if that were the case, the issue

4   would not be disposed of until 2010.

5       The costliness of litigating the question of the extent of the Parishes' property rights versus

6   the Estate's property rights has been well documented in other Chapter 11 cases, including those

7   of other Dioceses facing similar issues. For example, in Portland, a declaratory judgment

8   complaint has become the vehicle to address the parish property issue. This proceeding is at a

9   very preliminary stage. Counsel for the committee and the debtor in that case have filed fee

10  statements suggesting legal fees – in that <u>single</u> proceeding – are exceeding $180,000 <u>per month</u>

11  and they are not close to trial.

12      While there may be dispute as to the outcome of any such litigation, there is no dispute

13  that it will be costly and time consuming. Furthermore, the delay in litigating the issues,

14  regardless of which estimate of time is used, will delay confirmation and distributions to

15  Creditors, including Tort Claimants with legitimate claims.

16      **E.    The Financial Structure and Operations of the Diocese.**

17      The operations of the Diocese have been funded through three primary sources: (1) a "tax"

18  on the offertory donations collected by the Parishes (the "Chancery Tax"); (2) the difference in

19  earnings on the Deposit and Loan Fund and the fixed rate of return paid to Parishes and other

20  participants in the Deposit and Loan Fund; and (3) grants and direct donations.[14]

21      Prior to the Petition Date, the Diocese paid the participants in the Deposit and Loan Fund

22  a fixed rate of return on their investments. As of the Petition Date, that rate was of .75 percent

23  _____

24      [14] Because the Parishes are going to be separately incorporated as part of the confirmation
    of the Plan and there will be a restructure in the manner in which the Deposit and Loan Fund is
    administered, the Diocese and the Parishes and other entities who participate in the Deposit and
25  Loan Fund are working through exactly what services will be provided by the Diocese and how
    those services might be additionally compensated.
26

1   (the "Participant's Rate").  The difference between the Participant's Rate and the actual return on

2   the investments is retained by the Diocese to compensate it for its services.  In addition, as

3   provided under Canon Law, the Diocese charges each Parish a "tax" on the total offertory

4   donations collected by each Parish (the "Chancery Tax").  The Chancery Tax is used to fund

5   Diocesan operations.  As of the Petition Date, the Chancery Tax varied depending upon the

6   Parish.  The Diocese also receives grants and direct testamentary and non testamentary donations.

7   Typically these funds are donated with a restricted purpose and are reflected on the books and

8   records of the Diocese as restricted or endowment funds (also restricted).  If no such restriction

9   exists, those assets are considered to be part of the general assets of the Diocese.

10  Furthermore, the Diocese provides services to or administers certain programs for the

11  Parishes, Schools and other entities who might have some connection to the Diocese, such as the

12  cemeteries and the Catholic Foundation.  By way of example, such programs may be insurance or

13  lay employee's pension plans.  The Diocese acts as the custodian for premiums and other monies

14  paid by these entities to participate in these programs.  The funds received by the Diocese are not

15  property of the Diocese but are paid to the Diocese as the manager or administrator of the

16  programs.

17  Information regarding Diocese historical financial performance is contained in the

18  Audited Financial Statements for fiscal years 2002 and 2003 which are attached hereto as

19  Exhibit "5" and, the unaudited internally prepared financial statement dated September 20, 2004,

20  which is attached hereto as Exhibit "6".

21  **F.    The Diocese's Assets And Liabilities.**

22  Following is a description of some of the Assets and liabilities of the Diocese.  This

23  discussion is not inclusive of all Assets and liabilities as reflected on Exhibit "6" and for a more

24  comprehensive listing of such Assets and liabilities, reference should be made to Exhibit "6".

25

26

- 32 -

1    **1.    Assets.**

2        (a)    Real Property

3        The Diocese owns certain real property.  As of the Petition Date, this real property

4    consists primarily, but not exclusively, of two categories of property:  (i) property given to the

5    Diocese by a third party which might consist of a house, a vacant lot or similar property; and

6    (ii) property which the Diocese has acquired to be used for establishing future Parishes within the

7    Diocese.  Excluded from the Diocese Real Property is any property the Diocese may own

8    adjacent to or a part of St. Augustine Parish and any other real property that is used by the

9    Diocese for pastoral purposes.  This real property, collectively, is more particularly described in

10   Exhibit "4".  As of the Petition Date, the Diocese Real Property had a combined book value and

11   fair market value of approximately $3.3 million dollars.  As part of the Plan, the Diocese intends

12   to liquidate all of the Diocese Real Property.  An auction was held on May 21, 2005, at which all

13   Diocese Real Property, with the exception of a few miscellaneous parcels were sold.  The results

14   of the auction were not final as of the date of this Disclosure Statement.  Proceeds of these sales,

15   after payments of costs of sale including commissions, will be used to fund the Settlement Trust

16   and, if necessary, the Litigation Trust in accordance with the terms of the Plan.

17       (b)    Personal Property

18           (i)    Accounts Receivable

19       These Assets consist of amounts owed to the Diocese by Parishes and others for chancery

20   tax and other fees and costs.  The amount, net of doubtful accounts, as of the Petition Date was

21   $413,690.07.  As previously stated, the Diocese is a mission diocese.  One of the things that

22   makes it a mission diocese is the financial situation of the Parishes and its parishioners.  Out of

23   the seventy-five (75) Parishes, a substantial number of them are either unable to pay their

24   assessments at all or are unable to pay all of their assessments, including the accounts receivable

25   owed to the Diocese.  The Diocese is trying to work with these Parishes so that they can pay

26

1 something to the Diocese. The Diocese and other Parishes who might be able to assist the poorer

2 Parishes are exploring ways in which this might be accomplished.

3 (ii) St. Augustine Catholic High School

4 The newly opened St. Augustine Catholic High School operates out of what used to be

5 referred to as the Regina Cleri Center. The Diocese secured part of its obligations under the 2002

6 Settlement (described in Section IV.E.2(c) below) with a deed of trust encumbering the Regina

7 Cleri Property. In order to pay the settlement amount, and consistent with its mission to assist

8 with Catholic education within the geographic area of the Diocese, the Diocese sold the Regina

9 Cleri Property to the St. Augustine High School Corporation, an Arizona nonprofit corporation,

10 subject to the deed of trust in favor of the Escrow Agent. The terms of the sale provided for a

11 payment of $600,000 (the "Restricted Payment") at the time of closing and a deferred payment of

12 $2,400,000 to be paid on September 1, 2006 (the "St. Augustine Deferred Payment"). The

13 St. Augustine Deferred Payment is secured by a deed of trust encumbering the Regina Cleri

14 Property (the "St. Augustine Deed of Trust"). The St. Augustine Deed of Trust is a second

15 priority deed of trust, second in priority only to the Deed of Trust securing the remaining payment

16 on the Remaining 2002 Settlement Amount. As of the petition date, therefore, there was

17 $2,400,000 owing to the Diocese by St Augustine High School. Under the terms of the sale, the

18 Restricted Payment is to be held in restricted account and only used to pay the Remaining 2002

19 Settlement Amount owed to the Escrow Agent. The Restricted Payment plus the St. Augustine

20 Deferred Payment are, by the terms of the transaction, restricted and can only be used to pay the

21 Promissory Note.

22 (iii) Insurance Actions

23 The Diocese is the insured under certain general liability insurance policies (including

24 sexual misconduct) which were issued at various times relevant to the times at which certain Tort

25 Claims are alleged to have occurred. The Insurance Companies issuing the Insurance Policies

26 and the effective year(s) for each Insurance Policy are set forth in Exhibit "7" attached hereto.

1  Each of the Insurance Policies with the exception of the policy issued by The Ordinary Mutual is

2  an occurrence policy[15] which means that if the act occurred during a policy year, regardless of

3  when the claim is made, then the claim is covered by the applicable Insurance Policy. The

4  Ordinary Mutual Insurance Policy is a "claims made" policy which means that the relevant time

5  period for determining coverage is not the date of occurrence, but the date the claim is first

6  made.[16]

7      All of the Insurers have been put on notice of the Tort Claims which are known to the

8  Diocese. For those Tort Claims which are currently the subject of a pending lawsuit, the Insurers

9  were paying the cost of defense.[17]  Pursuant to the terms of the Ordinary Mutual policy, the

10  Diocese must pay fifty percent (50%) of the costs of defense. Each of the Insurers (other than

11  Ordinary Mutual) has reserved all rights with respect to whether there is coverage for the Tort

12  Claims at all. The Diocese contends that it has various claims against certain Insurance

13  Companies related to coverage and additional claims arising out of an Insurance Company's

14  actions with respect to coverage and settlement (or failure to settle) of the Tort Claims.

15      Each Insurance Company will be given an opportunity to participate in the Plan and

16  become a Settling Insurer. Any Insurance Company that fails to settle with the Diocese on terms

17  and conditions acceptable to the Diocese and approved by the Bankruptcy Court will not receive

18  the benefits of a Settling Insurer under the Plan. The Diocese has recently retained the law firm

19  of Haralson, Miller, Pitt, Feldman & McAnally, P.L.C., ("Miller Pitt") as special litigation

20  insurance counsel pursuant to Order entered on May 24, 2005. As an Arizona Supreme Court

21
22      [15] St. Paul insured the Diocese for professional liability in 1982-1983 which was a claims made policy. That policy has been exhausted.

23      [16] Although the Ordinary Mutual policy is a "claims made" policy, it is limited to claims first made after 1985 for acts occurring after that time.

24
25      [17] As a result of the filing of the Reorganization Case, the automatic stay has resulted in a stay of all actions. Accordingly, except for costs and fees related to removal to the Bankruptcy Court of the cases that were in litigation as of the Petition Date and certain other related issues, no costs have been incurred with respect to the cases in litigation as of the Petition Date.

26

- 35 -

Justice, Justice Stanley Feldman wrote much of the law in Arizona with respect to such key topics as insurance, bad faith, sex abuse torts, and repressed memory. After an initial evaluation period, during which Miller Pitt will be paid an hourly fee (subject to Bankruptcy Court approval), Miller Pitt will be compensated on a contingent fee basis with respect to recoveries in Insurance Actions. To the extent that the Debtor or Reorganized Debtor are required to pay advance any costs for the Insurance Actions, the Reorganized Debtor will receive reimbursement of those costs from the Settlement Trust.

At this time it is not possible for the Diocese to provide an estimate of the total value of the Insurance Actions. There are various factors that affect the ultimate amount which may be recovered from an Insurance Action against a particular Insurance Company. For example, each occurrence policy allegedly has certain limits that an Insurance Company will be required to pay for an "occurrence." There are issues as to what the definition of "occurrence" is for purposes of coverage. Additionally, examples of issues that affect coverage and liability may include: (i) whether each act of abuse is a separate occurrence; (ii) whether abuse that extended cover multiple policy years are separate occurrences; (iii) the extent of an Insurance Company's liability for the claim itself; (iv) the merits of the claims that are covered by a particular Insurance Company's policy; (v) whether a particular Insurance Company is liable for the entire amount of the Diocese's potential liability regardless of any limits in coverage because of the actions of that Insurance Company; and (vi) whether the Insurance Company is guilty of bad faith and the consequences of such a finding. While the Diocese believes it will prevail in any action against an Insurance Company, there is no guarantee nor is there a way to predict what those recoveries might be at this point.[18]

---

[18] See Section VI. below for a brief discussion of the Hartford Settlement.

(iv)    Interest of Bishop in certain other corporations

A number of nonprofit corporations associated with the mission of the Diocese have one member, the Bishop of the Diocese. Those corporations are Catholic Community Services, Inc., Catholic Foundation and Diocese of Tucson Catholic Cemeteries, Inc. The Bishop has no proprietary interest in these corporations. Moreover, each of the articles and by-laws provide that upon a dissolution of the corporation, the assets are to be transferred to another religious entity that performs the same service as the dissolved corporation. The Bishop's only real authority is to remove and replace the board of directors of such corporation(s) if he disagrees with their actions. To the best of the knowledge of the Diocese, that power has not been exercised.

(v)    Restricted Assets

There are various Assets which the Diocese lists on its financial statements as being held for others. As a non-profit religious organization, the Diocese is the recipient of grants, gifts and other assets which are subject to restrictions imposed by the donor or the grantor of the grant. In addition, the Diocese manages the Deposit and Loan Fund into which Restricted Deposits are made. These Restricted Deposits are subject to similar restrictions and are, therefore, not available for general purposes. These restricted assets are not property of the Estate nor are they available for distribution to Creditors.

(vi)    Avoidance Actions

(A)    Preferences

Pursuant to Bankruptcy Code § 547, a debtor in possession can recover certain payments made to creditors within ninety (90) days of the Petition Date or within one (1) year if the payment is made to an insider (as defined in the Bankruptcy Code). Not all such payments are subject to being paid back to the Estate and various defenses are available to Creditors against whom such claims are made. As of the date of this Disclosure Statement, the Diocese does not believe that any of the payments made by the Diocese within either of the two periods provided in

1   Bankruptcy Code § 547 are recoverable.  However, the Diocese will continue its analysis of these

2   payments and, to the extent the Diocese determines that any such payments are likely to be

3   recoverable pursuant to Bankruptcy Code § 547, it will pursue those recoveries.  The Diocese also

4   anticipates that it will work with the Committee on this issue.

5                                          (B)        Fraudulent Transfers

6                  Prior to the Petition Date, certain of the Tort Claimants filed an action in the Pima County

7   Arizona Superior Court contending that certain transfers of real property made by the Diocese

8   over the past several years were either constructive or actual fraudulent transfers.  The properties

9   to which the claim pertained were:  (i) the sale to St. Augustine Catholic High School of the

10  Regina Cleri Property discussed above; (ii) the transfer/sale and leaseback of the pastoral center

11  to the Catholic Foundation; (iii) the sale by St. Monica Parish of property to San Miguel for a

12  Catholic High School to be constructed on the property owned by St. Monica Parish; and (iv) the

13  transfer pursuant to an agreement entered into between the Diocese and the Caridad-DePorres in

14  2000.

15                 Although the Diocese had not responded to the complaint prior to the Petition Date, the

16  Diocese disputes any claims that any of the transfers were either constructively or actually

17  fraudulent.  The Diocese did not own the property transferred by St. Monica Parish.  The other

18  transfers were either made pursuant to existing agreements or for reasonably equivalent

19  consideration.

20                                         (C)        Strong-arm Powers

21                 An individual that filed a proof of claim in the Reorganization Case filed a motion seeking

22  authority to assert the debtor in possession's strong-arm authority under 11 U.S.C. § 544 in order

23  to supplement a claim that the Parish Real Property and other Parish Property are part of the

24  Estate.  That motion was denied.  As with a claim under 11 U.S.C. § 541 that the estate's property

25  includes the Parishes' property, the Diocese does not believe that the Estate's strong arm powers

26  under 11 U.S.C. § 544 would defeat the Parishes' property interests.  Moreover, any litigation

1　seeking to use strong arm powers under 11 U.S.C. § 544 to defeat the Parishes' property interests

2　would be subject to the same delay, costs and risks described above in Section III. D and

3　outweigh the benefits of such litigation. The Trustee of the Settlement Trust will be directed to

4　segregate $100,000 of the Initial Contribution Amount to allow the Unknown Claims

5　Representative to investigate and, if necessary, pursue possible recoveries which might be within

6　the Estate's strong-arm powers with respect to certain Avoidance Actions that will be assigned to

7　him. This authority will not extend to the Parish property issue which will be resolved by the

8　Plan and any agreements with the Parishes.

9　　　　　　**2.**　　　**Liabilities.**

10　　　　　　　　(a)　　　Parish Claims

11　　　　The Claims of the Parishes against the Diocese arise in two respects. First, the Parishes

12　have Claims against the Diocese for the amount of their Unrestricted Deposits for return of their

13　funds.[19] In addition, a number of Parishes and affiliated entities have made unsecured loans to

14　the Diocese to fund the 2002 Settlement (collectively, the "Parish Loans"). The balance of

15　Settlement Loans as of the Petition Date were approximately $4,700,000. The amount of the

16　Unrestricted Deposits which comprise the balance of the Parish Claims is approximately

17　$2,200,000. As of the petition date, the Diocese had made no payments on the Parish Loans. The

18　Diocese anticipates that either pursuant to Order of the Bankruptcy Court prior to the Effective

19　Date or pursuant to the Plan, the Unrestricted Deposits will be returned to the Parishes.

20

21

22

---

23　　　[19]　The Unrestricted Deposits of the Parishes have been segregated and are being held by
the Diocese and not disbursed to any Parish that claims a right to the Unrestricted Deposits. The

24　Diocese is merely the custodian, manager and trustee of those funds. The Diocese believes that
the Parishes dispute the Diocese's withholding of the Unrestricted Deposits, and that the Parishes

25　will claim that the Unrestricted Deposits are not property of the Estate but are the property of the
Parishes, are held for their benefit and cannot be used by the Diocese nor are they available for

26　the Claims of Creditors. The Diocese agrees with that position.

1              (b)      <u>Catholic Order of Foresters</u>

2       The Catholic Order of Foresters is a fraternal philanthropic Catholic organization (the

3 "Foresters") which has loaned money to the Diocese from time to time and, as of the Petition

4 Date, the Diocese was obligated to Foresters for Unsecured direct obligations of approximately

5 $2,000,000.

6              (c)      <u>2002 Settlement Obligations</u>

7       As part of the 2002 Settlement, the Diocese executed a promissory note in favor of the

8 Escrow Agent in the principal amount $3,000,000.00 (the "Promissory Note") secured by a first

9 deed of trust against the Regina Cleri Property. The Promissory Note is non-interest bearing and

10 matures in 2007.

11              (d)      <u>Parish Guaranty Claims</u>

12       As part of the administrative services that are provided to the Parishes by the Fiscal Office

13 of the Diocese, the Diocese assists Parishes with obtaining loans from such organizations as the

14 Foresters. Frequently a condition of those loans has been a guaranty by the Diocese. As of the

15 Petition Date, the Parish Guaranty Claims were approximately $6,900,000. The Parish Guaranty

16 Claims are contingent Claims against the Diocese, and the Diocese does not expect to have to pay

17 any sums on the Parish Guaranty Claims because the Parishes will fully perform on those loans.

18              (e)      <u>Trade Debt</u>

19       The Diocese, as a business, has incurred certain trade debt. As of the Petition Date, the

20 Diocese believes that it had approximately $83,672.44 in trade debt.

21              (f)      <u>Tort Claims</u>

22       As is discussed in detail below, the Diocese is a party to a number of lawsuits or other

23 claims wherein the claimants allege that they were abused by clergy or others associated with the

24 Diocese. The Tort Claimants assert, among other things, that the Diocese is liable because it

25 failed to properly supervise these individuals and that the Diocese knew or should have known

26 about the actions of these individuals. The Diocese has denied these allegations and has been

1  defending those suits.  In order to determine the universe of Tort Claims which might be asserted

2  against the Diocese and as provided under the Bankruptcy Code, the Diocese requested that a Bar

3  Date be set for Claims.

4       With the time to file Claims having expired on April 15, 2005, the universe of Tort Claims

5  (excluding Unknown Tort Claims) became known.  One hundred and eight (108) proofs of claim

6  alleging injuries related sexual abuse committed by clergy or others associated with the Diocese

7  were filed prior to the Claims Bar Date.  Five (5) of the timely filed proofs of claim were

8  duplicates of other Proofs of Claim, accordingly, one hundred-three (103) individuals filed Proofs

9  of Claim.  Nine (9) of the claims were filed by parents of direct victims of sexual abuse, although

10 in two instances, the direct victims did not file Tort Claims.  There are estimated to be thirty-six

11 (36) proofs of claims that contain abuse allegations that, on their face, are subject to objection on

12 various grounds.   Of the remaining approximately fifty six (56) Tort Claims, there are

13 approximately twenty-three (23) claims, which although they appear to be plausible, require

14 additional information prior to being Allowed either because they require additional proof as to

15 the allegation, or because they appear to be barred by the statute of limitations.   The Plan

16 contemplates giving these Tort Claimants an election to have their Tort Claims treated as Tort

17 Compromise Claims.  The Diocese is presently working with the Committee and a group of the

18 remaining Tort Claimants and their counsel to attempt to resolve allowance and treatment of their

19 Tort Claims under the Settlement Trust.  The Diocese anticipates that the Committee will be

20 filing objections to a number of Tort Claims which will be heard by the Court on June 30, 2005.

21       The Diocese further believes that there may be other potential Tort Claimants who are

22 currently minors or under the age of twenty (20) and for whom the statute of limitations has not

23 yet run ("Minors"), or whose memories are still repressed and for whom because of such

24 repression or other recognized incapacity, the statute of limitations has been extended ("Unknown

25 Tort Claims").

26

Each of these categories of Tort Claimants[20] have claims that satisfy the definition of claim under the Bankruptcy Code and are addressed under the Plan. The Bankruptcy Code has the "broadest possible definition" of a claim which is designed to ensure that "all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case." California Dept. Health Services v. Jensen (In re Jensen), 995 F.2d 925, 929 (9th Cir. 1993) quoting from H.R. Rep Non. 595, 95th Cong. 2nd Sess. 1, 309 (1978). In Jensen, the 9th Circuit has adopted "what might be called the 'fair contemplation' test for determining when the relationship between a debtor and a putative creditor gives rise to a claim. The focus in determining whether the claim exists is on the debtor's pre-confirmation conduct and a determination as to whether a relationship existed pre-confirmation between an identifiable claimant or group of claimants and the debtor's pre-confirmation conduct. Epstein v. Committee of Unsecured Creditors (In re Piper Aircraft), 58 F.3d 1573 (11th Cir. 1995); Hassanally, 208 B.R. 52; Ritter Ranch 255 B.R. 765 See also, Jensen, 995 F.2d at 930. Claims have been recognized under these tests beyond the typical context of mass torts and environmental liabilities, and even where rights are not yet enforceable under state law. Ritter Ranch, 255 B.R. 765; Hassanally, 208 B.R. at 51.

In this case, all of the Tort Claimants, irrespective of whether the repressed memories of the abuse have surfaced or they are minors, necessarily had a relationship and contact with clergy or others who were serving in the Diocese at the time the alleged abuse occurred. As such, all of the Tort Claimants including the Minors and Unknown Tort Claimants had an identifiable relationship with the Diocese which gives rise to the Claims. Accordingly, all of the Tort Claims may be addressed as part of the Plan.

---

[20] These categories would include: (i) those Tort Claimants who have already instituted litigation; (ii) those Tort Claimants who have notified the Diocese of a claim but have either chosen to receive services from the Diocese or not pursue the claim at all; (iii) those Tort Claimants who are aware of their claims but haven't brought them as of the Petition Date (including Minors); and (iv) the Unknown Tort Claimants.

1       The Diocese requested that the Court appoint a representative to represent the interests of

2 the Unknown Tort Claimants (the "Unknown Claims Representative"). A. Bates Butler III was

3 appointed by the Bankruptcy Court on October 27, 2004, to be the Unknown Claims

4 Representative. In addition, at the request of the Diocese, the Court appointed a Guardian ad

5 Litem, Charles L. Arnold to represent the interests of the Minors who might have Claims arising

6 out of abuse that would be included as Tort Claims (the "Guardian ad Litem"). The Order

7 appointing Mr. Arnold was part of the Order appointing the Unknown Claims Representative.

8     **G.**     **The Sex Abuse Crisis.**

9       Over the last fifty years a tragedy that runs contrary to the every teaching and tradition of

10 the Roman Catholic Church has unfolded in the Roman Catholic Church as a whole and in the

11 Diocese in particular: a small number priests, other clergy, and others took advantage of their

12 positions of trust and respect in the community and sexually abused children. The Diocese was

13 also affected by this tragedy. Starting in 1997, lawsuits were filed alleging that acts of abuse had

14 been committed by clergy and others within the Diocese. Most of these claims were made by

15 adults based upon acts that they alleged occurred as many as thirty years prior to bringing the suit.

16       Although generally the statute of limitations for bringing a civil suit is two years from the

17 date of the act, that changed in Arizona in 1998 when the Arizona Supreme Court issued the Doe

18 v. Roe opinion (Doe v. Roe, 191 Ariz. 313, 955 P.2d 951, 266 Ariz. Adv. Rep. 19 (Ariz.1998)),

19 which recognized that childhood sexual abuse can create latent psychological injuries to the abuse

20 victims which prevents the victims of that abuse from bringing a tort action within the statute of

21 limitations. This doctrine, commonly known as the "Repressed Memory Doctrine", is a variation

22 on the discovery rule that makes it legally possible for victims of sexual abuse to overcome the

23 statute of limitations defense in such suits.

24     **1.**     **The 2002 Settlement.**

25       The first round of cases alleging liability on the part of the Diocese because of acts of

26 clergy or others associated with the Diocese were starting toward trial in late 2001. At that time,

the Diocese was a defendant in 11 suits involving 16 plaintiffs (the "2002 Cases").[21]  Most of the plaintiffs were represented by the same counsel.  In addition, the Diocese was providing counseling and other services to people who alleged they had been abused but who had not sought damages through civil actions.  In early 2002, the Diocese and the plaintiffs in the 2002 Cases participated in a mediation that resulted in a settlement (the "2002 Settlement").  As part of the 2002 Settlement, the Diocese and the plaintiffs agreed that $3,000,000 of the settlement amount could be deferred until January, 2007 (the "Remaining 2002 Settlement Payment") which is evidenced by the Promissory Note.  The Claimants in the 2002 Cases are, therefore, secured creditors in the Reorganization Case.

The Diocese believed at the time of the 2002 Settlement that the claimants in the 2002 Cases, together with those who had informally sought help from the Diocese, constituted the universe of claims arising out of these problems and that the universe of claims was known and had been resolved. That belief was mistaken.

## 2.  **The Current Cases.**

Since the 2002 Settlement, another twenty-two (22) cases have been filed here and in California[22] involving thirty-four (34) plaintiffs alleging, among other things, the failure of the Diocese to properly supervise or otherwise deal with alleged knowledge by the Diocese of the actions of certain clergy and others.[23]  Furthermore, additional Tort Claims have been made; however, no litigation has been commenced by the Tort Claimants.  Given the experience since

---

[21]  The plaintiffs consisted of 11 plaintiffs who alleged that they were the victims of sexual abuse and 5 parents who alleged damages as result of their children having been allegedly abused.  The plaintiffs contended that the Diocese was liable for their damages on a theory of respondeat superior.  The Diocese denied and continues to deny any liability for these acts by clergy and others.

[22]  The California cases name the Diocese as a defendant along with other Dioceses in California.

[23]  None of the current cases have been tried; accordingly, neither the liability of the Diocese (which the Diocese disputes) nor the validity of the claims has been established.

the 2002 Settlement as well as the experience of other Dioceses around the country who have settled these types of cases, and as confirmed by the Tort Claims that were filed prior to the Bar Date, the Diocese believed that there may be other claimants who had not yet asserted formal (i.e. through litigation) or informal claims arising out of alleged abuse by clergy or others associated with the Diocese. The current Tort Claimants whose claims were in litigation as of the Petition Date were, in many instances, seeking punitive damages. In addition, the demands of these Tort Claimants were far beyond the ability of the Diocese to respond, particularly given the likelihood that there were additional claims that had not yet been brought. Moreover, because of the failure of some of the Insurance Companies to respond, the Diocese was unable to settle these cases outside the context of the Reorganization Case.

The purpose of this Reorganization Case is to enable the Diocese to pay fair and just compensation to all victims of clergy abuse irrespective of the happenstance of when their trial is scheduled or whether the alleged victim has recovered a repressed memory and at the same time allow the Diocese to continue its ministry, service its Parishes and Schools, continue its efforts to provide education and services to prevent child abuse and fairly pay its trade and other Creditors.

## V.     SIGNIFICANT EVENTS PRIOR TO THE REORGANIZATION CASE.

### A.     The Response to Childhood Sexual Abuse Crisis.

Bishop Kicanas became the coadjutor Bishop of Tucson on October 30, 2001, and sole Bishop after the retirement of Bishop Manuel Moreno in 2003. Bishop Kicanas has led the Diocese's response to the sexual abuse issues by: (1) providing and offering support to the victims of childhood sexual abuse; (2) reforming Diocesan operations to provide improved transparency regarding finances and historic and present abuse allegations; and (3) reforming Diocesan operations to prevent future abuse from occurring and to appropriately respond to abuse allegations.

In addition to the response discussed in Section I. above, other examples of the response of the Diocese under the leadership of Bishop Kicanas include:

- 45 -

•      Formed the Victim Assistance Program ("VAP"), in June of 2002 in conjunction with Catholic Social Service ("CSS") and Pima County Attorney's Office ("County Attorney"). The VAP is designed so that an abuse victim seeking assistance will receive appropriate care through a process that respects that person's privacy.  When a person calls the VAP, a report is made both to law enforcement and to the Diocese so that the allegation can be investigated.  Each allegation is either investigated by law enforcement or, when law enforcement declines to investigate because the alleged behavior occurred too long ago, by the Diocese.  Without waiting for any determination of the credibility or the validity of the allegation, the VAP may initiate counseling services through CSS or, if the individual prefers, through an independent licensed or certified professional.

•      Established the Sexual Misconduct Review Board in October of 2002 consisting of noted community leaders.[24]

•      Published (and continues to publish) the names of all priests and other workers for the Church against whom there are credible allegations of sexual misconduct involving children and updating this list when new allegations arise.

---

[24]   Members of the Board are: Msgr. Arsenio S. Carrillo, Vicar General and Rector Emeritus of St. Augustine Cathedral; Charlotte Harris, former director of development of Salpointe Catholic High School; Maureen Keegan, retired teacher; Sister Kathleen Kluthe, S.S.F., member of Jordan Ministry Team, which provides spiritual formation and religious education services in the Diocese of Tucson; Deacon Oscar Magallanes, child and family clinician at La Frontera Clinic in Tucson; Charles Pettis, retired president of Tucson Realty & Trust Co.; George Robles; retired Tucson Police Department officer, retired South Tucson Chief of Police, former chief investigator for the U.S. District of Arizona Federal Public Defender and former officer of Division 15 of the Pima County Superior Court;  Dr. José Santiago (Board Chairman), senior vice president and chief medical officer at Carondelet Health Network in Tucson; Sarah R. (Sally) Simmons, attorney specializing in employment law, past president of the UA Law College Association, and past president of the State Bar of Arizona; Rev. Frederick Tillotson, O.Carm, president of Salpointe Catholic High School, former director of Clinical Ethics for the Franciscan Health System, member of the Institutional Review Board for behavioral and social sciences at the UA, a member of the ethics committee at Tucson Medical Center and a consultant on medical ethics for several Catholic hospitals; Mercy Valencia, director of Space Management at the University of Arizona, former management analyst of the UA Office of Institutional Research and program coordinator for the UA Office of Arid Lands Studies.

1          •          Entered into an agreement with the County Attorney, under which the Diocese
2   reports all allegations of sexual abuse of children it receives or which it becomes aware of to the
3   County Attorney so that the County Attorney can initiate an appropriate law enforcement
4   investigation and response.  This agreement, entered into voluntarily by the Diocese, is
5   considered a model for other dioceses and law enforcement agencies across the country.

6          •          In conjunction with the release of the national John Jay College of Criminal Justice
7   Study on the Nature and Scope of the Problem of Sexual Abuse of Children and Young People by
8   Catholic Priests 1950 – 2003, the Diocese released detailed statistics regarding allegations of
9   sexual abuse by priests and other workers in the Diocese.

10          •          Participated in annual Compliance Audits by The Gavin Group of Boston, an
11   independent compliance auditing firm, regarding the Diocese's implementation of policies and
12   procedures for the response to allegations of sexual abuse of minors, for the creation of safe
13   environment programs, and for pastoral response and outreach to victims.

14          •          Created and implemented the Safe Environment Program that includes training
15   sessions of all Parish and School employees, mandatory fingerprinting of all current and
16   prospective employees of the Diocese, Parishes and Schools (including priests, religious women,
17   religious brothers, deacons, and seminarians) and volunteers as well as criminal history
18   background checks of all current and prospective employees and volunteers.  Through June of
19   2004, more than 2,000 people had been fingerprinted and had received background checks.  In
20   addition, a structure for oversight of compliance with policies and procedures for the creation of
21   safe environments for children at Parishes and Schools was established.

22          •          Hired Richard Serrano as Director of Human Resources in July of 2003.  His
23   background in law enforcement and more than twenty-five (25) years of human resource
24   experience with IBM international placed him in a unique position to work with Dr. Duckro to
25   develop a safe environment program for all Parishes and Schools.

26

**B.    The Reorganization Case.**

As previously stated, at the time of the 2002 Settlement, the Diocese believed that substantially all of the victims of sexual abuse had come forward.  That belief was mistaken as indicated above.  The Diocese's attempts to resolve these later cases have been unsuccessful.  As stated, the Diocese is a "mission" Diocese.  It does not have unrelated business income or activities.  It has limited property.  And, most importantly, it is desirous of achieving a final just, equitable, and fair resolution for those who suffered abuse, for its parishioners, and for others so that this chapter in the history of the Diocese can be closed.

**VI.    SIGNIFICANT EVENTS IN CHAPTER 11.**

The significant events which have occurred since the Petition Date are as follows:

- The Court entered orders authorizing the Diocese to employ the Debtor's Professionals who are:

  - The law firm of Quarles & Brady Streich Lang LLP;

  - The law firm of Gust Rosenfeld PLC;

  - The law firm of Thomas A. Zlaket P.L.L.C.;

  - The law firm of Goering, Roberts, Rubin, Brogna, Enos & Treadwell-Rubin, P.C.; and

  - The accounting firm of Keegan, Linscott & Kenon P.C.

- Because of the sensitive nature of the Tort Claims and the concern of the Diocese not to publicize the names of the claimed victims, the Diocese requested that certain information regarding the Tort Claimants be filed under seal which the Court granted on September 27, 2004.

- The Court granted the Diocese's application to pay certain prepetition wages in an amount that was less than the priority claims such employees would have under Bankruptcy Code § 507 if the claims were not paid.

- The Court granted the motion to allow the Diocese to continue to honor certain employee benefit plans for vacation and sick pay in order to retain its current employees.

1    •   The Court granted a motion to establish a procedure for allowance and payment of

2    professionals during the course of the Reorganization Case.

3    •   The Court granted a motion to allow the Diocese to continue its current bank accounts

4    and current cash management system in order to avoid disruption in the Diocese's business and

5    conserve Estate assets after the terms of the order were negotiated with the United States Trustee,

6    the attorneys for the Committee and certain other interested parties.

7    •   The Court set April 15, 2005, as the date by which all Claims against the Diocese were

8    to be filed.  The Court also approved the form of notice, the form of the claim form to be used by

9    Tort Claimants and the manner in which the Diocese proposed to publish notice in various

10   national and state newspapers and publications.

11   •   The United States Trustee appointed the Committee and the Court approved the

12   retention of Stinson Morrison Hecker LLP as attorneys for the Committee.

13   •   The Court entered the Order on motion of the Diocese appointing the Unknown

14   Claims Representative and the Guardian ad Litem.

15   •   The Diocese entered into a stipulation with four Tort Claimants which provided for the

16   treatment of their respective Tort Claims and set certain deadlines by which the Plan was to be

17   confirmed.

18   •   The Diocese removed all of the state court actions in Arizona and California which

19   were instituted prior to the Petition Date.  The Arizona cases were removed to the Bankruptcy

20   Court.  The California actions were removed to the United States District Court for the Central

21   District of California.  A list of the removed actions is attached hereto as Exhibit "8".  Pursuant to

22   stipulation, the California actions are going to be transferred to the Bankruptcy Court.

23   Furthermore, pursuant to stipulation, all parties have agreed that the time to seek remand or any

24   other remedies under applicable law and the time to follow any other procedures related to

25   removed actions would be extended.

26

- The Court approved the appointment of Tucson Realty & Trust as the real estate broker to assist the Diocese in the sale of the Parish Real Property.

- The Diocese filed its "<u>First Amended and Restated Plan of Reorganization</u>" and its "<u>First Amended and Restated Disclosure Statement</u>" each dated February 25, 2005. The Diocese solicited preliminary objections to the disclosure statement. Several parties in interest filed objections to the First Amended and Restated Disclosure Statement which the Diocese has attempted to address in this Disclosure Statement.

- The Court approved bidding procedures for the sale of Diocese Real Property at an Auction which was conducted on May 21, 2005, the proceeds from which will be contributed into the Settlement Trust and, if necessary, the Litigation Trust.

- The Court authorized the Diocese to employ and pay certain professionals in the ordinary course.

- The Court authorized the Diocese to participate in a grant that will have the effect of encumbering certain of the Diocesan real property with a historic preservations easement.

- The Court denied certain individuals, Phillip and Meta Hower, authority to independently pursue causes of action on behalf of the estate concerning avoidance actions and the extent of the estate.

- The Unknown Claims Representative's and the Guardian ad Litem's sought to appoint Hamilton, Rabinovitz and Alschuler ("HR&A") as consultants to provide statistical analysis to support a finding of the likely number of future claims. The Committee and the Diocese supported HR&A's application. The Court, however ultimately denied the HR&A application but granted the application of the Representatives to retain certain other professionals.

- The Diocese sought Court approval of a $7,000,000 settlement with Hartford to resolve and settle the Diocese's claims against insurance policies provided by the Hartford. Hearing to approve the Hartford Settlement was held on May 18, 2005, and the Order approving the settlement was entered on May 26, 2005.

- 50 -

1    • The Court approved the appointment of Haralson, Miller, Pitt, Feldman & McAnally,

2    P.L.C., as special insurance litigation counsel.

3    **VII.    DESCRIPTION OF THE PLAN.**

4    The following description of the Plan is for informational purposes only.  Creditors

5    should not rely on this description for voting purposes, but should read the Plan in its entirety.

6    This summary of the Plan does not purport to be complete.  THE PLAN IS CONTROLLING IN

7    THE EVENT OF ANY INCONSISTENCY BETWEEN THE CONTENTS OF THE PLAN

8    AND THIS DISCLOSURE STATEMENT.

9    **A.    Classification And Treatment Of Claims Under The Plan.**

10    **1.    Claim Amounts.**

11    Until Allowed by the Court, certain Claims against the Diocese are in unknown or

12    undetermined amounts.   Accordingly, the amounts of Claims specified in this Disclosure

13    Statement reflect only the Diocese's best estimates.   Additionally, the amounts of Claims

14    specified in this Disclosure Statement do not include all Claims that may arise from the rejection

15    of certain executory contracts or other contingent or unliquidated Claims against the Diocese.

16    **2.    Effective Date of the Plan.**

17    The "Effective Date" of the Plan determines when the performance of many of the

18    obligations under the Plan are due.  The Effective Date is defined in the Plan.

19    **3.    Classification generally.**

20    The Plan divides Claims against the Diocese into twelve (12) separate Classes which the

21    Diocese believes complies with the requirements of the Bankruptcy Code.   Unless otherwise

22    expressly stated in the Plan, the respective treatments under the Plan of Allowed Claims are in

23    full discharge and satisfaction of those Allowed Claims.   Except as provided in the Plan, all

24    Claims against the Diocese arising prior to entry of the Confirmation Order will be discharged as

25    of the Confirmation Date pursuant to Bankruptcy Code § 1141(d).

26

- 51 -

**B.** **Unclassified claims.**

**1.** **Administrative Claims.**

The Administrative Claims consist of the Allowed fees of the Chapter 11 Professionals and other Claims that would be allowable as Administrative Claims pursuant to Bankruptcy Code § 503. Holders of Allowed Administrative Claims will be paid in full on the Effective Date or the Date the Administrative Claim is allowed. Based upon the fees and costs of the Chapter 11 Professionals as of the date of this Disclosure Statement and assuming an August 1, 2005, Effective Date, the Diocese estimates that the Allowed Administrative Claims between the date of this Disclosure Statement and the Effective Date would be approximately $750,000 to $800,000. This estimate assumes no extraordinary litigation and that the Diocese is able to reach an agreement with many of the Tort Claimants regarding the treatment of their Claims under the Plan. If these assumptions are incorrect, the Administrative Claims could be significantly higher.

**2.** **Priority Unsecured Claims.**

Unless an Allowed Priority Unsecured Claimant agrees otherwise, the holder of every Allowed Priority Unsecured Claim will be paid in full on the Effective Date or when the claim is allowed by the Court. The Priority Unsecured Claims include all Claims entitled to priority pursuant to Bankruptcy Code § 507 other than Employee Unsecured Priority Claims which are treated elsewhere in the Plan. The Diocese does not believe that there are any Priority Unsecured Claims.

**3.** **Priority Tax Claims.**

Consistent with Bankruptcy Code § 1129(a)(9)(C), the holder of every Allowed Priority Tax Claim will be paid in full within six (6) years of the date of assessment The Debtor does not believe there are any Priority Tax Claims.

- 52 -

### C. **Unimpaired Claims**.

#### 1. **Priority Employee Unsecured Claims – Class 1. Unimpaired.**

Class 1 consists of every Unsecured Claim of an employee of the Diocese for vacation or sick leave pay which is otherwise entitled to priority pursuant to Bankruptcy Code § 507(a)(3)(A). All Allowed Priority Employee Unsecured Claims will be satisfied, in full, in accordance with the policies and procedures regarding vacation and sick leave pay in effect at the Diocese at the time such Priority Employee Unsecured Claim becomes matured and liquidated. Because the Bankruptcy Court granted the Debtor's motions to pay prepetition wages and to continue to honor the Diocese's sick pay and vacation policy, the Diocese does not believe there will be any Priority Employee Unsecured Claims; however, the ultimate liability for honoring the sick pay and vacation policy and paying any prepetition wages to the employees is approximately $343,000.

#### 2. **Other Secured Claims – Class 3. Unimpaired.**

The legal, equitable and contractual rights of holders of Allowed Other Secured Claims in Class 3 will not be altered by the Plan and will retain their lien on their collateral to the extent of his/her/its Allowed Other Secured Claim. The Other Secured Claims consist of Bank One, N.A.'s contingent secured claim in the amount of $300,000 arising out of a letter of credit issued by Bank One, N.A. The obligations to the beneficiary of the letter of credit are current. The Debtor does not believe that there are additional Other Secured Claims other than those identified.

#### 3. **Parish Guaranty Claims – Class 5. Unimpaired.**

The Plan does not alter the legal, equitable and contractual rights of the holders of Parish Guaranty Claims. The Parish Guaranty Claims consist of certain Parish obligations that the Diocese guaranteed. The Parish Guaranty Claims are contingent, unliquidated and unsecured. The Parish obligations are not in default and the Diocese does not anticipate that there will be a

- 53 -

default by any Parish.  The full amount of the guaranties outstanding which are Parish Guaranty Claims is approximately $7,268,202.

**4.      Insurance and Benefit Claims – Class 11.  Unimpaired.**

The Plan does not alter the legal, equitable and contractual rights of Allowed Insurance and Benefit Claimants, who will retain their Claims, if any, against the Reorganized Debtor and the Plan.  All such Insurance and Benefit Claims will be determined in accordance with the provisions of any benefit plans, policies and procedures of the Diocese and applicable law.

**D.      Impaired Claims.**

**1.      Class 2: Prepetition Date Secured Tax Claims.**

Class 2 Claims consist of every whole or prorated portion of a Secured Tax Claim which arises before and up to the Petition Date.  Holders of Allowed Class 2 Claims will retain their liens on their collateral to the extent of their Property Secured Tax Claims.  Allowed Class 2 Claims will bear interest at the rate of three percent (3%) per annum from the Effective Date until paid.  Allowed Class 2 Claims, including interest thereon, will be paid in two equal installments. (1) thirty (30) days after the Effective Date or the applicable Claim Payment Date; and (2) six (6) months after the Effective Date or the applicable Claim Payment Date.  No penalties will be paid on any of the Allowed Class 2 Claims.

**2.      Class 3: Escrow Agent Secured Claim.**

The Class 3 Claim consists of the amounts due the Escrow Agent pursuant to the Promissory Note in the amount of $3,000,000.  The Class 3 Claim, as and when it is an Allowed Claim, will be treated as a fully Secured Claim and will be paid in full without interest on the due date of the Promissory Note, January 24, 2007.  The Escrow Agent will retain its lien on its collateral to the extent of its Class 3 Allowed Escrow Agent Secured Claim.  On the Effective Date, the Diocese will provide the Escrow Agent with additional security by executing a pledge of the Restricted St. Augustine Account to the Escrow Agent.  The Account is currently invested in certificates of deposit with Smith Barney.

**3.** **Class 4: General Unsecured Convenience Claim.**

Class 4 General Unsecured Convenience Claims will consist of all Unsecured Claims (other than Tort Claims) in an amount of $500 or less, and the Claims of any holder of a General Unsecured Claim that elects to reduce its General Unsecured Claim to an amount of $500. Such election will be made on the ballot for accepting or rejecting the Plan, completed and returned within the time fixed by order of the Court. The Diocese believes that the total amount of the Class 4 General Unsecured Convenience Claims will not exceed $8,000.

**4.** **Class 6: Parish Loan Claims.**

The Class 6 Parish Loan Claims consists of every Claim against the Diocese now held by a Parish, including but not limited to Parishes' Claims for all Parish Loans including interest, attorneys' fees and other costs and charges. The Allowed Parish Loan Claims will bear interest from and after the Effective Date at the rate of two and one-half percent (2.5%) per annum or such other rate as set by the Bankruptcy Court in the Confirmation Order. The Diocese will make monthly payments, including interest, in the amount of $44,738 per month until the Allowed Parish Loan Claims are paid in full. The Parish Loan Claims are approximately $4,700,000.00.

**5.** **Class 8: General Unsecured Claims.**

The Class 8 Claims will consist of all Claims that are not General Unsecured Convenience Claims, Administrative Priority Claims, Priority Unsecured Claims, Priority Tax Claims, Priority Employee Unsecured Claims, Parish Guaranty Claims, Parish Loan Claims, Other Tort and Employee Claims, Tort Claims, or Penalty Claims. The Class 8 Claims include the Unsecured Claims of Foresters in the approximately amount of $2,000,000, a Claim of Arthur Gallagher in the approximate amount of $43,000 and certain Unsecured trade/vendor Claims. The total amount of General Unsecured Claims are approximately $2,499,517.83. The holders of Allowed General Unsecured Claims will be paid in full over time in monthly installments commencing thirty (30) days after the Effective Date through the fifteenth (15th) anniversary of the Effective Date. In addition, Class 8 Allowed Claims will be paid four and one-half percent (4.5%) interest

- 55 -

per annum or such other rate as set by the Bankruptcy Court in the Confirmation Order. The Reorganized Debtor will have the right to prepay any one or more of the Class 8 Claims.

**6.** **Class 9: Other Tort and Employee Claims.**

The Class 9 Other Tort and Employee Claims are those Unsecured Claims, demands, suits, causes of action, proceedings or any other rights or asserted right to payment heretofore, now or hereafter asserted against the Debtor, whether or not reduced to judgment, based upon or in any manner arising from acts or failure to act by the Debtor which has allegedly resulted in injury asserted against the Diocese for torts, including claims by employees of the Diocese, other than Tort Claims. Each Class 9 Other Tort and Employee Claimant, as and when such Claim becomes an Allowed Claim, will be paid solely from the proceeds of any insurance policies applicable the Claim. To the extent that such Claims are not paid in full by the insurance proceeds, then such Other Tort and Employee Claims, to the extent not so satisfied, will be Disallowed. Class 9: Tort Claims.

**7.** **Class 10: Tort Claims.**

(a)    Definition of Class 10 Tort Claims.

The Class 10 Tort Claims mean all Claims, demands, suits, causes of action, proceedings or any other rights or asserted rights to payment for, among other things, acts of sexual abuse committed by any clergy or other persons associated with the Diocese or any Parish, including but not limited to all employees and volunteers.

On or before the Effective Date (but after entry of the Confirmation Order), in full release satisfaction and discharge of all Claims in Class 10 the Diocese will:  (a) establish the Settlement Trust and, if necessary, the Litigation Trust, which provide for liquidation of Class 10 Claims and payment of Class 10 Claims as and when they become Allowed Claims by the execution of the Settlement Trust Agreement, a proposed copy of which is attached hereto as Exhibit "9" and, if necessary, the Litigation Trust Agreement, a copy of which will be filed prior to the hearing on the Disclosure Statement; (b) the Diocese will fund the Settlement Trust with an Initial

Contribution of no less than $15,700,000; (c) assign the Diocese's rights to the net proceeds from the sale of the Diocese Real Property if any such Diocese Real Property remains unsold as of the Effective Date or proceeds from a sale not yet received by the Diocese; and (d) assign the proceeds of the Insurance Action Recoveries.  Any amounts coming into the Fund after the Effective Date will also be paid to the Settlement Trust and distributed and reserved in accordance with the terms of the Plan.  In addition, the Court will appoint the Special Arbitrator who will determine the validity (Allowance and Disallowance) and Tier of each Tort Claim under the Settlement Trust if the Tort Claim of a  Settling Tort Claimant has not been resolved prior to the Effective Date.

(b)    <u>Treatment</u>

Each Tort Claimant will automatically be included in the Settlement Trust unless he or she has elected either to opt out of the Settlement Trust and participate in the Litigation Trust or elected to have his or her Tort Claim treated as a Tort Compromise Claim on the Ballot.  Not every Tort Claimant will be offered the opportunity to have his or her Tort Claim treated as a Tort Compromise Claim.

(i)    <u>Determination and Treatment<br/>of Tort Compromise Claims</u>.

Tort Claimants who elect on the Ballot to have their Tort Claims treated as a Tort Compromise Claim will receive a lump sum one-time payment of $15,000.00 on the Effective Date.  This opportunity will be offered to Tort Claimants who, in the estimation of the Committee or the Diocese, have a plausible Tort Claim but whose Tort Claim appears to be barred by the statute of limitations.  A Tort Claimant who does not timely elect to have his or her Tort Claim treated as a Tort Compromise Claim will have his or her Tort Claim Allowed or Disallowed by the Special Arbitrator pursuant to the Settlement Trust of Litigation Trust.  If a Tort Claim is Disallowed, the Tort Claimant **will not** have the right to request that such Tort Claim be treated as a Tort Compromise Claim and will receive no recovery under the Plan but can receive services

from the Diocese through VAP.  However, the Committee and the Diocese reserve the right to offer to a Settling Tort Claimant the right to participate as a Tort Compromise Claim anytime after the Effective Date but before the Tort Claim has been Disallowed by the Special Arbitrator. The amount necessary to pay all Tort Compromise Claims will be paid from the Settlement Trust.

(ii)  Determination and Treatment pursuant to the Settlement Trust.

The Special Arbitrator will consider each Claim of a Settling Tort Claimant in accordance with the criteria discussed in Article 15 of the Plan.  The Special Arbitrator will Allow or Disallow the Claim, if the Tort Claim is Allowed, classify each Claim as a Relationship Tort Claim, a Tier One Claim, a Tier Two Claim, a California Tier Claim (if applicable), a Tier Three Claim or a Tier Four Claim.  If a Tort Claim is Disallowed, the Tort Claim will not be placed in a Tier and the Tort Claimant will take nothing under the Plan.

Upon Allowance of a Tort Claim by the Special Arbitrator and placement in that Tier, (or within thirty (30) days after funding the Settlement Trust if the Tort Claim was Allowed prior to the Effective Date) a Tort Claimant with an Allowed Tier One Tort Claim will receive the Tier One Initial Distribution Amount of $100,000.00; a Tort Claimant with an Allowed Tier Two Tort Claim will receive the Tier Two Initial Distribution Amount of $200,000.00; a Tort Claimant with an Allowed Tier Three Tort Claim will receive the Tier Three Initial Distribution Amount of $425,000.00; a Tort claimant with an Allowed Tier Four Claim will receive the Tier Four Initial Distribution Amount of $600,000.00; a California Tort Claimant will receive the California Tort Claim Initial Distribution Amount of $300,000.00; a Relationship Tort Claimant will receive the Relationship Tort Claim Distribution Amount equal to 5% of the direct victim's Initial Distribution Amount limited as discussed below.

At such times as determined by the Trustee, after Allowance or Disallowance of all Tort Claims, including those which were Allowed as of the Effective Date, and after each Tort Claimant has received at least the Initial Distribution Amount applicable to his or her respective

Tier, each Tort Claimant who holds an Allowed Tort Claim (but excluding any Relationship Tort Claims) will receive his or her allocated share of any Excess Distributions after allocation of fifty percent (50%) of the remainder to the Unknown Claims Reserve. In addition, the Trustee will pay, if not already paid or funded, all Allowed Tort Compromise Claims, an appropriate amount of the Trust Administrative Expense Reserve and the Avoidance Action Fund. Excess Distributions will be the remainder of the Initial Contribution after payment of the Initial Distribution Amount to Allowed Tort Claims (excluding any Unknown Tort Claims).

The Unknown Claims Reserve not to exceed $5,000,000 will be funded over a period of time from the remainder of the Initial Contribution, if any, and other sources identified in the Plan and in this Disclosure Statement. At such times as the Bankruptcy Court determines that the Unknown Claims Reserve should be reduced or upon termination of the Unknown Claims Reserve, any reduction or termination will be subject to the Sharing Arrangement. After application of the Sharing Arrangement, the amount not distributed to the Diocese will be used to increase the Distributions to the Settling Tort Claimants with Allowed Tort Claims (excluding any Unknown Tort Claimants whose Claims have been Allowed) in accordance with the Weighted Distribution Ratio.

No distribution will be made to a Relationship Tort Claimant until the Tort Claim of the son/daughter/spouse has been Allowed. If the Claim of the direct Tort Claimant is Disallowed, the Claim of the Relationship Tort Claimant will also be Disallowed, the Relationship Tort Claimant will receive nothing under the Plan, and the Relationship Tort Claimant will have no further Claim against the Diocese, any Participating Third Parties, any Settling Insurers or any Settling Parties. If the Claim of the Tort Claimant is Allowed, the Relationship Tort Claimant will receive the Relationship Tort Claim Distribution Amount; provided, however, that if there is more than one son or daughter who is a Tort Claimant with an Allowed Tort Claim, the Relationship Tort Claim Distribution Amount will be limited to the highest Initial Distribution amount for a son or daughter regardless of how many children are Tort Claimants with Allowed

Tort Claims.  In addition, there will be only one Relationship Tort Claim Distribution Amount per family so that if two parents filed Relationship Tort Claims, regardless of whether they are married at the time of Allowance and payment, only one payment will be made and the parents can determine how the Relationship Tort Claim Distribution Amount will be split.  For example, if there  are two sons who have Allowed Tort Claims, one in Tier 3 and one in Tier 4, and each parent filed a Relationship Tort Claim, there will be one payment of $30,000 (five percent (5%) of $600,000) on the Claim Payment Date to both parents in full satisfaction of their Allowed Relationship Tort Claims.

(iii)   <u>Determination and Treatment<br>of Unknown Tort Claims.</u>

The Unknown Claims Reserve will be initially funded with one-half (1/2) of the Excess Distribution unless additional monies come into the Fund prior to the expected distribution from the Excess Distribution.  If additional monies come into the Settlement Trust from the Fund, those monies will be used to fund the Unknown Claims Reserve before any other distributions to the Settling Tort Claimants who hold Allowed Claims.  The Unknown Claims Reserve will also be funded from the Fund up to the full amount of the Unknown Claims Reserve.  The Unknown Claims Reserve will be held and administered by the Trustee in accordance with the terms of the Settlement Trust.  Any Unknown Tort Claims will be treated as follows:

(a)   Each Unknown Tort Claim when it is an Allowed Claim will be placed in a Tier by the Special Arbitrator using the same criteria for evaluating Tort Claims as used for other Tort Claimants, but any distribution will be held by the Trustee pending the determination referred to below.

(b)   On an annual basis, funds in the Unknown Claim Reserve will be distributed to holders of claims filed after the Bar Date and Allowed during the prior year in an amount equal to the amount distributed to date to holders of previously Allowed Tort Claims of Settling Tort Claimants; <u>provided</u>, <u>however</u>, <u>that</u>, on motion of a party in interest, the Court may reduce the

- 60 -

distributions to such claimants if a significant risk exists that the Unknown Claims Reserve will not be sufficient to make such distributions.

(c)     The Unknown Claims Reserve may be adjusted from time to time after the Effective Date by the Trustee upon notice to the Special Arbitrator, the Reorganized Debtor, the Committee and the Representatives and pursuant to order of the Court after a hearing.  Upon application of the Committee or the Reorganized Debtor, with notice to the Committee or the Reorganized Debtor (as the case may be), the Trustee, the Representatives and the Special Arbitrator, and after a hearing, the Unknown Claims Reserve may be reduced upon order of the Court; provided, however, that prior to any reduction, any amount which might otherwise be distributed to the Settlement Trust out of the Unknown Claims Reserve will be redistributed to the holders of Allowed Unknown Claims up to the amount that the Settling Tort Claimants with Allowed Tort Claims have received in the Tier in which such Allowed Unknown Tort Claim has been placed.  After such redistribution, any such reduction will be distributed in accordance with the terms of the Plan.  The Representatives will have standing at any hearing to determine any reduction in the Unknown Claims Reserve.

(iv)     Determination and Treatment
pursuant to the Litigation
Trust.

Non-settling Tort Claimants: (a) will be subject to the terms of the Litigation Trust Agreement; and (b) will not receive any payment if (and to the extent) the Claim is Disallowed pursuant to the litigation procedures constituting the Litigation Protocol and will have no further Claim against the Debtor, the Reorganized Debtor, any Participating Third Party, any Settling Party or any Settling Insurer.  All Non-Settling Tort Claimants will retain the right to adjudicate their Claims through litigation (including, if not previously waived, trial by jury in the Bankruptcy Court or the District Court, if and to the extent such is available), subject however, to the provisions of the Plan and the Litigation Trust Agreement.  If an objection has been filed to the Tort Claim of a Non-Settling Tort Claimant prior to the Confirmation Date, the objection will

- 61 -

constitute commencement of the action to determine the Allowance or Disallowance of the Tort Claim of a Non-Settling Tort Claimant. Upon entry of a Final Order in favor of a Non-Settling Tort Claimant, and upon resolution by Final Order of all Tort Claims of Non-Settling Tort Claimants, a Non-Settling Tort Claimant will receive, in full and complete satisfaction of such Allowed Claim, the lesser of:

    (a)    the amount of the judgment pursuant to a Final Order;

    (b)    $425,000; or

    (c)    to the extent that the Litigation Trust Fund, after deduction of all costs, expenses, fees and other charges which are to be paid or reserved by the Trustee, is not sufficient to pay all Allowed Tort Claims of Non-Settling Tort Claimants in accordance with (a) or (b) above, a Pro Rata share of the proceeds of the Litigation Trust in full and complete satisfaction of such Allowed Tort Claim of a Non-Settling Tort Claimant. Any amounts remaining in the Litigation Trust after payment of all Allowed Claims of Non-Settling Tort Claimants in accordance with and limited by the Plan.

No distribution will be made to any Non-Settling Tort Claimant whose Claim is Allowed until the Tort Claims of all Non-Settling Tort Claimants have been heard and determined by entry of a Final Order. Claims for punitive or exemplary damages in connection with Tort Claims, whether asserted by Tort Claimants or any other Claimants, will not be Allowed. No Non-settling Tort Claimant will have recourse to the Settlement Trust or the Reorganized Debtor, any Participating Third Party or any Settling Insurer and any such Disallowed portion of the Tort Claim of a Non-settling Tort Claimant will be discharged and released.

**8.    <ins>Class 12 - Penalty Claims.</ins>**

Class 12 Penalty Claims will include any fine, penalty, forfeiture, multiple damages, punitive damages, or exemplary damages not meant to compensate the claimant for actual pecuniary loss. No Penalty Claims will be Allowed and there will be no distribution to the holders of any Penalty Claims.

## VIII. Means For Execution of the Plan.

### A. Creation and Funding of the Settlement Trust and the Litigation Trust.

On or before the Effective Date (but after entry of the Confirmation Order), the Reorganized Debtor will, in full release, satisfaction and discharge of all Claims in Class 10 (Tort Claims) cause the following to occur:  (a) the execution and delivery of the Settlement Trust Agreement , if necessary, and the Litigation Trust Agreement, which will establish the Settlement Trust and the Litigation Trust; (b) the delivery of the initial funding necessary for the Diocese to meet its obligations under the Plan as of the Effective Date; and (c) the execution and delivery of any other agreements, assignments or commitments to carry out the terms of the Plan or the funding of the Settlement Trust or the Litigation Trust.  Any funds received from the Settling Insurers and Insurance Action Recoveries allocated to the Settlement Trust and, if necessary, the Litigation Trust received after the Effective Date will also be paid or distributed by the Debtor to the Trustee to be held and distributed in accordance with the Settlement Trust Agreement and the Litigation Trust Agreement, subject to the Sharing Arrangement.

The Trustee of the Settlement Trust and the Litigation Trust will assume full responsibility for resolving all Tort Claims pursuant to the Settlement Trust Agreement[25] and the Litigation Trust Agreement, as applicable; for making payments to the holders of Allowed Tort Claims that become Allowed under the conditions set forth in the Settlement Trust Agreement or the Litigation Trust Agreement; for collecting, investing and distributing funds for the benefit of the holders of Allowed Tort Claims; for fulfilling all other obligations under the Settlement Trust Agreement and the Litigation Trust Agreement; and for paying the costs and expenses of the Settlement Trust and the Litigation Trust, all set forth more fully in the Settlement Trust

---

[25]  The Special Arbitrator will actually hear and determine Allowance or Disallowance of Settling Tort Claims; however, the actual distribution will be done by the Trustee at the direction of the Special Arbitrator.

1  Agreement and the Litigation Trust Agreement. The Trust Administrative Expense Reserve will

2  be established by the Trustee for each of the Litigation Trust and the Settlement Trust and

3  maintained as determined by the Trustee.

4      **B.      Limitation of Funding.**

5          The Diocese and the Committee have agreed on the Sharing Arrangement whereby under

6  certain circumstances the Diocese will share in a percentage of the amounts to be distributed to

7  the Settling Tort Claimants. That Sharing Arrangement is set forth in the Plan. Any amounts

8  received by the Diocese will be used by the Diocese for Special Projects which will include

9  matters related the identification of sexual abuse, the training and education of employees of the

10 Diocese and other Catholic related entities within the territory of the Diocese regarding, among

11 other things, reporting requirements under applicable law of any acts of suspected sexual abuse,

12 dealing with victims of sexual abuse, establishing programs for the prevention of sexual abuse,

13 selection, education, screening, training and orientation of priests, teachers, deacons, volunteers

14 and other workers in the Diocese regardless of whether such individuals are directly employed by

15 or volunteer for the Diocese or employed or volunteer for any other Catholic related entities,

16 establishment of youth programs and the training and supervision of leaders for such programs,

17 counseling and other programs for the treatment of the effects of sexual abuse whether provided

18 directly by the Diocese, the VAP or some other entity or person, all costs associated with the

19 Office of Child, Adolescent and Adult Protection or such other similar entity established by the

20 Diocese and any other programs or activities related to the treatment of sex abuse victims and

21 programs related to the prevention of sexual abuse or any other programs which the Diocese

22 reasonably determines will assist it in preventing incidents of sexual abuse by clergy, other

23 workers or volunteers who work or volunteer in the Diocese and in other Catholic organizations

24 within the territory of the Diocese.

25

26

- 64 -

**C. Treatment of Executory Contracts.**

**1. Assumption and Rejection of Executory Contracts.**

On the Confirmation Date, except as otherwise provided herein, all Executory Contracts of the Debtor will be deemed rejected in accordance with the provisions and requirements of Bankruptcy Code §§ 365 and 1123 other than those Executory Contracts that: (a) have already been assumed by order of the Bankruptcy Court; (b) are subject to a motion to assume Executory Contracts that is pending on the Confirmation Date; or (c) are subject to a motion to reject an Executory Contract pursuant to which the requested effective date of such rejection is after the Confirmation Date. Approval of any motions to assume Executory Contracts pending on the Confirmation Date will be approved by the Bankruptcy Court on or after the Confirmation Date by a Final Order. Each Executory Contract assumed will revest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law. The Diocese leases its current space from the Catholic Foundation. The Diocese and the Catholic Foundation have been extending the time for the Diocese to assume or reject the lease pursuant to Bankruptcy Code § 365(d). The Diocese will file a motion to assume the lease prior to the hearing on confirmation of the Plan.

**2. Claims Based on Rejection of Executory Contracts.**

Every Claim asserted by a Creditor arising from the rejection of an Executory Contract pursuant to the Plan must be filed with the Bankruptcy Court no later than the first Business Day which is thirty (30) days after the Confirmation Date or the first Business Day that is thirty (30) days after entry of the Final Order of the Bankruptcy Court approving rejection if such Final Order is entered after the Confirmation Date. Every such Claim which is timely filed, as and when it becomes an Allowed Claim, will be treated under Class 7 of the Plan. Every such Claim which is not timely filed by the deadline stated above will be forever barred, unenforceable, and

discharged, and the Creditor holding the Claim will not receive or be entitled to any distribution under the Plan on account of such Claim.

**3.    Effect of Assumption of Executory Contracts.**

Any Executory Contracts assumed prior to the Effective Date, whether assumed prior to the Confirmation Date or as part of the confirmation process will be dealt with in accordance with the terms of the Executory Contract.

**D.    Funding on the Effective Date.**

All payments under the Plan which are due on the Effective Date will be funded from the Cash on hand, from the proceeds of the sale of the Diocese Real Property, from any contributions or settlements with any Participating Third Party and Settling Insurers and from other payments or contributions received by the Diocese for that purpose.

**E.    Funding After the Effective Date.**

The funds necessary to ensure continuing performance under the Plan after the Effective Date will be (or may be) obtained from any Cash retained by the Reorganized Debtor after the Effective Date; any Cash generated from the post-Effective Date operations of the Reorganized Debtor; and any other contributions or financing (if any) which the Reorganized Debtor may obtain on or after the Effective Date.  Funding after the Effective Date to the Settlement Trust will be from the Fund which will not be used for any purpose other than as specified in the Plan.

**F.    Procedure for Determination of Claims Other Than Tort Claims.**

(a)    Objections to Claims.  Notwithstanding the occurrence of the Effective Date, and except as to any Claim that has been Allowed prior to the Effective Date or any Tort Claim, the Reorganized Debtor may object to the allowance of any Claim against the Debtor or seek estimation thereof on any grounds permitted by the Bankruptcy Code by filing an objection within one hundred eighty (180) days after the Effective Date.

(b)    Disputed Claims.  No payments or other distributions will be made to holders of Claims unless and until such Claims are Allowed Claims pursuant to a Final Order.

- 66 -

(c)     <u>Treatment of Contingent Claims</u>.  Until such time as a Contingent Claim or a Contingent portion of an Allowed Claim becomes fixed or absolute or is Disallowed, such Claim will be treated as a Disputed Claim for all purposes related to distributions under the Plan.

**G.     <u>Payments Effective Upon Tender</u>.**

Whenever the Plan requires payment to be made, such payment will be deemed made and effective upon tender thereof by the Debtor or the Reorganized Debtor to the Creditor to whom payment is due.  If any Creditor refuses a tender, the amount tendered and refused will be held by the Debtor or the Reorganized Debtor for the benefit of that Creditor pending final adjudication of the dispute.  However, when and if the dispute is finally adjudicated and the Creditor receives the funds previously tendered and refused, the Creditor will be obliged to apply the funds in accordance with the Plan as of the date of the tender; and while the dispute is pending and after adjudication thereof, the Creditor will not have the right to claim interest or other charges or to exercise any other rights which would be enforceable by the Creditor if the Debtor or the Reorganized Debtor failed to pay the tendered payment.

**H.     <u>Preservation of Debtor's Claims, Demands, And Causes of Action</u>.**

All claims, demands, and causes of action of any kind or nature whatsoever held by, through, or on behalf of the Debtor and/or the Estate against any other Person, including but not limited to, all Avoidance Actions arising before the Effective Date and all Insurance Actions and which have not been resolved or disposed of prior to the Effective Date, are hereby preserved in full for the benefit of the Reorganized Debtor, except for such claims or causes of action, cross-claims, and counterclaims which have been released hereunder or pursuant to a Final Order prior to the Effective Date and except those that are transferred to the Trustee of the Settlement Trust or the Litigation Trust or to the Unknown Claims Representative.  To the extent necessary, the Reorganized Debtor is hereby designated as the estate representative pursuant to and in accordance with Bankruptcy Code § 1123(b)(3)(B).  Furthermore, in accordance with Bankruptcy

Code § 1123(b)(3), after the Effective Date, the Reorganized Debtor will own and retain, and may prosecute, enforce, compromise, settle, release, or otherwise dispose of, any and all claims, defenses, counterclaims, set offs, and recoupments belonging to the Debtor or its Estate. All defenses, counterclaims, Claims, and demands related to the Tort Claims are preserved and transferred to the Trustee of the Litigation Trust and the Settlement Trust in accordance with Bankruptcy Code § 1123(b). The Debtor and the Reorganized Debtor will also be entitled to assign their rights under the Plan. On the Effective Date, to the extent necessary, the Reorganized Debtor is hereby designated as the estate representative pursuant to and in accordance with Bankruptcy Code § 1123(b)(3)(B) with respect to the Insurance Actions. For any other provisions relating to the reservation of rights and preservation of claims, demands and causes of action, reference is made to the Plan.

**I.** **Special Provisions Governing Unimpaired Claims.**

Except as otherwise provided in the Plan, nothing will affect the Debtor's or the Reorganized Debtor's rights and defenses with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to or setoffs or recoupments against such Unimpaired Claims.

**J.** **Operative Documents.**

The Debtor will prepare any documents which the Debtor and the Reorganized Debtor deem are necessary or appropriate to execute the Plan or provided for under the Plan. If there is any dispute regarding the reasonableness or propriety of any such documents after reasonable and good faith efforts by the Debtor to negotiate and obtain approval of the documents by the other affected Person(s), any such dispute will be presented to the Bankruptcy Court for determination at or in conjunction with the Confirmation Hearing.

**K.** **Return of Deposits.**

To the extent that the Debtor was required to and did pay deposits to any Creditors after the Petition Date as a condition of or as security for continued service after the Petition Date,

- 68 -

1    then, upon satisfaction of the Claims of such Creditor(s) pursuant to the Plan, any such deposits,

2    together with any interest or other income earned thereon, if any, will be refunded to the

3    Reorganized Debtor within fifteen (15) days of demand by the Reorganized Debtor for return of

4    such deposit(s).

5           **L.**      **Administrative Claims Bar Date.**

6           All requests for payment of administrative costs and expenses incurred prior to the

7    Effective Date pursuant to Bankruptcy Code §§ 507(a)(1) and 503(b) will be served and filed

8    with the Bankruptcy Court no later than thirty (30) days after the Effective Date.  Any such Claim

9    which is not served and filed within this time period will be forever barred.  Any Claims for fees,

10    costs, and expenses incurred by any Chapter 11 Professionals after the Effective Date will be

11    treated as part of the fees and expenses of the Reorganized Debtor and need not be submitted to

12    the Bankruptcy Court for approval.  After approval of the final fee applications of the Chapter 11

13    Professionals by the Bankruptcy Court for services provided and costs incurred during the course

14    of administration of the Reorganization Case and prior to the Effective Date, the Chapter 11

15    Professionals will not be required to submit any further fee applications to the Bankruptcy Court

16    in accordance with Bankruptcy Code § 330.

17           **M.**      **Delivery Of Distributions.**

18           Distributions will be made by the Debtor or the Reorganized Debtor with respect to all

19    Claims other than Tort Claims[26] as follows:

20                 (a)      At the addresses set forth in the proofs of Claim filed by holders of

21    Claims (or the last known addresses of such holders if no proof of Claim is filed or if the Debtor

22    or the Reorganized Debtor has not been notified of a change of address);

23

24

---

[26]  Distributions to Tort Claimants will be pursuant to the terms of the Litigation Trust Agreement or the Settlement Trust Agreement although the procedures may be similar or the same as the procedures set forth above.

25

26

(b)     At the addresses set forth in written notices of address change delivered to the Debtor or the Reorganized Debtor after the date of any related proof of Claim;

(c)     At the addresses reflected in the Schedules if no proof of Claim has been filed and the Debtor or the Reorganized Debtor has not received a written notice of change of address; or

(d)     If any distribution to a holder of an Allowed Claim is returned as undeliverable, no further distributions to such holder will be made unless and until the Debtor or the Reorganized Debtor is notified of such holder's then-current address, at which time all missed distributions will be made to the holder without interest.

All claims for undeliverable or uncashed distributions must be made on or before the first (1st) anniversary of the date applicable to such distribution, or with respect to the a final distribution to a Creditor holding an Allowed Claim, within ninety (90) days thereof.  After such date, all such unclaimed property will revert to the Reorganized Debtor for further distribution in accordance with the Plan, and the Claim of any holder or successor to such holder with respect to such property will be discharged and forever barred, notwithstanding any federal or state escheat law to the contrary.

**N.     Limitation on De Minimis Payments.**

The Debtor or the Reorganized Debtor will make no distributions of less than $50 to any Creditor holding an Allowed Claim.  If a Creditor holding an Allowed Claim does not receive a distribution due to the provisions of this Section on any date on which is a distribution is to be made to Creditors in the same Class as the Creditor being entitled to such de minimis payment, then the Claim (so long as it is an Allowed Claim) will remain eligible for distributions on any subsequent distribution date, subject to the provisions of this Section.  In all events, the Creditor holding an Allowed Claim which has not received a distribution on any previous distribution dates because of this provision, will receive such distribution on the date that final distribution is made to Creditors in the same Class as the Creditor being entitled to such de minimis payment.

**IX. CONDITIONS TO EFFECTIVE DATE.**

    **A. Conditions To Occurrence Of Effective Date.**

Each of the following are conditions to the Effective Date, which conditions must be satisfied or waived by the Debtor.

    (a) The Confirmation Order has been entered by the Bankruptcy Court and the Confirmation Order has become a Final Order.

    (b) The Confirmation Order is in form and substance satisfactory to the Debtor.

    (c) All actions, documents, and agreements necessary to implement the Plan will have been effected or executed.

    **B. Debtor's Obligations to Cause Effective Date to Occur.**

Upon satisfaction of the conditions to the Effective Date, the Reorganized Debtor shall pay or make provision for the prompt payment to holders of Allowed Claims to whom payments, pursuant to the Plan, are to be made on the Effective Date. The Reorganized Debtor will also make the transfers required to be made to the Settlement Trust and the Litigation Trust unless such transfers have occurred prior to the Effective Date, and such transfers will be in full release and complete satisfaction and discharge of the Tort Claims.

    **C. Waiver Of Conditions.**

The Debtor, in its sole discretion, may waive any of the conditions to the occurrence of the Effective Date including waiver of the Final Order condition any time from and after the Confirmation Date. In that event, the Debtor will be entitled to render any or all of its performance under the Plan prior to what otherwise would be the Effective Date if the above-referenced conditions were not waived, including, but not limited to, the right to perform under any circumstances which would moot any appeal, review, or other challenge of any kind to the Confirmation Order if the Confirmation Order is not stayed pending such appeal, review, or other challenge.

- 71 -

**D.** **Effect of Non-occurrence of Conditions.**

If the consummation of the Plan does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or this Disclosure Statement will: (a) constitute a waiver or release of any Claims by or against the Debtor; (b) prejudice in any manner the rights of the Debtor; or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtor in any respect.

**E.** **Merger; Choice of Law.**

All obligations of the Debtor to all Claimants will be merged into the Plan and the documents executed by the Reorganized Debtor at Closing and delivered to the respective affected Claimants. All such obligations of the Reorganized Debtor will be evidenced by the Plan and such executed and delivered documents. Unless otherwise provided therein, such documents will be governed by and construed in accordance with Arizona law.

**F.** **Other Obligations of the Reorganized Debtor.**

The Reorganized Debtor will review all Claims other than Tort Claims filed against the estate and, if warranted, object to Claims within the time period provided in the Plan; and perform all of its obligations under the Plan Documents, including, without limitation, those obligations provided in the Settlement Trust Agreement and the Litigation Trust Agreement.

**G.** **Modifications To Plan.**

The Plan may be modified by the Debtor or the Reorganized Debtor (as applicable) subject to and in accordance with the provisions and requirements of Bankruptcy Code § 1127.

**X.** **EFFECT OF CONFIRMATION.**

**A.** **Discharge.**

Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date the Debtor will be discharged from and its liability shall be extinguished completely in respect of any Claim and Debt, whether reduced to judgment or not, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, fixed or not, matured or

- 72 -

Case 4:04-bk-04721-BMW  Doc 401   Filed 05/26/05   Entered 05/26/05 23:38:07   Desc
Main Document    Page 78 of 96

1    unmatured, disputed or undisputed, legal or equitable, known or unknown, that arose from any

2    agreement of the Debtor entered into or obligation of the Debtor incurred before the Confirmation

3    Date, or from any  conduct of the Debtor prior to the Confirmation Date, or that otherwise arose

4    before the Confirmation Date, including, without limitation, all interest, if any, on any such

5    Claims and Debts, whether such interest accrued before or after the date of commen cement of the

6    Case, and including, without limitation, all Claims and Debts based upon or arising out of Tort

7    Claims, Relationship Tort Claims, Unknown Tort Claims, and from any liability of the kind

8    specified in Bankruptcy Code §§ 502(g), 502(h), and 502(  i), whether or not a proof of claim is

9    filed or is deemed filed under Bankruptcy Code § 501, such Claim is Allowed under Bankruptcy

10   Code § 502, or the holder of such Claim has accepted this Plan.

11          **B.       <u>Vesting</u>.**

12          Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the

13   Effective Date the Reorganized Debtor shall be vested with all of the property of the Estate free

14   and clear of all Claims, Liens, encumbrances, charges and other interests of Creditors, and will

15   thereafter hold, use, dispose or otherwise deal with such property and operate its business free of

16   any restrictions imposed by the Bankruptcy Code or by the Court.  All Debtor Actions and,

17   except to the extent the same are transferred to the Settlement Trust or the Litigation Trust, all

18   Insurance Actions are hereby preserved for the benefit of the Reorganized Debtor under the

19   respective trust agreements, the proceeds of which shall be used, as necessary for funding

20   obligations to either the Settlement Trust or the Litigation Trust, except as otherwise provided in

21   the Plan, the settlements approved by prior order of the Court or approved by the Court in

22   connection with confirmation of the Plan.  Prosecution and settlement of the Debtor Actions and

23   the retained interest in any Insurance Actions shall be the exclusive responsibility of the

24   Reorganized Debtor. The Reorganized Debtor shall have sole and absolute discretion over

25   whether to prosecute or settle such causes of action.

26

**C.** **Exculpation And Limitation Of Liability.**

Neither the Debtor, the Reorganized Debtor, the Committee, the Unknown Claims Representative, the Guardian ad Litem nor any of their respective present or former members, managers, officers, directors, employees, advisors, attorneys, or agents acting in such capacity (the "Released Parties") will have or incur any liability to, or be subject to any right of action by, any holder of a Claim or any other party in interest or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Reorganization Case, the pursuit of confirmation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct; and in all respects such parties will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan or in the context of the Reorganization Case.

**D.** **Permanent Injunction Against Prosecution of Released Claims and Channeled Claims Against Participating Third Parties and Settling Insurers.**

Except as otherwise expressly provided in the Plan, for the consideration described in the Plan, on the Effective Date all Persons who have held, hold, or may hold Channeled Claims or Claims against the Diocese or any claims against any Released Parties, whether known or unknown, and their respective agents, attorneys, and all others acting for or on their behalf, shall be permanently enjoined on and after the Effective Date from: (a) commencing or continuing in any manner, any action or any other proceeding of any kind with respect to any Claim against the Parties, the Diocese, the Reorganized Debtor, the Settlement Trust, the Litigation Trust, the Trustee, and his respective predecessors, successors, officials, shareholders subsidiaries, divisions, affiliates, representatives, attorneys, merged or acquired companies or operations or assigns (collectively, the "Parties") or the property of the Parties; (b) seeking the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree, or order against the Parties or the property of the Parties, with respect to any discharged Claim or

- 74 -

Channeled Claim; (c) creating, perfecting, or enforcing any encumbrance of any kind against the Parties or the property of the Parties with respect to any discharged Claim or Channeled Claim; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due to the Parties with respect to any discharged Claim or Channeled Claim; and (e) taking any act, in any manner and in any place whatsoever, that does not conform to or comply with provisions of the Plan, the Settlement Trust Agreement or the Litigation Trust Agreement. Notwithstanding, such provisions in the Plan, each Non-Settling Tort Claimant will be entitled to continue or commence an action against the Trustee of the Litigation Trust (in his capacity as Trustee only and not in his individual capacity) in which the Non-Settling Tort Claimant will be entitled to a jury trial for the sole purpose of obtaining a judgment as permitted by the Litigation Trust Agreement, thereby liquidating such Non-Settling Tort Claimant's Claim so that it may be paid with other Allowed Tort Claims in the ordinary course of the operations of the Litigation Trust, consistent with the provisions of the Litigation Trust Agreement. The holder of any such judgment will be enjoined from executing against the Litigation Trust or its assets. In the event any Person takes any action that is prohibited by, or is otherwise inconsistent with the provisions the Plan related to the release, discharge and injunction, then, upon notice to the Court by an affected Party, the action or proceeding in which the Claim of such Person is asserted will automatically be transferred to the Court (or, as applicable, the District Court) for enforcement.

The discharge and injunction provisions of the Plan are integral parts of the Plan.

## XI. RETENTION OF JURISDICTION.

Notwithstanding confirmation of the Plan and the occurrence of the Effective Date, the Bankruptcy Court will retain jurisdiction for the following purposes specifically described in the Plan which include, but are not limited to:[27] (i) determine the allowance and payment of any

---

[27] However, the continuing and retained jurisdiction of the Court is limited so that any internal disputes between a Parish and the Diocese or any other entity whose dispute should be determined in a church tribunal or in accordance with Canon Law, will be determined in such tribunal and not in the Bankruptcy Court.

Claims upon any objections thereto (or other appropriate proceedings) other than Tort Claims unless specifically provided for in the Settlement Trust or the Litigation Trust; (ii) determine objections of the Committee or the Reorganized Debtor to the determination by the Special Arbitrator of the Allowance of a Tort Claim or the Tier placement of an Allowed Tort Claim; (iii) determine any dispute which may arise regarding the interpretation of any provision of the Plan; (iv) enforce any provisions of the Plan and any and all documents relating to the Plan; (v) determine any matter relating to the implementation, effectuation, and/or consummation of the Plan as expressly provided in any provision of the Plan; (vi) facilitate the performance of the Plan by entering, consistent with the provisions of the Plan, any further necessary or appropriate order regarding enforcement of the Plan; (vii) facilitate or implement the allowance, disallowance, treatment, or satisfaction of any Claim, or any portion thereof; (viii) adjudicate any dispute or to hear and determine any action taken, proposed, or threatened by any state, federal, or local governmental regulatory agency or unit having or asserting jurisdiction or power over the conduct of the business of the Debtor and/or the Reorganized Debtor; (ix) enter an appropriate final decree in the Bankruptcy Case; (x) implement and enforce the Confirmation Order and the Plan according to their terms; (xi) determine any and all motions regarding assumption or rejection of Executory Contracts and any and all Claims arising therefrom; (xii) hear and determine any claim or cause of action by or against the Debtor; the Debtor's officers, directors, and employees; the Chapter 11 Professionals; and the Reorganized Debtor; (xiii) adjudicate any causes of action or other proceeding currently pending or otherwise referenced here or elsewhere in the Plan, including, but not limited to, the adjudication of the Avoidance Actions and any and all "core proceedings" under 28 U.S.C. §157(b) which may be pertinent to the Reorganization Case and which the Debtor or the Reorganized Debtor may deem appropriate to initiate and prosecute before the Court in aid of the implementation of the Plan; and (xiv) modify the Plan pursuant to the provisions of the Plan.

If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction or is otherwise without jurisdiction over any matter arising out of the Reorganization Case, the provisions regarding retention of jurisdiction by the Bankruptcy Court will not diminish, control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## XII. GENERAL PROVISIONS.

### A. Extension Of Payment Dates.

If any payment date falls due on any day which is not a Business Day, then such due date will be extended to the next Business Day.

### B. Notices.

Any notice required or permitted to be provided under the Plan will be in writing and served by regular first class mail, overnight delivery, or hand-delivery.

### C. Closing of the Case.

At such time as the Plan has been fully administered and/or the Plan has been substantially consummated, the Reorganized Debtor will file an application for Final Order showing that the Plan has been substantially consummated. The Reorganized Debtor will file an application for Final Order upon notice to only those Creditors, holders of Interests, and parties that, after the Effective Date, have specifically requested, after which an order approving the Reorganized Debtor's final report and closing the Reorganization Case may be entered.

### D. Interest.

Whenever interest is to be computed under the Plan, interest will be simple interest and not compounded.

### E. Additional Assurances.

The Debtor, the Reorganized Debtor, and the Creditors holding Claims herein will execute such other further documents as are necessary to implement any of the provisions of the Plan.

**F.    Confirmation By Nonacceptance Method.**

The Debtor has requested, as part of the Plan, confirmation of the Plan pursuant to Bankruptcy Code § 1129(b) with respect to any impaired Class of Claims which does not vote to accept the Plan.

**G.    Withdrawal Of Plan.**

The Plan may be withdrawn or revoked prior to entry of the Confirmation Order.

**H.    Severability And Reformation.**

It is the Debtor's intention to comply fully with the Bankruptcy Code and applicable nonbankruptcy law in proposing the Plan.  Therefore, if any provision of the Plan is determined by the Bankruptcy Court to be contrary to the Bankruptcy Code or applicable nonbankruptcy law, that provision will be deemed severed and automatically deleted from the Plan, if it cannot be reformed or the provision or its interpretation will be deemed reformed to ensure compliance; provided, however, that nothing contained in this Section will prevent the Debtor from modifying the Plan in any manner whatsoever in accordance with and as set forth in the Plan.  Pursuant to any ruling by the Bankruptcy Court regarding the subject matter of this Section, any such severance or reformation will be stated specifically in the Confirmation Order, which then will control notwithstanding any contrary or inconsistent provisions of the Plan.

**I.    Prohibition Against Prepayment Penalties.**

If the Debtor or the Reorganized Debtor chooses, in its sole and absolute discretion, to prepay any obligation on which deferred payments are provided for under the Plan, the Debtor or the Reorganized Debtor will not be liable or subject to the assessment of any prepayment penalty thereon unless otherwise ordered by the Bankruptcy Court.

**J.    Fractional Dollars.**

Notwithstanding any other provision of the Plan, no payments or distributions under the Plan of or on account of fractions of dollars will be made.  When any payment or distribution of or on account of a fraction of a dollar to any holder of an Allowed Claim would otherwise be

1    required, the actual payment or distribution made will reflect a rounding of such fraction to the
2    nearest whole number (up or down).

3         **K.**      <u>**Payment Of Statutory Fees And Filing of Quarterly Reports**</u>.

4         All fees payable pursuant to Section 1980 of Title 28 of the United States Code, 28 U.S.C.
5    § 1980, as determined by the Bankruptcy Court at or in conjunction with the Confirmation
6    Hearing, will be paid on or before the Effective Date and, thereafter, in accordance with
7    applicable bankruptcy law. All quarterly reports of disbursements required to be filed by
8    applicable bankruptcy law will be filed in accordance with applicable bankruptcy law.

9         **L.**      <u>**Reservation of Rights**</u>.

10         Except as expressly provided in the Plan and this Disclosure Statement, the Plan will have
11    no force or effect unless the Confirmation Order is entered by the Bankruptcy Court and the
12    Effective Date has occurred. None of the filing of the Plan, any statement or provision contained
13    in the Plan or in this Disclosure Statement, or the taking of any action by the Debtor with respect
14    to the Plan will be or will be deemed to be an admission or waiver of any rights of the Debtor
15    with respect to the holders of Claims prior to the Effective Date.

16         **M.**      <u>**No Professional Fees or Expenses**</u>.

17         No professional fees or expenses will be paid by the Debtor or the Reorganized Debtor
18    with respect to any Claim except as specified in the Plan or as Allowed by Final Order of the
19    Court.

20         **N.**      <u>**Continuation of Committee and Release of Unknown Claim**</u>
21                    <u>**Representative and Guardian ad Litem**</u>.

22         Upon the occurrence of the Effective Date, the Committee will continue for purposes
23    specified in the Plan. Except with respect to certain provisions contained in the Plan regarding
24    the Unknown Claims Reserve and any assigned Avoidance Actions, the Unknown Claims
25    Representative and the Guardian ad Litem will be released from all rights and duties arising from
26    or related to the Reorganization Case.

**O.    Section 1146 Exemption.**

Pursuant to Bankruptcy Code § 1146(c), any transfers of property pursuant hereto will not be subject to any document, recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment in the United States, and the confirmation Order will direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**P.    Successors and Assigns.**

The rights, benefits and obligations of any Person named or referred to in the Plan will be binding upon, and will insure to the benefit of, the heir, executor, administrator, successor or assign of such Person.

**XIII.    POST-CONFIRMATION MANAGEMENT AND REORGANIZED DEBTOR.**

**1.    The Diocese.**

The administration of the Reorganized Debtor will continue with the same offices and individuals in those offices as identified in Section IV.B. above.

Bishop Kicanas became Bishop of Tucson on March 7, 2003. He was born in Chicago and was ordained a priest for the Archdiocese of Chicago on April 27, 1967. Bishop Kicanas served in various capacities in the Archdiocese's seminary system for over 25 years. In 1984, he was appointed Rector of Mundelein Seminary at the University of St. Mary of the Lake, Mundelein, Illinois, which is the Theologate graduate level seminary of the Archdiocese. Concurrently, he served as a Lecturer in Community and Organization Development at Loyola University. Bishop Kicanas has a Ph.D. in Educational Psychology, a M.Ed. in Guidance and Counseling from Loyola University, and a Licentiate in Sacred Theology from St. Mary of the Lake Seminary, Mundelein, IL.

- 80 -

# XIV. FEDERAL TAX CONSEQUENCES.

THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN. ACCORDINGLY, ALL HOLDERS OF CLAIMS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS WITH SPECIFIC REFERENCE TO THE FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO SUCH HOLDER. NEITHER THE DEBTOR NOR DEBTOR'S COUNSEL MAKES ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO THE DEBTOR OR ANY CREDITOR.

Under the Internal Revenue Code of 1986, as amended (the "Code"), there may be significant federal income tax issues arising under the Plan described in this Disclosure Statement that affect Creditors in the case.

The Settlement Trust and the Litigation Trust is each a "qualified settlement fund" ("QSF") with in the meaning Treasury Regulations enacted under Internal Revenue Code Section 486B(g). Each Trust is characterized as a QSF because:

1. The Trust is established pursuant to an order of, or is approved by, the United States, any state or political subdivision thereof, or any agency or instrumentality (including a court of law) of any of the foregoing and is subject to the continuing jurisdiction of that governmental authority;

2. The Trust is established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event that has occurred and that has given rise to at least one claim asserting liability arising out of, among other things, a tort, breach of contract, or violation of law (but excluding non-tort obligations of the Diocese to make payments to its general trade creditors or debt holders that relates to: a case under Title 11 of United States Code, a receivership, foreclosure of similar proceeding in a Federal or State court, or a workout); and

3.    The Trust is a trust under state law.[28]

The primary tax consequences of the Trust being characterized as a QSF are the following:

1.    The Trust must use a calendar taxable year and the accrual method of accounting.

2.    If the Diocese funds the Trust with appreciated property, the Diocese is deemed to sell the property to the Trust. Accordingly, any gain or loss from the deemed sale must be reported by the Diocese.

3.    The Trust takes a fair market value basis in property contributed to it by the Diocese.

4.    The Trust's gross income less certain modifications is taxable at the highest federal tax rate applicable to trusts and estates (currently 35%). The Diocese's funding of the Trust with cash and other property is not reported by the Trust as taxable income. However, earnings recognized from, for example, the short-term investment of the Trust's funds will be subject to tax. The Committee and the Debtor are in discussions as to any limitations on investments that might mitigate the tax rate applied to the Trust.

5.    The Trust may deduct from its gross income a limited number of administrative expenses; the Trust is not entitled to deduct distributions paid to its beneficiaries.

6.    The Trust will have a separate taxpayer identification number and will be required to file annual tax returns (which are due on March 15). The Trust will also be required to comply with a number of other administrative tax rules including filing information returns (generally IRS Form 1099) when approved payments are made to claimants.

---

[28] Treas. Reg. 1.468B-1(c)

1      It is not practicable to present a detailed explanation of every possible federal income tax

2 ramifications of the Plan.

3 **XV.**    **ACCEPTANCE AND CONFIRMATION.**

4     **A.**    **Voting Procedures.**

5         **1.**    **Generally.**

6       Only those Classes that are impaired under the Plan are entitled to vote to accept or reject

7 the Plan. The Diocese reserves the right to supplement this Disclosure Statement (if necessary)

8 and to solicit any of those Classes which may prove to be impaired or unimpaired, as the

9 Reorganization Case develops further.

10       Separate ballots will be sent to the known holders of Claims whether or not such Claims

11 are disputed. The Court has been asked to provide a mechanism for estimating Tort Claims for

12 **voting purposes only.** In addition, only the holders of Allowed Claims (or Claims that have been

13 temporarily allowed or have been estimated by the Bankruptcy Court) which are impaired are

14 entitled to vote on the Plan. A Claim to which an objection has been filed is not an Allowed

15 Claim unless and until the Bankruptcy Court rules on the objection and any appeals are

16 determined, unless the Bankruptcy Court determines otherwise. The holders of such Disputed

17 Claims are not entitled to vote on the Plan unless they request that the Bankruptcy Court, pursuant

18 to Bankruptcy Rule 3018, temporarily allow the Claims in appropriate amounts solely for the

19 purpose of enabling the holders of such Disputed Claims to vote on the Plan, and the Bankruptcy

20 Court does so.

21         **2.**    **Incomplete Ballots.**

22       Ballots which are signed, dated, and timely received, but on which a vote to accept or

23 reject the Plan has not been indicated, will not be counted as a vote either to accept or to reject the

24 Plan or as a vote cast with respect to the Plan.

25

26

**3.     Withdrawal Of Ballots; Revocation.**

Any Creditor holding an impaired Allowed Claim which has delivered a Ballot accepting or rejecting the Plan, opting out of the Settlement Trust, or electing to participate as a Tort Compromise Claim, may withdraw such acceptance or rejection or election by delivering a written notice of withdrawal to the Diocese at any time prior to the voting deadline.  A notice of withdrawal, to be valid, must: (i) contain the description of the Claim to which it relates and the amount of such Claim; (ii) be signed by the voting Creditor, in the same manner as the Ballot; and (iii) be received by the Diocese in a timely manner at the address set forth below.  Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of Ballots or change in the Claimants election to opt out of the Settlement Trust which is not received in a timely manner will not be effective to withdraw a previously furnished Ballot.

**4.     Submission Of Ballots.**

The form of Ballot for each of the Classes entitled to vote on the Plan will be sent to all Creditors along with a copy of the Court-approved Disclosure Statement and a copy of the Plan. Creditors should read the Ballot carefully.  The Bankruptcy Court has approved the form of Ballot to be submitted to the holders of Tort Claims.  If any Creditor has any questions concerning voting procedures, it may contact:

> QUARLES & BRADY STREICH LANG LLP
> One South Church Avenue, Suite 1700
> Tucson, AZ 85701
> (520) 770-8700
> Attention: Suzanne Utter

Ballot(s) or withdrawals/revocations or changes of election thereof must be returned to the above counsel for the Diocese.  Ballots (and withdrawals/revocations and changes of elections of Ballots) must be postmarked no later than _____, 2005.  In addition, Ballots may be faxed, Attention: Suzanne Utter, (520) 770-2228.  To be effective, transmission of the facsimile must begin no later than 5:00 P.M. on _____, 2005.

1    In addition, the Bankruptcy Court will hold a hearing on confirmation of the Plan

2    commencing on _____, 2005 at _____ a.m./p.m. in the Bankruptcy Courtroom

3    No. 446, 4th Floor, 38 South Scott Avenue, Tucson Arizona 85701.  All objection(s), if any, to the

4    confirmation of the Plan must be in writing; must state with specificity the grounds for any such

5    objections); and must be filed with the Bankruptcy Court and served upon counsel for the Diocese

6    at the following address on or before July 1, 2005:

7            QUARLES & BRADY STREICH LANG LLP
             One South Church Avenue Suite 1700
8            Tucson, Arizona 85701
             (520) 770-8700
9            Attention: Kasey C. Nye, Esq.

10   **B.     <u>Feasibility.</u>**

11   The Bankruptcy Code requires, as a condition to confirmation, that the Bankruptcy Court

12   find that liquidation of the Diocese or the need for future reorganization is not likely to follow

13   after confirmation.  For the purpose of determining whether the Plan meets this requirement, the

14   Reorganized Debtor's ability to meet its obligations under the Plan has been analyzed.   As

15   discussed previously, the Diocese has prepared projections of the cash flow for the Diocese's

16   businesses.  The projections were prepared by Keegan, Linscott & Kenon and are attached as

17   Exhibit "10" to this Disclosure Statement.  The Diocese reasonably believes that the Debtor will

18   be able to fund the Plan on the Effective Date and the Reorganized Debtor will be able to make

19   all payments required to be made pursuant to the Plan.

20   **C.     <u>Best Interests Of Creditors And Liquidation Analysis.</u>**

21   Under Bankruptcy Code § 1129(a)(7), the Plan must provide that Creditors receive as

22   much or more under the Plan than they would receive in a Chapter 7 liquidation of the Diocese.

23   This analysis is unusually hypothetical in this case, because, as a non profit entity, the Diocese's

24   Reorganization Case cannot be converted to a Chapter 7 without the Diocese's consent under

25   11 U.S.C. § 1112(c)(disallowing conversion of chapter 11 cases where the debtors is "not a

26

moneyed corporation"). The Diocese submits that the best interest of creditors test in this context is akin to that of a Chapter 9 proceeding.

> While the best interests of the creditors test is an elusive standard in Chapter 9] nevertheless the concept is not without meaning.... The concept should be interpreted to mean that the plan must be better than the alternative that creditors have. In the chapter 9 context, the alternative is dismissal of the case, permitting every creditor to fend for itself in the race to obtain the mandamus remedy and to collect the proceeds.... [The courts] must apply **the test to require a reasonable effort by the municipal debtor that is a better alternative to the creditors than dismissal of the case**.

In re County of Orange, 191 B.R. 1005, 1020 (Bankr. C.D. Ca. 1996)(quoting 4 Collier on Bankruptcy, 943.03(7) (15th ed. 1995)(emphasis added by Judge Ryan). Accordingly, it is the Diocese's position that the best interest of creditors standard be applied to compare this Plan to the true alternative of dismissal and a race to the courthouse which greatly benefits the first to sue over the claims of others. Nevertheless in a hypothetical liquidation, the Diocese asserts that all Creditors will receive more under the Plan than they would in a liquidation. In a liquidation, not only would the assets subject to restriction be in dispute, but the Participating Third Parties and Settling Insurers would not voluntarily contribute without the corresponding benefit of putting these claims behind them.

Notwithstanding the position of the Diocese regarding the application of the best interests of creditors test to a non-profit entity such as the Diocese, attached hereto as Exhibit "11" is a liquidation analysis. As is evident from Exhibit "11", even under a traditional liquidation analysis, Creditors will receive not less under the Plan than they would receive in a hypothetical Chapter 7. The liquidation value of the Property[29] is estimated to be less than $4,000,000 which is substantially less than all unsecured creditors, including Tort Claimants, will receive under the Plan.

---

[29] This is an amount which would be available to distribution to all Unsecured Creditors which include the General Unsecured Creditors and the Tort Claimants.

- 86 -

**D.     Confirmation Over Dissenting Class.**

In the event that any impaired Class of Claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the request of the Diocese if all other requirements under Bankruptcy Code § 1129(a) are satisfied, and if, as to each impaired Class which has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such non-accepting Classes.    Each of these requirements is discussed below.

**1.     No unfair discrimination.**

The Plan "does not discriminate unfairly" if: (a) the legal rights of a dissenting Class are treated in a manner that is consistent with the treatment of other Classes whose legal rights are similar to those of the dissenting Class; and (b) no Class receives payments in excess of those which it is legally entitled to receive for its Claims.  The Diocese believes that under the Plan: (i) all Classes of impaired Claims are treated in a manner that is consistent with the treatment of other similar Classes of Claims; and (ii) no Class of Claims will receive payments or property with an aggregate value greater than the aggregate of the Allowed Claims in such Class. Accordingly, the Diocese believes that the Plan does not discriminate unfairly as to any impaired Class of Claims.

**2.     Fair and Equitable Test.**

The Bankruptcy Code establishes different "fair and equitable" tests for Secured Claims, Unsecured Claims, and holders of Equity Interests, as follows:

(a)     Secured Creditors.  Either: (i) each impaired Secured Creditor retains its liens securing a Secured Claim and receives on account of its Secured Claim deferred cash payments having a present value equal to the amount of its Allowed Secured Claim; (ii) each impaired Secured Creditor realizes the "indubitable equivalent" of its Allowed Secured Claim; or (iii) the property securing the Claim is sold free and clear of liens with such liens to attach to the

- 87 -

proceeds, and the liens against such proceeds are treated in accordance with clause (i) or (ii) of this subparagraph (a).

(b)    <u>Unsecured Creditors</u>.  Each impaired unsecured Creditor receives or retains under the Plan property of a value equal to the amount of its Allowed Claim.  There is no absolute priority rule issue in this case because there are no interests or junior creditors; or the holders of Claims and Equity Interests that are junior to the Claims of the non-accepting Class do not receive any property under the Plan on account of such Claims and Equity Interests.

(c)    <u>Equity Interests</u>.  Either: (i) each holder will receive or retain under the Plan property of a value equal to or greater than (A) the fixed liquidation preference or redemption price, if any, of such interest or (B) the value of such interest; or (ii) the holders of interests that are junior to the non-accepting Class will not receive any property under the Plan. The Diocese believes that the Plan satisfies the "fair and equitable" test with respect to all impaired Classes.

As with the best interests of creditors test, the fair and equitable test is applied differently in the Reorganization Case than in most reorganization cases because the Diocese is not a moneyed corporation.  This is the case because the members of a non-profit, in this case, the Bishop, have no personal interest in the property of the corporation.  Accordingly, there is effectively no equity interest in the Diocese.  Accordingly, what is commonly referred to as the "absolute priority rule" embodied by Bankruptcy Code § 1129(b)(2)(B) does not prevent the Diocese from continuing to operate.

## XVI.    <u>ALTERNATIVES TO THE PLAN</u>.

If the Plan is not confirmed, several different events could occur: (1) the Debtor could propose another plan providing for different treatment of certain Creditors; or (2) the Bankruptcy Court (after appropriate notice and hearing) could dismiss the Reorganization Case if the Debtor is unable to confirm an alternative plan in a reasonable period of time.

- 88 -

1    **XVII.   RECOMMENDATIONS OF THE DEBTOR AND CONCLUSION.**

2           The Diocese recommends that all Creditors vote to accept the Plan.  The Diocese believes

3    that the Plan provides the best possible return to Creditors under the circumstances.

1

2      DATED: May 25, 2005

3

4                              THE ROMAN CATHOLIC CHURCH
                               OF THE DIOCESE OF TUCSON, an
5                              Arizona corporation sole

6

7      By  _+ Gerald Kicanas_____
                     The Most Reverend Gerald F. Kicanas, DD
8                    Bishop of the Roman Catholic Church of the
                     Diocese of Tucson

9

10     Prepared and Submitted By:

11

12     QUARLES & BRADY STREICH LANG LLP
       One South Church Avenue
13     Suite 1700
       Tucson, AZ 85701-1621

14

15

16     By _Susan G. Boswell_____
             Susan G. Boswell
             Kasey C. Nye
17

18     Attorneys for Debtor
       The Roman Catholic Church of the Diocese of
19     Tucson

20

21

22

23

24

25

26